United States District Court
Southern District of Texas
FILED

MAY 2 0 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | District Court Civil Case # B-02-074 |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | In Chapter 11 |
|    Debtor | |
| Colin Kelly KAUFMAN, Appellant | Appeal No. 02-05 |
| | |
| vs. | and |
| | |
| CKS ASSET MANAGEMENT, INC. & | Appeal No. 02-06 |
| Michael BOUDLOCHE, Appellees | |

Font: Korinna

REPLY BRIEF ON APPEAL
OF DOCKET NUMBERS 469 & 470 OF
APPELLANT COLIN KELLY KAUFMAN

Respectfully Submitted by:

Colin Kelly Kaufman, Attorney at Law
1106 Third Street 78404-2312
P.O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone (361) 888-8865
Telecopier (361) 888-8172

email address: colinkkk@yahoo.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | District Court Civil Case # B-02-073 |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | In Chapter 11 |
| Debtor | |
| Colin Kelly KAUFMAN, Appellant | Appeal No. 02-05 |
| | and |
| vs. | Appeal No. 02-06 |
| | |
| CKS ASSET MANAGEMENT, INC. & | |
| Michael BOUDLOCHE, Appellees | |

Table of Contents of Appellant Colin Kelly Kaufman's
Reply Brief on Appeal of Docket Numbers 469 & 470

Table of Cases and Authorities......................................................................i

Table of Statutes and Rules........................................................................iv

I. Reply Issues Presented...........................................................................1

    A. Mistakes.........................................................................................1
        1. Court Approval.............................................................................1
            (a). Pre-Confirmation...............................................................1
            (b). First Accounting................................................................1
        2. Delegating Duties.........................................................................1
            (a). Court Order Effect............................................................1
            (b). Rule of Supervision..........................................................1
    B. Still Claiming a Duty to Do the Impossible.............................................1
        1. Distributions Impossible.................................................................1
        2. CKS Asked for More than It Was Entitled to.......................................2
        3. Can't Ask a Useless Act.................................................................2
        4 . Other Data Impossible..................................................................2
    C. Taxman Is Not the Answer....................................................................2
    D. Arguments for the First Time on Appeal?.................................................2
        1. Good Faith Raised Below.................................................................2
        2. Res Judicata Raised Below...............................................................2
        3. Estoppel and Quasi Estoppel Were Raised Below..................................2
        4. Not Appellant Who Kept Raising the New Issues...................................2
        5. Standard to Raise in Trial Court........................................................2
        6. Appellee's Error............................................................................2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | District Court Civil Case # B-02-074 |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | In Chapter 11 |
|    Debtor | |
| Colin Kelly KAUFMAN, Appellant | Appeal No. 02-05 |
| | and |
| vs. | Appeal No. 02-06 |
| | |
| CKS ASSET MANAGEMENT, INC. & | |
| Michael BOUDLOCHE, Appellees | |

Table of Contents of Appellant Colin Kelly Kaufman's
Reply Brief on Appeal of Docket Numbers 469 & 470

Table of Cases and Authorities................................................................i

Table of Statutes and Rules.................................................................iv

I. Reply Issues Presented....................................................................1

   A. Mistakes.................................................................................1
      1. Court Approval.....................................................................1
         (a). Pre-Confirmation..........................................................1
         (b). First Accounting...........................................................1
      2. Delegating Duties..................................................................1
         (a). Court Order Effect.........................................................1
         (b). Rule of Supervision.......................................................1
   B. Still Claiming a Duty to Do the Impossible.........................................1
      1. Distributions Impossible..........................................................2
      2. CKS Asked for More than It Was Entitled to......................................2
      3. Can't Ask a Useless Act...........................................................2
      4 . Other Data Impossible............................................................2
   C. Taxman Is Not the Answer.........................................................2
   D. Arguments for the First Time on Appeal?..........................................2
      1. Good Faith Raised Below..........................................................2
      2. Res Judicata Raised Below.........................................................2
      3. Estoppel and Quasi Estoppel Were Raised Below..................................2
      4. Not Appellant Who Kept Raising the New Issues..................................2
      5. Standard to Raise in Trial Court..................................................2
      6. Appellee's Error....................................................................2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | \| | District Court Civil Case # B-02-073 |
| Charles B. FELDMAN dba | \| | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | \| | In Chapter 11 |
| Debtor | \| | |
| Colin Kelly KAUFMAN, Appellant | \| | Appeal No. 02-05 |
| | \| | and |
| vs. | \| | Appeal No. 02-06 |
| | \| | |
| CKS ASSET MANAGEMENT, INC. & | \| | |
| Michael BOUDLOCHE, Appellees | \| | |

Table of Contents of Appellant Colin Kelly Kaufman's
Reply Brief on Appeal of Docket Numbers 469 & 470

Table of Cases and Authorities.................................................................................i

Table of Statutes and Rules...................................................................................iv

I. Reply Issues Presented.......................................................................................1

   A. Mistakes.........................................................................................................1
      1. Court Approval.........................................................................................1
         (a). Pre-Confirmation.............................................................................1
         (b). First Accounting..............................................................................1
      2. Delegating Duties....................................................................................1
         (a). Court Order Effect............................................................................1
         (b). Rule of Supervision..........................................................................1
   B. Still Claiming a Duty to Do the Impossible.........................................................1
      1. Distributions Impossible............................................................................1
      2. CKS Asked for More than It Was Entitled to................................................2
      3. Can't Ask a Useless Act...........................................................................2
      4 . Other Data Impossible.............................................................................2
   C. Taxman Is Not the Answer................................................................................2
   D. Arguments for the First Time on Appeal?............................................................2
      1. Good Faith Raised Below..........................................................................2
      2. Res Judicata Raised Below........................................................................2
      3. Estoppel and Quasi Estoppel Were Raised Below.........................................2
      4. Not Appellant Who Kept Raising the New Issues..........................................2
      5. Standard to Raise in Trial Court.................................................................2
      6. Appellee's Error......................................................................................2

7.  Appellee's Attempt to Change Issues on Appeal........................................3

E.  Burden of Proof.............................................................................3
   1.  Burdens in Good Faith Cases..........................................................3
   2.  The Rule, Not the Exception..........................................................3

F.  Intentional Tort Required..................................................................3

G.  Actions Speak Louder than Words...........................................................3


II.  Reply Argument..............................................................................3


A.  Mistakes....................................................................................4
   1.  Court Approval........................................................................4
       (a).  Pre-Confirmation..............................................................4
       (b).  First Accounting..............................................................4
             Footnote 1 (Cases showing Appellant could get interest).....4-5
             Footnote 2 (Why stop getting prior court approval?)...............5
       (c).  A Small Minority of, Not All the Assets.......................................6
   2.  Delegating Duties.....................................................................6
             Footnote 3 (without accepting Appellees' position that
             Texas Trust Code governs, still Appellees claims are
             contradicted by Sec. 113.018 of Texas Trust
             Code)..........................................................................7
             Footnote 4 (without accepting Appellees' position that
             Texas Trust Code governs, still Appellees claims are
             contradicted by Sec. 114.003 of Texas Trust
             Code)..........................................................................8
       (a).  Court Order Effect............................................................8
             Footnote 5 [without accepting Appellees' position that
             Texas Trust Code governs, still Appellees claims are
             contradicted by Sec. 112.054(a) of Texas Trust
             Code]..........................................................................8
       (b).  Rule of Supervision...........................................................9

B.  Still Claiming a Duty to Do the Impossible................................................9
   1.  Distributions Impossible.............................................................10
   2.  CKS Asked for More than It Was Entitled to...........................................11
             Footnote 6 (several reasons why CKS demand no good)......11
             Footnote 7 (CKS always demands work without pay)............12
   3.  Can't Ask a Useless Act.............................................................12
   4 .  Other Data Impossible..............................................................13

C.  Taxman Is Not the Answer?................................................................14

D.  Arguments for the First Time on Appeal?..................................................16
             Footnote 8 (Additional authorities on this rule)....................16
   1.  Good Faith Raised Below.............................................................16
   2.  Res Judicata Raised Below...........................................................17

      3.  Estoppel and Quasi Estoppel Were Raised Below...............................17
      4.  Not Appellant Who Kept Raising the New Issues...................................18
      5.  Standard to Raise in Trial Court........................................................18
      6.  Appellee's Error.............................................................................18
                Footnote 9 [Affirmative defenses, Rule 8(c), F.R.Civ.P.]........18
      7.  Appellee's Attempt to Change Issues on Appeal...............................19
                Footnote 10 (Giving back money to creditors?)...................19
  E.  Burden of Proof...................................................................................19
      1.  Burdens in Good Faith Cases.........................................................20
      2.  The Rule, Not the Exception............................................................21
  F.  Intentional Tort Required......................................................................21
  G.  Actions Speak Louder than Words........................................................21
      1.  Election; Quasi-Estoppel.................................................................22
      2.  Appellant Not Bound......................................................................22

III.  What Appellees Omit....................................................................................23

  A.  Laches.................................................................................................23
  B.  Affirmative Defenses.............................................................................23
  C.  Spent His Time How?............................................................................23
  D.  March, 2002 Contradicts June, 2001.....................................................23
  E.  Made No Complaints............................................................................24

IV.  Comment....................................................................................................24

V.  Conclusion...................................................................................................24

  A.  Summary of Requested Relief................................................................25
  B.  Prayer..................................................................................................25

Signature..........................................................................................................25

Certificate of Service........................................................................................-i-

Appeals Service List.........................................................................................-i-

<u>Table of Citations</u>

In re ABQ-MCB Jt. Venture, 153 B.R. 338 (Bkcy., D N.M. 1993)...................p. 20

In re Allied Mechanical Services, Inc., 885 F.2d 837 (11th Cir. 1989)....................p. 4, n. 1

Black's Law Dictionary 823 (1st Ed. 1891).........................................................13

Bowen Engr'g v. Estate of Reeve, 799 F.Supp. 467, 489 (D N.J. 1992)
    (Anne Thompson, Dist. J.)...................................................................13

Callahan v. Giles, 155 S.W.2d 795 (Tex. 1942).........................................11, n. 6

Coke on Littleton 127b (1607)..............................................................8

Corbin on Contracts Sec. 1320 (3d Ed. 1964)..............................................p. 9

Corbin on Contracts Sec. 1340 (3d Ed. 1964)........................................pp. 9-10

In re Crown Sportswear, Inc., 575 F.2d 991 (1st Cir. 1978)...........................p. 20

In re Daikin Miami Overseas, 868 F.2d 1201 (11th Cir. 1989)...............p. 16, n. 8

In re Drexel, Burnham Lambert Group, Inc., 133 B.R. 13, 23 (Bkcy., SD N.Y. 1991)...p. 20

In re Flo-lizer, Inc., 107 B.R. 1431 (SD Ohio 1989), aff'd 916 F.2d 363
    (6th Cir. 1989)........................................................................p. 5, n. 1

In re Friendship College, Inc. (United States v. Friendship College, Inc.),
    787 F.2d 430 (4th Cir. 1984).......................................................p. 5, n. 1

In re Frontier Properties, Inc., 979 F.2d 1358 (9th Cir. 1992)..................p. 5, n. 1

Haase v. Chapman, 308 F.Supp. 399 (WD Mo. 1969)..................................p. 13

In re Hall, Bayoutree Assocs., Ltd. (Oaks of Woodlake, Phase III v. Hall,
    Bayoutree Assocs., Ltd.), 939 F.2d 802, 804 (9th Cir. 1991).....................p. 16, n. 8

In re H.L.S. Energy Co., Inc. (State of Texas v. Lowe, Trustee), 151 F.3d 434
    (5th Cir. 1998)...........................................................................p. 16

In re Hudson (Hudson v. Raggio & Raggio), 107 F.3d 355, 357
    (5th Cir. 1997).......................................................................... p. 16, n. 8

In re Integrated Resources, Inc., 147 B.R. 650, 23 B.C.D. 1042
    (Bkcy., SD N.Y. 1992)......................................................................................p. 20

Intntl. Ins. Co. v. Johns, 874 F.2d 1447, 1461 (11th Cir. 1989)........................p. 20

Jacob & Youngs v. Kent, 230 N.Y. 239, 129 N.E. 889 (1921) (Cardozo, J.)..................p. 14

Kattelman v. Madden, 88 F.2d 858 (8th Cir. 1937)..........................................p. 10

In re Krug, 131 B.R. 207 at 209 (Bkcy., ND Fla. 1991) (Killian, Bkcy. J.)......................p. 20

In re LaRoche, 131 B.R. 253, 256 (D R.I. 1991), aff'd 969 F.2d 1299 (1st Cir. 1992)...p. 20

In re Mall at One Assocs., 175 B.R. 1009 (Bkcy., ED Pa. 1995).............................p. 5, n. 1

McCann v. Texas City Refining, Inc., 984 F.2d 667, 673 (5th Cir. 1993)...............p. 16, n. 8

In re Megafoods Stores, Inc. (Texas Comptroller of Public Accounts v.
    Megafoods Stores, Inc.), 163 F.3d 1063, 1068 (9th Cir. 1998)....................p. 5, n. 1

Olive-Sturnenberg Lumber Co. v. Gordon, 138 Tex. 459, 159 S.W.2d 845, 847
    (Tex. Com. App., opinion adopted, 1942)..................................................p. 11, n. 6

In re Pizza of Hawaii, Inc., 761 F.2d 1374 (9th Cir. 1985)......................................p. 16, n. 8

In re Power Recovery Systems, Inc., 950 F.2d 798 (1st Cir. 1991)................................p. 10

In re Revely, 148 B.R. 398 (Bkcy., SD N.Y. 1992)..........................................p. 20

Silver v. Stearns, 58 F.2d 626 (5th Cir. 1932)................................................p. 10

In re Southeast Bkg. Corp. (Brandt v. Bassett), 827 F.Supp. 742 (SD Fla.
    1993).........................................................................................p. 20

In re Structure & Design, Inc., 156 B.R. 3 (Bkcy., D Maine 1993)...............................p. 21

Sweet Jan Jt. Venture v. FDIC, 809 F.Supp. 1246, n. 4 (ND Tex. 1992)......................p. 20

In re Taxman Clothing Co., 49 F.3d 310, 316 (7th Cir. 1995).......................................p. 15

29 Tex. Jur. 150-152, "Master and Servant," Secs. 83-84 (1934)................................p. 7

In re Thacker, 6 B.R. 861, 865 (Bkcy., WD Va. 1980)....................................p. 21

Toyo Cotton Co. v. Cotton Concentration Co., 461 S.W.2d 116, 118 (Tex. 1971).......p. 10

United States v. Calverly, 37 F.3d 1600, 164 (5th Cir. 1994) (en banc), *cert.*
        *denied*, 513 U.S. 1196, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995)............p. 16, n. 8

## Table of Statutes and Rules on Appeal

Pp. 18, 19, 20................................................... Federal Rules of Civil Procedure Rule 8(c):

(c) Affirmative Defenses.  In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver and any other matter constituting an avoidance or affirmative defense.  When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

P. 8.................................................................Sec. 112.054(a) of the Texas Trust Code :

(a) On the petition of a trustee or a beneficiary, a court may order that the trustee be changed, that the terms of the trust be modified, that the trustee be directed or permitted to do acts that are not authorized or that are forbidden by the terms of the trust, that the trustee be prohibited from performing acts that are required by the terms of the trust, or that the trust be terminated in whole or in part if:
(1) the purposes of the trust have been fulfilled or have become illegal or impossible to fulfill; or
(2) because of circumstances not known to or anticipated by the settlor, compliance with the terms of the trust would defeat or substantially impair the accomplishment of the purposes of the trust.

P. 7........................................................................Sec. 113.018 of the Texas Trust Code:

Sec. 113.018.  Employment of Agents.  A trustee may employ attorneys, accountants, agents, including investment agents, and brokers reasonably necessary in the administration of the trust estate.

P. 8........................................................................Sec. 114.003 of the Texas Trust Code:

Sec. 114.003.  Person Other than Trustee in Control.  If a trust instrument reserves or vests authority in any person to the exclusion of the trustee, including a settlor, an advisory or investment committee, or one or more co-trustees, to direct the making or retention of an investment or to perform any other act in the management or administration of the trust, the excluded trustee is not liable for a loss resulting from the exercise of the authority in regard to the investments, management or administration of the trust.

Font: Korinna

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Colin Kelly Kaufman, former plan trustee in the captioned case and the Appellant, and respectfully shows the Court as follows:

I. Reply Issues Presented.

A. Mistakes. Appellees make certain mistakes in statements made in their brief.

1. Court Approval. On p. 2, middle paragraph, of Appellees' brief, Appellees claim that Appellant never got court approval to pay anything, and paid himself all the money.

(a). Pre-Confirmation. The first was done for his pre-confirmation work as examiner.

(b). First Accounting. The second court approval was for work through the date of the first accounting.

2. Delegating Duties. The law does not forbid fiduciary duties to be delegated.

(a). Court Order Effect. Even if it did forbid, a court order would be effective to allow such delegation.

(b). Rule of Supervision. The only duty implicated here is just to supervise.

B. Still Claiming a Duty to Do the Impossible. Appellees are still saying that Appellant could be sanctioned by the loss of all his fees because he could not do the impossible. That position is entirely unsupported by the law.

-1-

    1. <u>Distributions Impossible</u>.

    2. <u>CKS Asked for More than It Was Entitled to</u>.

    3. <u>Can't Ask a Useless Act</u>.

    4 . <u>Other Data Impossible</u>.

C. <u>Taxman Is Not the Answer</u>.  Appellee cites <u>Taxman</u> for an irrelevant point, rather than its point that benefit to the estate is an available measure of recovery for persons such as a plan trustee.

D. <u>Arguments for the First Time on Appeal</u>? Appellant did not raise arguments for the first time on appeal.

    1. <u>Good Faith Raised Below</u>.

    2. <u>Res Judicata Raised Below</u>.

    3. <u>Estoppel and Quasi Estoppel Were Raised Below</u>.

    4. <u>Not Appellant Who Kept Raising the New Issues</u>.  Now Appellees kept raising new issues, after all the pleadings had been closed, and the hearings were proceeding.  So if parties are going to run afoul of the rule against raising issues for the first time on appeal, they are going to be the ones.

    5. <u>Standard to Raise in Trial Court</u>.  The trial court has to know a position is contested before the court.  If that is known to the trial court, that issue has been raised below, and is before the court on appeal.

    6. <u>Appellee's Error</u>.  It was Appellee's affirmative defense to the fee application that Appellant acted in bad faith or with such gross negligence as to constitute an intentional tort.  And so the successor plan trustee thereby had the duty to plead it.

7. <u>Appellee's Attempt to Change Issues on Appeal</u>.  Appellee, does raise on appeal issues that the plan trustee never pled to the court below.

E.  <u>Burden of Proof</u>.  Appellant did not have the burden of proof on all issues below.  Appellant had the burden to prove the work was done and the estate benefitted.  The party asserting an affirmative defense always has the burden to prove it.  Rule 8(c), F.R.Civ.P.  So here, Appellee had the burden to show a disqualifying affirmative defense, a reason to deny fees despite work done and benefit bestowed.

1.  <u>Burdens in Good Faith Cases</u>.  The cases are clear that good faith is always presumed; and someone claiming bad faith must present evidence to prove it.

2.  <u>The Rule, Not the Exception</u>.  Since the plan required such bad faith or gross negligence as was the equivalent of an intentional tort, clearly no different rule is authorized in this case.  Bad faith was not proven, and was not found, and not being presumed, must be treated as absent.

F.  <u>Intentional Tort Required</u>.  Appellee says the Plan's requirement of an intentional tort to take money from the plan trustee does not apply to fee applications.  No citation is made to any place in the record, nor to any rule or principle of law to support that claim.

G.  <u>Actions Speak Louder than Words</u>.  Why has no demand been made on Mike Boudloche during the past year for performance of any alleged necessary disclosures omitted by Mr. Kaufman?

II. <u>Reply Argument</u>.

A.  <u>Mistakes</u>.  The brief of the Appellees makes some statements that can hardly be called anything other than errors – plain old mistakes.

-3-

1. <u>Court Approval</u>. On p. 2, middle paragraph, of Appellees' brief, Appellees claim that Appellant never got court approval to pay anything, and paid himself all the money in the estate. Both statements are wrong. Appellant had gotten court approval of two prior fee applications. And Appellant paid himself a minority percentage of the estate assets.

(a). <u>Pre-Confirmation</u>. The first fee application was done for his 1992 pre-confirmation work as examiner.

(b). <u>First Accounting</u>. Another fee application was done later. It was for his work up through his first accounting. Then Appellant went some years not asking for fees, and likewise not paying himself for his work. (Appellant did not mention interest owed on previously earned fees, but would have been entitled to demand it, under the caselaw. He just didn't know, since Appellee didn't plead it, that how much was owed, when, was an undecided issue to be raised again at the hearing on February 22, 2002.[1])

---

[1] Applicant's Original Brief on Appeal pointed out in footnote 4 that normally Applicant was entitled to interest for funds owed him but not paid for several years. Texas law gives a right to 6% interest beginning January 1 of the year after a debt is incurred, if no other amount is contracted for. So, not even trying to compound interest annually, in 1998, Appellant could have gotten 3 & ½ years interest at 6% (i.e., 21% or more than one-fifth) for fees earned in 1994; 2 & ½ years at 6% (or over 15%) for fees earned in 1995, etc. Appellee did not comment on this point; but the cases generally seem to support it. <u>In re Allied Mechanical Services, Inc.</u>, 885 F.2d 837 (11th Cir. 1989) (administrative expenses owed the government accrued interest post-petition, and full payment required paying that interest as well as the principal); <u>In re Flo-lizer, Inc.</u>, 107 B.R. 1431 (SD Ohio 1989), <i>aff'd</i> 916 F.2d 363 (6th Cir. 1989) (same); <u>In re Frontier Properties, Inc.</u>, 979 F.2d 1358 (9th Cir. 1992) (interest on land sale contract obligation was as much a part of claim as principal, and equally entitled to payment as administrative expense); <u>In re Friendship College, Inc. (United States v. Friendship College, Inc.)</u>, 787 F.2d 430 (4th Cir. 1984) (post-petition withholding taxes owed United States were administrative expenses, and interest and penalties on them were likewise administrative expenses to be paid before pre-petition creditors); <u>In re Mall at One Assocs.</u>, 175 B.R. 1009 (Bkcy., ED Pa. 1995) (where plan called for payment of administrative expenses "in full" that, unlike payment of pre-petition creditors, meant

-4-

(And Mr. Boudloche is wrong to claim, p. 8, para. 6 of his brief that "Mr. Kaufman paid

himself $49,428.95 more than even he had testified was owed to him for that time.

Applicant NEVER testified that CKS Exhibit 17 was accurate. And he never got more than

was owed to him, under the one theory of payment or the other.) When payment resumed

in 1998, fee applications were not filed in advance.[2] But, as even the court below noted, it

_____

payment with post-petition interest and penalties); In re Megafoods Stores, Inc. (Texas
Comptroller of Public Accounts v Megafoods Stores, Inc.), 163 F.3d 1063, 1068 (9th Cir. 1998)
(post-petition taxes collected for Texas Comptroller by Handy Andy stores were administrative
expense, and therefore, post-petition interest on them was an administrative expense and had to
be paid to confirm a plan, and since bankruptcy code imposes no time limit on administrative
expense claimants to make their claims, any time not forbidden by the plan or court order was
timely to assert interest right), etc.

[2] Since Appellant was happy to seek prior court approval in 1993, one might wonder why
Appellant would want to change tactics and seek only subsequent court approval in 1998. So
long as the rule was that creditors paid for work they ordered, Appellant was thrilled to submit
his fee applications to the bankruptcy court. That was true from 1986-1998. In 1998, things
changed. Appellant did not change his style of work, of charging, or what he charged for in any
significant way (except for an occasional rate increase). But the bankruptcy court went suddenly
from never taking as much as 1% off Appellant's fee applications to almost never allowing even
50% of Appellant's final fee applications. Appellant's cases lasted for many years; years of work
came up to be compensated for, at the end of every case (remember, this case itself is for ten
years of work, and the court below proposed to pay Appellant about 10%, which wouldn't even
meet overhead.) Suddenly, over $2 million in fees for these many years of work were all denied.
(Naturally, Appellant's rate went to $400 an hour, in all cases, not just this one -- with fees so
often denied or reduced, Appellant had to cover expenses. And, rates had not kept up with
inflation. And other cases have allowed $400. And contrary to Appellee's brief, p. 4, middle
para., Judge Schmidt DID NOT rule that the fees were unreasonably high, nor that the charges
were unexplained. Read the cited passage, p. 12, lines 21-24, June 28 transcript. He never said
that. Instead, he said Appellant did the work and benefitted the estate, p. 13, lines 2-4.)
   A reasonable person in Appellant's position in 1998, knowing that the law expects plan
trustees to pay fees and expenses (including their own) first, and seek court approval later, might
conclude that doing so was the better course. In their wildest imaginations, people would never
have suspected that paying one's fees at a lawful time in a perfectly lawful manner would result in
such wild accusations in, and improper rulings from, the court below. If Applicant had suspected
anything like this, he would never have agreed to do this favor for the U.S. Trustee's office in the
first place. "No good deed ever goes completely unpunished." If Appellant gets paid in full, this
case will not have been worth it. It would take a huge enhancement to make Appellant whole.

is not required of plan trustees that they seek court approval of payments first; they have the option to pay first and seek approval later.

(c). <u>A Small Minority of, Not All the Assets</u>. Appellant paid himself cerca $250,000 (plus another cerca $27,000 of expenses) out of the over half a million dollars (over $540,000) Mr. Feldman disclosed to the estate. Mr. Feldman kept $179,000 for "expenses" – though, despite Appellant's efforts to discover the truth, Mr. Feldman has never disclosed an actual payment of a single dollar of actual expenses (one assumes he had some, but he had a duty to prove what they were and show the back-up documents). Over $80,000 was paid out under court orders, mostly to Mr. Moon. When Mr. Kaufman began paying himself, six or seven years after the plan was confirmed, he was at the same time trying to assemble the data and preparing to deal with the main job that the FDIC wanted him to do in the case: discover if Mr. Feldman had complied with his duty to turn over the five years of income. That was the creation of a $1 million asset, and worth a lot more than the $277,000 that Mr. Kaufman was simultaneously being paid. Essentially, Mr. Kaufman came bounding into bankruptcy court saying, "look guys, despite the enormous difficulty of the case, I have created a $1 million asset. If you guys want to, I'll settle it against Mr. Feldman for $225,000 and pay most of that to creditors. Or if not, we'll pursue the whole thing." But (evidently) the creditors did not want to prosecute the case against Mr. Feldman. The rest of this case has pretty much consisted of efforts to destroy the $1 million asset.

2. <u>Delegating Duties</u>. The law does not forbid fiduciary duties to be

delegated. If it did, there wouldn't be any accounting firms, would there?[3] But "non-delegable" has nothing to do with fiduciaries per se. It is a rule of liability, of *respondeat superior*. A "non-delegable" duty is merely a duty THE LIABILITY FOR WHICH CANNOT BE AVOIDED. See e.g., Secs. 83-84, "Master and Servant," 29 Tex. Jur. 150 (1934), pointing out if a duty is considered to be "primary and non-delegable" that just means that "he is liable for an injury resulting from a breach thereof although he has chosen a competent superintendent or foreman to perform the duty in question." And further: "Nor as to such duties is the employer relieved of responsibility by engaging an independent contractor to do the work." A "non-delegable" duty was just a "restriction of the fellow servant doctrine." 29 Tex. Jur. 151, in footnote 9. The "fellow servant" doctrine said that employers were not responsible for injuries inflicted on an employee because of the negligence of a fellow employee. Nobody is alleging negligence on the part of the CPA in this case, so the fellow servant doctrine and the "non-delegable" duty rules equally do not apply. Furthermore, Sec. 84 shows that the duties which are "non-delegable" under the law are those duties fundamentally important to life and limb. Whether a CPA will be hired or not is not fundamentally important to life and limb. Furthermore, Appellees' claims, as to what the state law of "non-delegable duty" is, are contradicted by the Texas Trust Code, which allows duties to be "delegable" if the person hired to do the work is named in the

---

[3] Although Appellant does not agree that the whole Texas Trust Code applies, see the Original Brief on Appeal, still its section on "rights" to employ persons very well might. Sec. 113.018 of the Texas Trust Code says:

A trustee may employ attorneys, accountants, agents, including investment agents, and brokers reasonably necessary in the administration of the trust estate.

controlling writing.[4]  Here a new court order was entered altering the prior controlling

writing to add the CPA, Al White.  So Appellees' contention violates state statutory law.

(a).  Court Order Effect.  Say the law normally did forbid hiring a CPA

to do accounting work.  It doesn't, but say it did.  Still a court order would be effective to

allow such delegation of authority.  Appellees never cited any authority to show that the

bankruptcy court's order granting Appellant's request to put someone else in charge of

responding to CKS's demands was so illegal as to be void.  Even the Texas Trust Code

expressly provides for a court order to modify the common law or the Trust Code itself,[5]

and Appellees point to nothing that would cause an exception for the court orders here.  If

the court order was not void, then it protected Appellant from later complaints that he

should be doing something, instead of the CPA doing something.

(b).  Rule of Supervision.  The most the law has ever required when

---

[4] Again, without accepting Appellees' position that all the Texas Trust Code applies, still it does show that Appellees are wrong to claim that Texas law supports their position.  Sec. 114.003 of the Texas Trust Code says: If a trust instrument reserves or vests authority in any person to the exclusion of the trustee, including a settlor, an advisory or investment committee, or one or more co-trustees, to direct the making or retention of an investment or to perform any other act in the management or administration of the trust, the excluded trustee is not liable for a loss resulting from the exercise of the authority in regard to the investments, management or administration of the trust.

[5] Sec. 112.054(a) of the Texas Trust Code says: (a) On the petition of a trustee or a beneficiary, a court may order that the trustee be changed, that the terms of the trust be modified, that the trustee be directed or permitted to do acts that are not authorized or that are forbidden by the terms of the trust, that the trustee be prohibited from performing acts that are required by the terms of the trust, or that the trust be terminated in whole or in part if:

(1) the purposes of the trust have been fulfilled or have become illegal or impossible to fulfill; or

(2) because of circumstances not known to or anticipated by the settlor, compliance with the terms of the trust would defeat or substantially impair the accomplishment of the purposes of the trust.

-8-

experts are employed to do work that they do better than non-experts, is that the employer check to see that they do not slack off and refuse to perform. CKS here never asked the CPA to perform. So the CPA didn't have to. So no duty to supervise was created - the CPA could not have been slacking off, when he was not asked by CKS to do anything. So no required supervision could possibly have been omitted. Since Appellant actually did secure data and a report from the CPA, cerca Thanksgiving, 2000, despite CKS's omissions, Appellant exceeded any duty that might ever have existed under any such doctrine. Figuring out that there was a million-dollar claim from data in a report that CKS's principal thought was useless garbage (see CKS's letter of December 8, 2000, which still claims that CKS is the "largest creditor"!) was more than "substantial performance." When CKS asked for more documents, Appellant asked for them, and eventually filed the motion to compel furnishing them that CKS ended up opposing.

B. <u>Still Claiming a Duty to Do the Impossible.</u> Appellee relies on a trial judge's discretion. But Appellant's original brief on appeal shows all failures to apply the right legal standard are always abuses of discretion. The right legal standard doesn't make people do the impossible. Appellant's testimony was that it was impossible to pay creditors until claims were fixed. Mr. Browning, CKS's expert at the hearing of June 23, 2001, agreed. Yet Appellees still say that Appellant could be sanctioned by a loss of all fees because he could not do the impossible. The law is contra. *See e.g.,* <u>Corbin on Contracts</u>, Sec. 1320 (3d Ed. 1964) (impossibility is a defense to the obligation to perform); and Sec. 1340 (third parties' refusal to give necessary cooperation to allow performance is a defense to the obligation to perform); and see also such cases as <u>Toyo Cotton Co. v. Cotton</u>

-9-

Concentration Co., 461 S.W.2d 116, 118 (Tex. 1971) (Concentration's failure to deliver

Toyo's cotton was excused for impossibility because of a strike, citing Sec. 1340 of Corbin;

but that did not give it the right to charge Toyo extra per diem during the strike because it

still had possession of the cotton Toyo had demanded but never received.) See likewise,

Kattelman v. Madden, 88 F.2d 858 (8th Cir. 1937) (no sanction possible for failure to carry

out court order where compliance was impossible); In re Power Recovery Systems, Inc.,

950 F.2d 798 (1st Cir. 1991) (general rule is that impossibility is an effective defense to

claim of violating court order; but exception exists where party, after notice of the order,

deliberately acts so that future compliance will become impossible, such as intentionally

conveying away property to a third party after knowing the court had ordered it returned,

etc.) The Fifth Circuit has recognized the usual rule that inability to comply is a defense to

a complaint of failure to follow a court order. Silver v. Stearns, 58 F.2d 626 (5th Cir. 1932)

(turnover order in bankruptcy, held, though refusal to allow party to prove inability to

comply would require reversal, record did not show that such refusal occurred).

      1. Distributions Impossible. Appellant's Original Brief shows distributions

were impossible for two reasons – first because CKS and Parkwell's claims were not fixed

(the court below expressly discussed they were not fixed on p. 3 of the transcript of the

June 28, 2001 hearing, line 16 - p. 4, line 12). Did CKS have 95% of the claims, or did

Parkwell have 80% of the claims? It was impossible next because administrative expenses

had to be paid first, and much administrative work remained to be done. So these were

not knowable. Because Parkwell did not agree to drop its sanctions claim against CKS

until AFTER the hearing on Appellant's fee application, and Appellant had not the power to

agree for Parkwell and CKS, there was never any possibility of making a distribution in the case. The bankruptcy court said it would set a hearing if Parkwell and CKS could not agree as to the amounts of their respective claims in March, 2002. Appellant is not aware whether they ever agreed. But distribution is STILL impossible until an agreement is reached, or the matter is tried and a court order is had.

     2. <u>CKS Asked for More than It Was Entitled to</u>. Appellees seem to think that everything CKS asked for, it had a right to get. But that wouldn't be true. CKS was told the Appellant expected to let unsecured creditors have $10,000; so immediately it sent the letter of July 28, 1997 demanding MORE than $10,000 worth of work, probably at least two or three times $10,000 worth of work. But just because CKS demanded it doesn't mean that CKS had a right to get it. The Bankruptcy Code talks in terms of when the fiduciary of the bankruptcy estate has a duty to disclose what he already knows. It does not require the fiduciary of the bankruptcy estate to go out and discover currently unknown things for creditors upon demand. Neither does the Texas Trust Act.[6] It was

---

[6] This demand was no good to create a duty to respond in accordance with its terms for several other reasons, besides those discussed elsewhere in the text. Even under the Appellees' chosen statute, the Texas Trust Code, the demand was no good because CKS got to make only one demand a year, and this was the fourth demand CKS had made in cerca 15 months. It was no good to create a duty to respond because it was the demand that led to CKS's motion to compel, which was denied by the court. It was no good to create a duty to respond because it was the demand which was attached as an exhibit to former plan trustee's motion to hire an accountant to respond to it, and which led to an order hiring Al White, CPA to respond to it. So it needed to be re-sent and re-addressed to Al White, CPA, once the order hiring him was entered. It was no good because CKS did nothing about it for four years, and led the former plan trustee and the other parties to the bankruptcy case to understand that it was abandoned. *See e.g.*, <u>Olive-Sturnenberg Lumber Co. v. Gordon</u>, 138 Tex. 459, 159 S.W.2d 845 (Tex. Com. App., opinion adopted, 1942), where the court said:

    As stated by Justice Sharp in <u>Callahan v. Giles</u> [155 S.W.2d 795], "the maxim that *Equity aids the diligent and not those who slumber on their rights* is

unquestioned that Appellant did not KNOW the data about what Mr. Feldman had done. And given the war between Parkwell and CKS, the former plan trustee had no right to take CKS's side, and spend all the money in the estate doing CKS's bidding, when there was an excellent chance that Parkwell would win and be the dominant claimant against the estate.[7] (A couple of years later, Parkwell sold its collateral at a profit, and there arose a possibility that Parkwell's claim should be denied for it already being paid.) A minority creditor has no right to make demands that spend the dominant creditor's (or really, any other creditor's) money.

   3. Can't Ask a Useless Act. Equity never requires a party to do a useless act. Haase v. Chapman, 308 F.Supp. 399 (WD Mo. 1969) (also saying that actually the law doesn't either); followed in Bowen Engr'g v. Estate of Reeve, 799 F.Supp. 467, 489 (D N.J. 1992) (Anne Thompson, Dist. J.). See similarly the translation of "Non licet quod

---

a fundamental principle of equity jurisprudence, resulting in a rule of practice which has made the defense of laches just as complete a bar to the assertion of an equitable right as the defense of limitation is a bar to the assertion of a legal right. P. 847.

[7] This recklessness in demanding enormous amounts of work without regard to the means available to pay for the work is characteristic of CKS throughout this case. See Appellant's motion to cancel CKS's claim, dkt. 424, R2083-2121. CKS's first communication to the plan trustee was a demand that plan trustee give him a copy of all his (six years worth of) files. CKS complained that Mr. Moon wouldn't give him anything; and it is true that Mr. Moon alleged that he lost all his files during one of his moves during the case. But it was typical of CKS to think right off the bat that thousands of dollars of estate's money should be spent purely for its own convenience without considering the effect of the expenditure on the funds of anybody else. The July 29, 1997 letter was just another instance of this. Having just filed a motion to convert because of lack of money; and having just been told that creditors might get $10,000; CKS demands $30,000 of new work that there are not any funds available to pay for. The only rational explanation that Appellant can see is that CKS always planned to object to the administrative fees, and never planned to pay them; and that's why it didn't care whether it ran them up or not.

*dispendio licet*" in <u>Black's Law Dictionary</u> 823 (1st Ed. 1891), "That which may be done

only at a loss is not permitted to be done," and citing <u>Coke on Littleton</u> 127b (1607) to

show that this common law rule stands for the proposition that "The law forbids such

recoveries whose ends are vain, chargeable and unprofitable." When CKS asked Mr.

Kaufman in 1997 to spend more than the $10,000 he disclosed could be hoped to be

available eventually to give to creditors, this was not a legal demand unless CKS could

show that the work was calculated to return more than the amount spent. Appellant was

entitled to use his sound business judgment in determining whether the money would be

wisely spent, or whether it would be better to pursue peaceful means of acquiring the

requested data (as Appellant did) instead of spending a lot of money churning the estate

for little or no return.

       4 . <u>Other Data Impossible</u>.  The record shows that Appellant did not get any

information about tax returns or anything else from the accountant until cerca

Thanksgiving of 2000.  It was impossible for Appellant to give CKS data that Appellant had

tried to get, but still did not have.  And when Appellant tried to get a court order for the

turnover of the Feldmans' data; this was mostly denied, evidently because CKS and the

Debtor opposed that. Dkt. 421, R2067-68.  Appellant had the right to question whether

he would get more data by seeking a court order (of the sort denied in the summer of

2001) than by seeking voluntary compliance.  So Appellant got all the data he possibly

could, as soon as he could get it; and then asked the bankruptcy court to order he be

given the rest.  Even despite the failure of the bankruptcy court to order production of the

larger part of the data; Applicant's efforts still achieved a substantial compliance or a

"substantial performance" of the intent of the plan – because he got enough (with his analytical skills) to show that the Feldmans owed their $1 million.  Substantial performance entitles a contracting party to his pay, less any actual damage from any imperfections.  Jacob & Youngs v. Kent, 230 N.Y. 239, 129 N.E. 889 (1921) (Cardozo, J.) (Contractor used "Cohoes" instead of "Reading" pipe).  Because Appellees cannot deny this; they are reduced to claiming that somehow Appellant's substantial performance should have come sooner, or that perhaps Appellant should have had more faith in the judge to order discovery instead of trying to get what he did by the means he used, or hinting that maybe Appellant really could have gotten more earlier from judicial action, despite subsequent events appearing to prove Appellant was right to be skeptical of that.  In any case, there is no proof that Appellant could have done any more than to get such data as Appellant got and put in his Proposed Final Report (and sent to CKS to analyze the week after Thanksgiving, though Appellant had not had been able to analyze it himself yet), nor that Appellant could have gotten any of it any sooner than Appellant actually got it.  Appellant testified he did all that was possible to get the information as soon as he could get it; and no testimony was received to contradict that.  So failure to give more information sooner was not a penalizable event.

C. <u>Taxman Is Not the Answer</u>?  Appellant's Original Brief on Appeal pointed out in footnote 4, that more than one accepted way exists to calculate how much a plan trustee is entitled to be paid.  Besides the hourly rate way, there is the "benefit of the estate" way; and Appellant's payments never exceeded the amount he was entitled to receive under the "benefit of the estate" method of calculation – and this would be true even if a zero value

was given to his work creating the $1 million asset which was the claim against the

Feldmans. So Appellant was never paid in advance. What was Appellee's response?

"'Taxman' says you shouldn't use up the estate." What kind of response is that? It's a non

sequitur, and it's not relevant under the facts as they really exist. Appellant was not using

up the estate; he was building the $1 million asset. It is true that Appellant was paying

himself the $250,000 in extra cash that Appellant himself had already brought in to benefit

the estate; but he had a right to, and he needed to, if he was going to create the $1 million

asset which he was trying to create. That's what the estate got in return for the money he

paid himself. He was entitled to pay himself that money, and a reasonable business

person would conclude that his work toward creating the additional $1 million was an

unexpected bonus, a lot more than a fair return, for paying Appellant the money which he

had already earned. It is the idea that is being argued for the other side that is the strange

claim -- that Appellant should have been required to have done the work and

simultaneously have expected to get nothing for it. In re Taxman Clothing Co., 49 F.3d

310, 316 (7th Cir. 1995) like the other cited cases, affirms that when one seeks payment

for benefit of the estate, the amount of the benefit bestowed is the limit on the amount of

fees to be paid, even when there are other assets to pay them. (Some cases say there are

exceptions, of course, where opponents run up the fees, by requiring fees for appeals and

the like; but Taxman didn't dwell on that). And of course, in addition, expenses of the

estate are payable from the estate whether beneficial or not. In re H.L.S. Energy Co., Inc.

(State of Texas v. Lowe, Trustee), 151 F.3d 434 (5th Cir. 1998).

     D. <u>Arguments for the First Time on Appeal</u>? Indeed, there is a rule that a party

cannot raise issues for the first time on appeal.  But Appellant did not raise arguments for the first time on appeal.  The same cannot be said about Appellees.[8]

      1.  <u>Good Faith Raised Below</u>.  The issue of "good faith" and the need of Appellees to prove such bad faith or gross negligence as would amount to an intentional tort was expressly pled by Appellant in June, 2001, see paragraph 6-D, p. 5, of Appellant's Response to CKS's Motion to Remove Trustee, dkt. 426, R2171-2241; and likewise paragraph 6-I-(1) of the same on p. 10, R2180; and likewise paragraph 8-B of the same on p. 19, lines 2-3, R2189.  *See also*, para. 19, p. 20 of 2nd Amended Final Report, dkt. 408, R1539-1978; and Finding of Fact 46-J, p. 41 of Appellant's requested findings of fact and conclusions of law of June 27, 2002, dkt. 437, R2361-2386, asking the court to find that CKS's refusal to acknowledge the applicability of this required standard was evidence of CKS's excessive litigiousness.  The bankruptcy court took judicial notice of the hearings of

---

[8] In the Fifth Circuit, another authority on raising issues for the first time on appeal is <u>In re Hudson (Hudson v. Raggio & Raggio)</u>, 107 F.3d 355, 357 (5th Cir. 1997), a bankruptcy fee application appeal, where the court pointed out, citing <u>McCann v. Texas City Refining, Inc.</u>, 984 F.2d 667, 673 (5th Cir. 1993), that this circuit will review issues raised for the first time on appeal "only for plain error" and cited <u>United States v. Calverly</u>, 37 F.3d 1600, 164 (5th Cir. 1994) (en banc), *cert. denied*, 513 U.S. 1196, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995), to show that even with plain error, the error must have "seriously affected the 'fairness, integrity, or public reputation' of the judicial proceedings."

    Other circuits recognize at least five exceptions to the general rule against raising issues for the first time on appeal: (a) to prevent a miscarriage of justice, (b) where the appellant had no opportunity to raise the objection below, (c) to protect a ""substantial interest of justice," (d) where the proper resolution of the issue is beyond doubt, and (e) if the issue presents significant questions of general impact or great concern.  <u>In re Daikin Miami Overseas</u>, 868 F.2d 1201 (11th Cir. 1989).  Some courts say issues may be raised for the first time on appeal if they are purely legal, and there is a full record already available for the appellate court to make a determination. <u>In re Hall, Bayoutree Assocs., Ltd. (Oaks of Woodlake, Phase III v. Hall, Bayoutree Assocs., Ltd.)</u>, 939 F.2d 802, 804 (9th Cir. 1991), following <u>In re Pizza of Hawaii, Inc.</u>, 761 F.2d 1374 (9th Cir. 1985).

June, 2001 at the hearing on February 22, 2002.  Appellant also raised the issue again before the court order was entered below.  See para. 13, memo summary of issues submitted to the court by Appellant on March 5, 2002, dkt. 468, R3585 -3601.  So the issue was raised before the trial court by Appellant.  It was addressed by CKS at the hearing in June, 2001.  If anybody is trying to "raise it for the first time on appeal" it is the successor plan trustee, who clearly did NOT mention that this was the test to the bankruptcy court.

2. <u>Res Judicata Raised Below</u>.  Res judicata was pled in June, 2001; but it was also specifically pled in response to both Mike Boudloche's and CKS's objections to Applicant's fee application.  See paragraph 9, p. 5 of the Appellant's Response, dkt. 461, R 3484-3513, to Mike Boudloche's objection, dkt. 460, R3477-82; and see paragraph 9-C & 9-3. same page, R3488; and paragraph 25, p. 13, and paragraph 25-B, p. 13-14, R3526-27, of the Appellant's Response, dkt. 462, R3514-3569, to CKS's objection.  So Appellees are in error to claim that this was raised for the first time on appeal.

3. <u>Estoppel and Quasi Estoppel Were Raised Below</u>.  Appellant's responses to the objections of Mike Boudloche and of CKS to his final fee application both mentioned estoppel and quasi-estoppel.  Dkt. 461, R3484-3513 and dkt. 462, R3514-69.  These were filed and served before the hearing of February 22, 2002, in time for all parties to know that these were issues Appellant thought would arise at that hearing.  Appellant's proffer of evidence states the facts necessary to infer these.  So these were not raised for the first time on appeal.

4. <u>Not Appellant Who Kept Raising the New Issues</u>.  Appellant did not

-17-

change issues after the pleadings were filed and the hearing commenced – Appellees did. So one could understand if he were late in responding to a position, given that he was never told which issues appellees were trying, before they tried them. The appellee's issues and proof, on which the court below was asked to rule, never conformed to the pleadings, and always kept changing, and were never known to be the issues of the hearing until AFTER Appellants' evidence had been concluded. The bankruptcy court's ruling after the February 22, 2002 hearing was not based on any evidence submitted at that hearing but on issues that Appellant had thought he had already won the previous June. But Appellant never let it be thought that any Appellee claim was undisputed prior to the bankruptcy court ruling on it.

     5. <u>Standard to Raise in Trial Court</u>. Appellate courts exist to keep trial judges from making prejudicial errors in trying cases. The rule against raising issues for the first time on appeal is designed to insure that the trial which is being reviewed by the appellate court is the same trial that was being heard by the trial court. The test is whether the trial judge understood that something was contested before he had to rule on it.

     6. <u>Appellee's Error</u>. Appellee's affirmative defense to the fee application was that Appellant acted in bad faith or with such gross negligence as to constitute an intentional tort. So the successor plan trustee thereby had the duty to plead it. Rule 8(c), F.R.Civ.P.[9] Appellant has certainly pointed out that Mike Boudloche, the successor plan

---

    [9] Rule 8(c) reads as follows: **(c) Affirmative Defenses**. In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res

-18-

trustee, did not plead nor prove any such affirmative defense. But that is not Appellant raising the issue for the first time on appeal; because Appellant raised it below. So Appellees are wrong to say Appellant raised issues for the first time on appeal.

       7. Appellee's Attempt to Change Issues on Appeal. Appellee, by contrast, wants to use issues before this court, that it never pled, nor supported by evidence in the trial court. Try "loan". It never appeared in any pleading, nor anywhere in the hearing record before the bankruptcy judge, but has a whole paragraph on p. 4 of Appellee's brief.[10] But Appellee never pled, nor offered evidence, to support the alleged defenses in the opinion below. If your pleadings and proof are bad, and the hearing's over, no problem: get an opinion that raises for you the issues that you should have raised yourself!

      E. Burden of Proof. Appellant did not have the burden of proof on all issues below. Appellant had the burden of proving the work was done and the benefit to the estate. Once he did, then the question of affirmative defenses arose. The persons objecting to fees had the burden of going forward to prove some disqualifying affirmative defense (and Mr. Boudloche never pled any viable ones; the only ones which were pled were mentioned adversely by the bankruptcy judge, and seem to be abandoned). Appellee had the burden

---

judicata, statute of frauds, statute of limitations, waiver and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation.

   [10] P. 8, para. 4 of Appellee's brief claims Appellant thought he owed to give back money to pay unsecured creditors. But the quoted passage actually refers to Appellant's expectation he would have to reduce his unpaid fees for creditors to get any of the $225,000 expectation damages he was willing to settle out Mr. Feldman's $1 million reliance damage claim for. This is best seen in CKS exs. 21-22, "Confidential: A Settlement Proposal" of May 7, 2001, dkt. 433, R 2350 *et seq.*, enclosed. ($600,000 is stated, not $1 million, because more tax returns came later.)

to show an additional outside reason to deny Appellant's fees, despite work done and benefit bestowed.  Rule 8(c), F.R.Civ.P.

      1.  <u>Burdens in Good Faith Cases</u>.  Lack of good faith is typical affirmative defense, like fraud and illegality, which it resembles.  So the cases are clear that good faith is always presumed, and it is the burden of someone claiming bad faith to go forward with evidence to prove it.  <u>In re ABQ-MCB Jt. Venture</u>, 153 B.R. 338 (Bkcy., D N.M. 1993) (bankruptcies are presumed to be filed in good faith); <u>In re Crown Sportswear, Inc.</u>, 575 F.2d 991 (1st Cir. 1978) (same);  <u>In re Drexel, Burnham Lambert Group, Inc.</u>, 133 B.R. 13, 23 (Bkcy., SD N.Y. 1991) (held, attorney's "decisions must be presumed to be in utter good faith in view of the attorney's legal and ethical responsibilities"); <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 23 B.C.D. 1042 (Bkcy., SD N.Y. 1992) (good faith of board of directors of corporation is presumed, and burden of proof is on opponents to prove contra; <u>Intntl. Ins. Co. v. Johns</u>, 874 F.2d 1447, 1461 (11th Cir. 1989) (good faith is always presumed, and the one asserting contrary always has burden to show it); <u>In re Krug</u>, 131 B.R. 207 at 209 (Bkcy., ND Fla. 1991) (Killian, Bkcy. J.) (held, "Courts should *never* presume a lack of good faith") (emphasis by the court); <u>In re LaRoche</u>, 131 B.R. 253, 256 (D R.I. 1991), aff'd 969 F.2d 1299 (1st Cir. 1992) (involuntary petitions presumed filed in good faith); <u>In re Revely</u>, 148 B.R. 398 (Bkcy., SD N.Y. 1992) (involuntary petitions must be presumed filed in good faith, and burden to show contrary is on the opponents); <u>Sweet Jan Jt. Venture v. FDIC</u>, 809 F.Supp. 1246 (ND Tex. 1992) (held, in note 4, rule is that good faith is presumed, but evidence here was sufficient to rebut the presumption); <u>In re Southeast Bkg. Corp. (Brandt v. Bassett)</u>, 827 F.Supp. 742 (SD Fla. 1993) (directors of

corporation must always be presumed to be acting in good faith until contrary is proven);

In re Structure & Design, Inc., 156 B.R. 3 (Bkcy., D Maine 1993) (bankruptcies are

presumed filed in good faith, and the opponent has the burden to show the contrary); In re

Thacker, 6 B.R. 861, 865 (Bkcy., WD Va. 1980) (held, "Courts should never presume a

lack of good faith").  Appellant's evidence was that he acted in good faith.

2.  The Rule, Not the Exception.  Since the plan required such bad faith or

gross negligence as was the equivalent of an intentional tort, this case is no different than

the general rule.  Bad faith was not proven, and was not found, and did not exist, and not

being presumed, must be treated as absent, too.  No pleadings or proof or findings

supported the court's decision below.

F.  Intentional Tort Required.  Appellee says the requirement of an intentional tort

does not apply to fee applications.  No citation is made to any place in the record, nor to

any rule or principle of law to support that claim.  It contradicts the plain language of the

Plan.  The amendment to the Plan appointing the former plan trustee specifically says

there must be a finding of bad faith or such gross negligence as would constitute an

intentional tort to take any money from the plan trustee.  It doesn't say "fee applications"

are excluded or limited, so such limits should not be implied.  When a court orders a plan

trustee to pay hundreds of thousands of dollars, that is taking money from the plan

trustee.  And there was neither evidence nor finding of any intentional tort.

G.  Actions Speak Louder than Words.  Why has no demand been made on Mike

Boudloche during the past year for performance of any alleged necessary disclosures

omitted by Mr. Kaufman?  If any party in interest felt that Appellant had failed to give

-21-

substantial performance in the accountings which were furnished, then the duty which allegedly existed on the part of Appellant was passed on to his successor, Mike Boudloche, who was appointed plan trustee last summer, and still has yet to make any disclosures or furnish any accountings in this case. If Mr. Boudloche is not expected to do any of this work, that is an admission by conduct that Mr. Kaufman was not really being expected to do more than he did, either. The issue was just raised to find an excuse to keep Appellant from having the money he had previously earned, and what remained to be paid him.

1. <u>Election; Quasi-Estoppel</u>. If the creditors now want to elect not to pursue these causes of action, because creditors gain no value from them, then they had no value against Mr. Kaufman, either. Quasi estoppel says that whatever position they get the benefits of against Mike Boudloche, they are going to be stuck with as against Mr. Kaufman. If they are not suing Mr. Boudloche for accountings, they shouldn't be suing Mr. Kaufman. If anything Appellant is much less responsible than Appellee Boudloche – Appellant got information, and has court orders, and moved to compel (and the judge below only gave tax returns -- clear impossibility of getting more), and Appellee has never gotten any data from the CPA or Mr. Feldman, never sought a court order to get any, nor ever any such order ruled on. And CKS specifically said in court it wanted the new trustee to get such data – so no impossibility shown as yet on the part of Appellee.

2. <u>Appellant Not Bound</u>. The other claimants (pre-petition creditors) may want to give up their own claims against Mr. Feldman. But they cannot bind Appellant to give up Appellant's causes of action; and Appellant expects that the new plan trustee will carry out his duties to collect enough money from Mr. Feldman to complete payment of

the administrative expenses in this case.

III.  <u>What Appellees Omit</u>.

A.  <u>Laches</u>.  Appellees never explain why they can wait four years after the bankruptcy court has ordered that the former plan trustee did not have to give further accountings to CKS, before making their collateral attack on it.  Laches was pled by Appellant.  It was proven at the hearing.  It is as full a defense in equity as limitations is. *See e.g.*, cases cited in Footnote 6, p. 11, above.

B.  <u>Affirmative Defenses</u>.  Appellee Mike Boudloche, the successor plan trustee, pled in his objection to Appellant's final fee application that Appellant could not recover because the Bankruptcy Code sections governing Chapter 11 trustees (who must be appointed before confirmation, to count as serving in that capacity) also govern a plan trustee's fee applications.  Appellant's response pointed out that the caselaw is clear that these sections only govern up to confirmation of a plan (i.e., they stopped controlling in 1992).  Appellees do not try to brief the contrary, and accordingly it would seem that Appellees have abandoned that (unsupported and unsupportable) position.

C.  <u>Spent His Time How</u>?  Appellant strongly attacked the Court's statement below that most of Appellant's time was spent resisting accountings and defending his reputation.  Appellees made no attempt to defend the judge below on that point.  Accordingly it would seem that Appellees have abandoned that (unsupported and unsupportable) position.

D.  <u>March, 2002 Contradicts June, 2001</u>.  Appellant pointed out that the bankruptcy court's ruling of June 28, 2001 reads like a different case and has very

-23-

different findings than those contained in the written opinion of March, 2002. Appellees' brief made no attempt to deny the truth of this, nor to defend the judge below on that point. Accordingly it would seem that Appellees have abandoned any potential contention to the contrary.

E. Made No Complaint. Appellant pointed out that estoppel and quasi-estoppel and waiver were implicated by the actions of the creditors in making no complaints about the accountings between 1997 and 2001. Appellees' brief makes no attempt to deny the truth of this, nor to defend the judge below on that point. Accordingly it would seem that Appellees have abandoned any potential contention to the contrary.

IV. Comment.

Transcripts were completed four days before this brief was due, and Appellant promptly had them copied and numbered as record pages; but there just was not enough time to complete this brief, including its tables, and also give the court an analysis of the new transcripts. And after the reply brief was done, space was not available to correct the original brief with actual transcript record page numbers. (25-page limit.)

VIII. Conclusion.

The bankruptcy court ignored that Applicant earned the money applied for, that Applicant's efforts created (or at least discovered) $250,000 in cash that came in from the bank stock and Feldman Valley-Wide, not to mention the $1 million asset in the form of the liabilities of the Feldmans to the bankruptcy estate, which more than justified even greater compensation than had ever been paid, that no intentional tort had been proven sufficient to authorize taking any money back, that any complaints about accountings or

the like had been resolved four years before, and laches applied, and no retraction of any prior waivers had ever been issued; that it is improper to treat Applicant's actions as illegal *ex post facto* and without notice, when they were proper when done, and done in compliance with and in reliance on the prior orders of the bankruptcy court.

A.  <u>Summary of Requested Relief</u>.  As a result, the decision below should be reversed, and a decision should be rendered here allowing Applicant the fees applied for. Or alternatively, the district court might reverse the order below, for wrongly suggesting advance payments were made to former plan trustee, and wrongly ordering fees disgorged and wrongly claiming Appellant benefitted the estate only by $200,000 (we know $250,000 cash was created by Appellant, plus the $1 million claim); and to remand for entry of such judgment and further consistent findings. Or further in the alternative, the district court might consider withdrawing the reference of the case below to the bankruptcy court, and hold its own hearing to deal with the otherwise remandable portion of the case itself without making any remand at all.

WHEREFORE, PREMISES CONSIDERED, Applicant respectfully asks the Court to reverse the decision below, and adjudge that Applicant's fees and expenses be allowed (in the amount of cerca $454,000) as submitted, or alternatively give such decision as is discussed above, and grant such other and further relief as may be fair or just.

Respectfully Submitted,

Colin Kelly Kaufman, In propria personam
State Bar of Texas # 11113000
So. Dist. Federal ID # 9242

-25-

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone (361) 888-8865
Telecopier (361) 888-8172

<u>Certificate of Service</u>

I certify I had one of the personnel at this law office serve the foregoing writing on the persons shown on the Appeal Service List which follows, by U.S. mail, first class postage prepaid, this 17th day of May, 2002.

Colin Kelly Kaufman

<u>Appeal Service List</u>

1.    Matthew A. Rosenstein, Esq.
      420 American Bank Plaza
      Corpus Christi, TX. 78475

      FAX (361) 883-5590

2.    Richard Grant, Esq.
      3102 Oak Lawn #700
      Dallas, TX. 75219

      FAX (214) 777-5082

3.    Michael B. Schmidt, Esq.
      712 American Bank Plaza
      Corpus Christi, TX. 78475

      FAX (361) 884-6000

4.    Ron Simank, Esq.
      Schauer & Simank, Attys.
      615 N. Upper Broadway, Ste. 2000
      Corpus Christi, TX. 78476

      FAX (361) 884-2822

5.    James P. Moon, Esq.
      6001 Summerside Dr., Ste. 200
      Dallas, TX. 75252

      FAX (361) 931-1452

6.    Colin Kelly Kaufman
      P. O. Box 1662
      Corpus Christi, TX. 78403-1662

      FAX (361) 888-8172

-i-

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | Appeal # 02-05 and # 02-06 |
| ___Debtor___ | In Chapter 11 |

Index to Selected Shorter Documents Attached to
Appellant's Reply Brief for the Convenience of the Court

31. R0386. 12/20/96 — docket #261: order entered. Re: #250 - denying motion of CKS Asset Management to enforce and implement confirmed plan and to compel plan trustee to file an accounting (failure to prosecute).

33. R0430 - 0442. 05/13/97 — docket #275, and refiled as part of docket # 441: plan trustee's sixth report and partly unopposed motion to extend plan term to January 31, 1998; order enclosed. *{Used as Exhibit M(f) to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

36. R0451 - 0455. 06/27/97 — docket #281: plan trustee's response to CKS's motion to convert (Kaufman). *{Used as Exhibit M(d) to Hon. Keith P. Ellison, Esq., U.S. District Judge - dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

38. R0457- 0474. 08/13/97 — docket #287: plan trustee's original partly unopposed motion to employ accountant — filed by Colin K. Kaufman; order enclosed. *{Used as Exhibit 1(1e) to Hon. George P. Kazen, Esq. Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

44. R0496. 10/15/97 — docket #315: order entered. Unopposed order granting plan trustee's application for employment of accountant (Al White) - Granted. *{Used as Exhibit 1(1d) to Hon. George P. Kazen, Esq. Chief U.S. District Judge & Hon. Keith P. Ellison, Esq. United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

84. R2035-2046. 6/5/01 -- docket #413 Opposed Expedited Motion By Trustee Colin Kelly Kaufman To Compel Production of Documents . Hearing set for 9:00 6/8/01 at 1133 N Shoreline Corpus Christi to lg (swm) [EOD 06/06/01] [90-1254] *{Used as Exhibit G to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

91. R2066. 6/8/01 -- docket # 420 Hearing Re: [413-1] Motion To Compel Production of Documents by Colin Kelly Kaufman continued to 9:00 6/22/01 at 1133 N Shoreline Corpus Christi. Arguments presented. Tax returns to be provided by 6/13/01. (swm) [EOD 06/08/01]

[90-1254]

95. R2083-2121. 6/13/01 -- docket # 424  Opposed Expedited Motion By Trustee Colin Kelly Kaufman to Cancel CKS's Claim, Or Alternatively To Assign CKS's Claim , Or Set-Off Its Potential Dividend To Plan Trustee To Secure Fees (swm) [EOD 06/13/01]  [90-1254] {Used as Exhibit H to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}

105. R2350-2351. 6/22/01 -- docket #433  Creditor CKS Asset Management Witness and Exhibit List (swm) [EOD 06/25/01] [90-1254] .  Exhibit 21, R2351-467 through R2351-475; & Exhibit 22, R2351-476 through R2351-478

144. R3585-3601. 3/5/02 -- docket # 468  Notice Re: Filing of Colin K Kaufman's Post-Hearing Letter Memorandum of Issues to be Presented. (seh) [EOD 03/06/02] [90-1254] {Used as Exhibit 2(2c) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/ State Bar -- dated 03/12/02}

152. R3715. 07/13/01 — Letter from Hon. Keith P. Ellison, U.S. District Judge re: letter to notify you that a complaint has been filed.

153. R3716-3717. 12/06/01 — Letter ruling of Hon. George P. Kazen, Chief United States District Judge (in record as part of Docket #466).

31. 12/20/96 — docket #261: order entered.  Re: #250 - denying motion of CKS Asset Management to enforce and implement confirmed plan and to compel plan trustee to file an accounting (failure to prosecute).

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

United States Bankruptcy Court
Southern District of Texas
ENTERED

DEC 20 1996

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES FELDMAN | § | CASE NUMBER 90-01254-B-11 |
| | § | |
| | § | |

**ORDER DENYING MOTION OF CKS ASSET MANAGEMENT INC TO ENFORCE AND IMPLEMENT CONFIRMED PLAN AND TO COMPEL PLAN TRUSTEE TO FILE AN ACCOUNTING (#250)**

It appearing to the Court that the above-referenced matter was set for hearing on OCTOBER 9, 1996, 9:00 A.M., United States Courtroom, 500 East Tenth, Brownsville, Texas, and there being no announcement made and no appearance by the parties; it is, therefore,

ORDERED that the document referenced above is DENIED WITHOUT PREJUDICE for failure to prosecute.

DATED:    DEC 17 1996

RICHARD S. SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

RECEIVED
DEC 2 3 1996
BY:_____

R0386

33. 05/13/97 — docket #275: plan trustee's sixth report and partly unopposed motion to extend plan term to January 31, 1998; order enclosed. *{Used as Exhibit M(f) to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION



MAY 13 97

| IN RE: | | BANKRUPTCY CASE NO. 90-01254-B11 |
| Charles B. FELDMAN dba | | |
| Charles B. Feldman Investments | | IN CHAPTER 11 |
| Soc. Sec. # 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, Debtor | | |

Bkcy. Local Rule 9013 Notice (1-1-93): IF YOU WANT A HEARING, YOU MUST REQUEST ONE IN
WRITING AND YOU MUST RESPOND SPECIFICALLY TO EACH PARAGRAPH OF
THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE
BANKRUPTCY COURT WITHIN 20 DAYS FROM THE DATE YOU WERE SERVED AND
GIVE A COPY TO THE PERSON WHO SENT YOU THIS NOTICE. OTHERWISE THE
COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.

IF A REQUEST FOR EMERGENCY RELIEF IS MADE, THE COURT MAY ACT
EXPEDITIOUSLY ON THE MATTER. A HEARING MAY BE SET IN LESS THAN 20
DAYS. IF SO, ANSWERING THIS PLEADING WILL NOT PRESERVE YOUR RIGHTS.
ONLY ATTENDANCE AT THE HEARING IS NECESSARY FOR YOU TO OBJECT. IF
THE HEARING OCCURS MORE THAN 20 DAYS AFTER YOU WERE SENT THIS
WRITING, YOU MUST FILE A WRITTEN OBJECTION OR THE COURT MAY GRANT
THE RELIEF AS UNOPPOSED.

PLAN TRUSTEE'S SIXTH REPORT AND PARTLY UNOPPOSED
MOTION TO EXTEND PLAN TERM TO JANUARY 31, 1998.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Colin Kelly Kaufman, the duly appointed and acting Plan Trustee herein, and for his

Sixth Report, respectfully shows the Court and parties in interest as follows:

I. Introductory.

1. The Reaction to the Fifth Report. As the Court is aware, much litigation post-petition has been

initiated or caused by one creditor, an assignee of the FDIC in Dallas named CKS. This has resulted in

court proceedings and consequent legal work causing otherwise unnecessary expenditures of estate

funds. The legal work caused by CKS, who is probably going to get paid in the vicinity of $10,000, may

1

R0430




have already cost creditors as much as $30,000. This is the same creditor who filed an abstract of judgment in violation of the plan, making it impossible for a long time for the Reorganized Debtor to sell any real property. When the Fifth Report was filed, this creditor through its counsel, complained because it was just like the Fourth Report! See Exhibit GRUMP.

 A. <u>Same Old Format</u>. The Plan Trustee admits to being sufficiently a creature of habit that he  continued doing his reports in the same old format, that nobody ever objected to before.

 B. <u>Lacked Psychic Vibes</u>. The Plan Trustee admits that he didn't do the report in the way that Exhibit GRUMP complains wasn't done. But how was the Plan Trustee to know he should do it differently? Plan Trustee lacked sufficient psychic vibes to read this corporate creditor's constructive mind! So he couldn't figure out, BEFORE Exhibit GRUMP was sent, that it would say the things it does. Before CKS complained that Mr. Kaufman had not already done the things requested in Exhibit GRUMP, counsel should have checked to be sure Mr. Kaufman's Ouija board was not broken!

 C. <u>Can't Be Done Quickly</u>. The Plan Trustee would point out that to do all the things requested in Exhibit GRUMP, a great deal of input from Charles Feldman, the person who was actually to sell off his former property, is needed. Alas, Mr. Kaufman's powers to read minds is no greater in the case of Mr. Feldman than it is in the case of Mr. Newsom. Mr. Kaufman is thus forced to resort to more mundane means of communications like telephones and FAX machines. This takes time. And Mr. Feldman has a business to run in the meantime. As shown below, Mr. Kaufman proposes that a final report a few months later will include more of the things that Mr. Newsom is demanding.

 2. <u>Remaining Assets</u>. The Plan Trustee has made progress in the area of determining the real value of the remaining assets, with a view to sell them. See Exhibit AFFIDAVITS attached for affidavits of Mr. Curtis Bonner, well-known Valley attorney. The Court has entered an Order allowing the Plan Trustee

2

R0431

to hire appraisers, and these will be available probably in about another six weeks.

## II. Extend Term.

3. Need Six Months, at Least. The Plan Trustee feels that in another six or eight months, enough will have been done to enable the Court to say so. The Court will have enough data before it to determine that further efforts to dispose of the remaining realty are not likely to be successful. At that time, the Plan Trustee will offer creditors a distribution in kind of the unsold assets, along with their share of the cash for sold assets. If they choose to accept this distribution, a final report will be filed. To the extent they choose NOT to accept their distribution in kind, the unsold assets will be abandoned to Mr. Feldman, and a final report will STILL be filed. Some extra time now would be appropriate because a lot of selling time was lost while the abstracts of judgment were outstanding against the property.

4. Standard. A confirmed Plan can be amended if no material prejudice would occur to the creditors who voted for it, and if it has not yet been "substantially consummated." Sec. 1127(b), Bkcy. Code; In re Manges, 29 F.3d 1034 (5th Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1105, 130 L.Ed.2d 1071 (1995). Extending the Plan term until January 31, 1998 would not materially harm any creditor that the Plan Trustee is aware of. And "substantial consummation" is defined in the caselaw as the transfer of the bankruptcy estate property along with the commencement of payments to CREDITORS. Manges, supra. So far, the estate property was transferred to the Reorganized Debtor to sell for creditors, but only administrative expenses, not creditors, have been paid since the Plan was confirmed. So the Court can still modify the Plan by extending the term to January 31, 1997.

## III. Conclusion.

5. Finis. The Court should give a little more time to sell this property before giving up on the idea that it is sellable.

3

R0432

WHEREFORE, PREMISES CONSIDERED, the Plan Trustee respectfully requests that this Court extend the Plan term until January 31, 1998, and that he have such other and further relief as may be fair or just.

Respectfully submitted,

Colin Kelly Kaufman, Plan Trustee, Pro Se
State Bar of Texas # 11113000
So. Dist. Fed. ID # 9242

Colin Kelly Kaufman, Atty. at Law
1106 Third St. 78404-2312
PO Box 1662
Corpus Christi, TX. 78403-1662

Telephone (512) 888-8865
TeleFAX (512) 888-8172

### Certificate of Conference

I certify that I discussed with Mr. Feldman and Mr. Moon at or shortly before the time of filing my Fifth Report the possibility of extending the Plan term for six or eight months before making a final determination that the remaining property could not be sold, and neither of them expressed any opposition to that. Also, I talked to Mr. Moon again on May 13, 1997, and the same situation prevailed.

Colin K. Kaufman

### Certificate of Service

I certify I had one of the personnel at my law office serve a copy of the foregoing writing on the persons shown on the service list attached to the original of this document on file with the captioned bankruptcy court this 13th day of May, 1997.

Colin K. Kaufman

4

R0433

## FELDMAN SERVICE LIST

Mr. Charles B. Feldman
Charles Feldmann Investments
926 Lantana St.
Harlingen, TX  78550-8080

Office of the US Trustee
Wilson Plaza Building
606 N. Carancahua, Room 1107
Corpus Christi, TX  78476

Ms. Nancy Holley
US Trustee's Office
The Lyric Center, Suite 2500
440 Louisiana St.
Houston, TX  77002

~~Ronald A. Simank~~  *Delete per CLS*
Pipitone, Schauer & Simank, P.C.
2000 First City Bank Tower, FCB 159
615 North Upper Broadway
~~Corpus Christi, TX  78476~~

Christopher M. Weil
Weil & Petrocchi, P.C.
1900 N. Tower, LB 3674
Dallas, TX  75201

Angela C. Dickerson
Pape,Sapp,Zivley,Hill & LaBoon
700 Lavaca, Suite 800
Austin, TX  78701

Paul T. Curl
Pape,Murray,McClenahan & Sparr
200 NBC Bank Building
430 Soledad
San Antonio, TX  78205

Colin K. Kaufman
Powers & Kaufman
P.O. Box 1662
Corpus Christi, TX  78403

Millard O. Anderson, Jr.
Ludwick & Anderson
5944 Luther Lane, Suite 800
Dallas, TX  75222

~~Phil F. Snow~~  *Delete per C*
Snow & Fogel
1331 Lamar St., Suite 1070
~~Houston, TX  77010~~

Nancy L. Abell
Assistant US Attorney
P.O. Box 1671
Brownsville, TX  78251

MBNA Amercia
c/o Becket & Watkins
P.O. Box 512, Dept. N
Malvern, PA  19355

~~Charles M. Jefferson~~  *Delete*
James M. Stoffer, Jr.     *C*
Smith,Barshop,Stoffer & Mill
One Riverwalk Place, Suite 1
700 North St. Mary's St.
~~San Antonio, TX  78205~~

James P. Moon, Esq.
James P. Moon & Assoc., P.C.
2602 McKinney Ave., Suite 35
Dallas, TX  75204

R. Kirk Newsom
Newsom,Terry & Newsom, LLP
Sterling Plaza, Suite 600
5949 Sherry Lane
Dallas, TX  75225

R0434

## NEWSOM, TERRY & NEWSOM, L

*a Limited Liability Partnership*

### ATTORNEYS AND COUNSELORS

Sterling Plaza
Sherry Lane
Texas 75225
(214) 739-1000
Facsimile (214) 739-9009

R. Kirk Newsom

## FACSIMILE TRANSMISSION

**DATE:**      April 21, 1997

**TO:**      Colin K. Kaufman, Esq.

**FAX #:**      1-512-888-8172

**FROM:**      R. Kirk Newsom

**SUBJECT:**   Feldman Bankruptcy

**Number of pages of this transmission, including this page: 2  page(s).**

**If you have any difficulty receiving this transmission, please call (214) 739-1000. The number of our facsimile machine is (214) 739-9009.**

Letter attached responding to your report that I received in the mail today.

cc      James P. Moon, Esq. - 214-220-0562

Steve Ditto - 361-9380

**(Original will NOT follow)**

Exhibit GRUMP

R0435

TORNEYS AND COUNSELORS

600 Sterling Plaza
5949 Sherry Lane
Dallas, Texas 75225
Telephone (214) 739-1000
Facsimile (214) 739-9009

R. Kirk Newsom

April 21, 1997

**Via Telefacsimile To**
**1-512-888-8172**
Colin K. Kaufman, Esq.
P. O. Box 1662
Corpus, Christi, Texas 78403-1662

RE:   Case No. 90-01254-B-11
In Re:  Charles B. Feldman

Dear Colin,

I received your "Plan Trustee's Fifth Report" today. While it was a bit entertaining to read, it was a far cry short of the form of report that I had hoped would have been prepared. The report simply reiterates old news and neither informs the court or creditors of what has been done over the past five years to implement the terms of the Plan, such as, for example, setting forth essentially a balance sheet of the estate showing (a) what assets existed at confirmation, (b) what assets have been liquidated and the gain realized, (c) what specific assets remain to be liquidated, and (d) the anticipated extent of gain to the estate. My client has no desire to ask you to become "Mr. Stork"; quite the contrary, it appears that Mr. Feldman has done nothing and under the Plan as I read it, it appears that you were put in the Plan at least as a point of accountability for Mr. Feldman. It does not appear to me, however, that Mr. Feldman has in reality been accountable to anyone, since it appears little or nothing has been done over the past five years to liquidate the estate.

Now, whether under this rather confusing Plan YOU were to "crack the whip", or whether the creditors and the Court were to simply rely on Mr. Feldman's good intentions, is uncertain. We simply want to know what's been done, what's out there, and what can be expected in the remaining 60 days of the Plan. Specifics are needed, and none were provided in your Fifth Report.

I would like to respond to your comments about CKS, specifically its actions in 1995 recording an assignment of judgment lien, and the amount of its claim. I am very interested to know the specific facts you are aware of that support the conclusions you reached in your report that "...These abstracts caused great consternation to Feldman's bankers, who are governed by FDIC regulations concerning how they must classify loans...", and "...These abstracts also made it impossible for Feldman to sell his real estate interests which were supposed to be sold under the Plan...". These statements appear preposterous, and what is even more strange to me is why such comments are coming

R0436

Colin K. Kaufman, Esq.
In Re: Feldman
04/21/97
Page - 2

from you, the Plan Trustee. Are you an advocate for the Debtor, or are you the "Watchdog", so to speak, acting for the benefit of the creditors? To be frank, I am very confused by your report, but I am nevertheless willing to wait until your final report is filed on May 9th, which surely will include all of the information in such detail that creditors and the Court, who have not been adequately informed over the past five years, can have a proper view of what has been done and what will transpire during the remainder of this proceeding.

Lastly, with respect to the claim of CKS, at this time it is possible that at least one claim, the claim of Parkwell Investments, Inc., is significantly overstated, or alternatively, perhaps a significant asset has not been reported by the debtor. This needs to be looked into. If you review the way in which the claim of Parkwell was established, it raises some serious questions. If you can assist in answering either of these questions, I would appreciate hearing from you as soon as possible.

Very truly yours,

R. Kirk Newsom

cc    James P. Moon, Esq. - 214-220-0562

Steve Ditto - 361-9380

R0437

TOTAL P.03

**BONNER & BONNER**
ATTORNEYS AT LAW
103 S. THIRD STREET
P. O. BOX 288
HARLINGEN, TEXAS 78551

NEAL BONNER (1927-1990)
CURTIS BONNER

May 1 , 1997

PHONE 210 - 428-9152
FAX 210 - 428-0671

Mr. Colin K. Kaufman
P. O. Box 1662
Corpus Christi, Texas 78403-1662

    IN RE:  Charlie Feldman

Dear Colin

    After I met with you and Charlie I prepared the enclosed but unfortunately did not forward same to you.  I apologize to you for having failed to send them.

    Please review and let me know if you see any changes which you would like to be made and return these to me.  I will make changes and send back to you.

                 Sincerely yours,

                 Curtis Bonner

Copy to:
Mr. Charlie Feldman
Mr. James Moon

Exhibit AFFIDAVITS

RECEIVED
MAY 2 1997
BY:

R0438

STATE OF TEXAS

COUNTY OF CAMERON

AFFIDAVIT

BEFORE ME THE UNDERSIGNED AUTHORITY personally appeared Curtis Bonner who after being by me duly sworn deposes and says:

My name is Curtis Bonner. I am over the age of eighteen years. I have never been convicted of a crime involving moral turpitude and I am fully competent to make this affidavit. I have personal knowledge of all the facts stated herein and same are true and correct.

I own an undivided 25% interest in approximately 900 acres out of Espiritu Santo Grant in Cameron Co., Texas located on the north side of the Intracoastal Barge Channel at Arroyo City, Texas. Charles B. Feldman also owns a 25% interest in this property.

The property has no land access for ingress and egress and is bordered on the south by the barge channel and on the north by the old stream bed of the Arroyo Colorado. The property has no utilities to it and there are no easements available along which electricity and water could be provided.

The property is generally coastal prairie and salt flats covered with salt grass subject to inundation by water in several areas. The soil is generally sandy. There are a couple small narrow bands of brush which run east and west. It is not suitable for farming because of the poor salty soil. It is not particularly suitable for cattle ranching as there are no water sources on the property except the Arroyo Colorado which is pretty salty at that point since it is only some two miles from the Laguna Madre which is a hyper-saline estuary. Also since there is no access by land a drilling rig cannot be brought in to drill any water wells. There is an easement for dredge spoil owned by the Army Corps of Engineers along the shore of the barge channel. The property is only used for hunting by myself and 2 of the other co-owners.

Access to the property is only by boat. Since no property is owned on the south side of the channel lease arrangements for a nominal payment must be made from year to year for use of a pier from which to launch. If you want to take a truck or tractor vehicle over to the property you must put same on a borrowed barge and convey it down the waterway to a low point on the bank and off-load it. Or you can hire a crane and barge from Port Isabel to transport it but that is extremely expensive to the tune of some $5,000 to $10,000.

I have actively hunted the property but I do not have a vehicle over there. I keep a wheel barrow there during hunting season and I use that to haul feeder, corn and any deer I might kill. This is primitive hunting as you might gather. Prior to coming up with the idea of the wheel barrow I used a pole and a friend (a la African safari) to haul out any game and carried sacks of corn on my shoulder.

When this property was purchased we were leasing an adjacent ranch for hunting. So access was no problem. We lost that lease some ten years ago and have been denied access since then. It was our intent to subdivide the waterfront into lots and sell them



R0439

similar to the development on the south side of the barge channel. However after purchase the lack of land access, the astronomical cost of getting water and electricity to the property and the onerous subdivision rules which have been put in place for counties along the Mexican border makes subdividing economically impossible.

I am not interested in selling my interest in the property. There are 2 other co-owners besides myself and Mr. Feldman. One of those co-owners (Mr. Lievens) just died in February leaving a wife and five children. I do not believe any probate has been initiated on his estate as of yet. In order to make use of the property a great deal of cooperation and give and take is required of the co-owners since the land is mostly open prairie and we must work together to acquire a launching place, repair the pier which we have, etc.

As to why I am not personally interested in selling my interest in this property I do not believe that at the present time an offer to purchase would be sufficient to interest me and to obtain enough proceeds to purchase hunting property to replace it. I struggled for ten years to pay for it and now the only carrying costs I have is for my share of the taxes and my share of rental for use of a pier for a launching place. It would be impossible for me to purchase another place to hunt which is only 30 minutes from my home and office.

Several years ago a ready willing and able buyer was procured who offered to purchase the property but the contract was terminated when we could not deliver ingress and egress by land. I believe the same impediment to a sale exists today. The problem is that the access problem was created by the dredging of the intracoastal canal because prior to that this property was not land-locked or should I say water-locked. This property is not out of the same land grants as the property over which access would have to come and so a suit for access is probably not winnable.

Further affiant sayeth not.

_Curtis Bonner_
Curtis Bonner

Subscribed and sworn to before me the undersigned authority on March 12, 1997.

_Notary Public, State of Texas_
Notary Public, State of Texas

IRMA M. GONZALEZ
Notary Public, State of Texas
My Commission Expires 12-23-1?

STATE OF TEXAS

COUNTY OF CAMERON

## AFFIDAVIT

BEFORE ME THE UNDERSIGNED AUTHORITY personally appeared Curtis Bonner who after being by me duly sworn deposes and says:

My name is Curtis Bonner. I am over the age of eighteen years. I have never been convicted of a crime involving moral turpitude and I am fully competent to make this affidavit. I have personal knowledge of all the facts stated herein and same are true and correct.

I own an undivided one-sixth interest in certain lots in the Caldwell and Kirksey-Bell Subdivisions on South Padre Island in Cameron County, Texas. Charles B. Feldman is a co-owner along with four others. The lots have no improvements in the way of paved roads or available utilities.

The lots are located somewhere north of the Town of South Padre Island in an undeveloped area. There are no utilities to the property and probably the only way to locate same is to hire a surveyor because there are no roads in the subdivisions. A portion of the lots lying near the public beach have been lost to erosion and we have stopped paying taxes on those.

Because of articles in the newspaper about a proposed development to the north of this property which was terminated because of lack of water for service to this area I have formed the opinion that these lots probably have no market value at the present time. This is particularly true because of the recent developments in governmental regulation on the coastal barrier islands.

For these lots to have reasonable market value is going to require the Cameron County Fresh Water Supply District to acquire significant additional water rights and construct additional sewer treatment facilities to serve this area.

For the foreseeable future the co-owners must pay the taxes assessed against the property with little hope of selling the property in the near future.

Further affiant sayeth not.

Curtis Bonner

Subscribed and sworn to before me the undersigned authority on March 10, 1997.

IRMA M. GONZALEZ
Notary Public, State of Texas
My Commission Expires 12-23-1...

Notary Public, State of Texas

R0441

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:                                     |    CASE NO. 90-01254-B-11
                                           |
Charles B. FELDMAN, dba Charles            |    IN CHAPTER 11
    Feldman Investments, Debtor            |

---

ORDER GRANTING EXTENSION OF PLAN TERM
TO JANUARY 31, 1998

CAME ON to be considered the Plan Trustee's Sixth Report and Partly Unopposed

Motion to Extend Plan Term to January 31, 1998, and the Court, having considered the

grounds asserted in support of extending the Plan term, and finding that good grounds have

been asserted for the same, and no opposition thereto having been heard;

It is therefore accordingly hereby ORDERED, ADJUDGED and DECREED that the

Plan term for selling or liquidating the property of the estate be and it hereby is extended until

January 31, 1998.

So ordered this date _____.


                                _____
                                Hon. Richard S. Schmidt, Esq.
                                UNITED STATES BANKRUPTCY JUDGE

After entry, copies to:

Charles B. Feldman, Debtor
Jas. P. Moon, Debtor's Atty., 2602 McKinney Ave., Suite 350, Dallas, TX. 75204
C. K. Kaufman, Plan Trustee, FAX # 1-512-888-8172
R. Kirk Newsom, 600 Sterling Plaza, 5049 Sherry Ln., Dallas, TX. 75225

R0442

36. 06/27/97 — docket #281: plan trustee's response to CK's motion to convert (Kaufman). *{Used as Exhibit M(d) to Hon. Keith P. Ellison, Esq., U.S. District Judge — dated 08/13/01 & to Richard Russell w/State Bar — dated 08/31/01}*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

FILED

JUN 27 97

UNITED STATES
BANKRUPTCY COURT

IN RE:                                              BANKRUPTCY CASE NO. 90-01254-C-11

Charles B. FELDMAN dba
Charles B. Feldman Investments             IN CHAPTER 11
Soc. Sec. # 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, Debtor

---

## PLAN TRUSTEE'S RESPONSE TO CKS' MOTION TO CONVERT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Colin Kelly Kaufman, the duly appointed and acting Plan Trustee herein, and for his Response to CKS' Motion to Convert, respectfully shows the Court and parties in interest as follows:

I. Response to Specific Allegations.

0. No Separate Motion. There is no separate motion to appoint a plan trustee, only an allegation that the Court should do so in CKS's objection to Plan Trustee's Sixth Report and Motion to Extend Plan Term to January 31, 1998. Despite this lack, Plan Trustee has tried to figure out which of CKS's allegations are merely defensive and which ought to be taken as its motion to convert.

1. No Grounds. Plan Trustee denies the allegations of paragraph 11 of the Response, saying that no suitable report has been filed. Plan Trustee has given what was asked for. If a much more detailed and expensive a report, costing a lot more attorneys fees is the "suitable" one has to specifically demand that. That was never specifically demanded until the recent Respone of CKS.

2. No Duty to File Here. Plan Trustee denies the allegations of Paragraph 12 of the Response, alleging that Plan Trustee had a duty to file things with this court. That was a right, not a duty. Plan Trustee denies the allegations of Paragraph 13 claiming that Plan Trustee had a duty to file things with the

1

court. This was a right, not a duty.

3. <u>Assets</u>. Plan Trustee admits there are assets as alleged in Paragraphs 14 and 15.

4. <u>No Difficulty</u>. Plan Trustee denies the allegations of Paragraph 16 that it has been difficult to tell that Mr. Feldman has been selling assets, as he was supposed to be.

5. <u>Diligence</u>. Plan Trustee denies the allegations of Paragraph 17 claiming that Mr. Feldman has not used due diligence to sell and Plan Trustee has not adequately supervised him, or that a liquidating plan is "not feasible" if liquidation is difficult. The caselaw is clear that, "liquidating plans are always feasible" at least in the sense that "further liquidation" not provided for in the Plan will never be necessary. A Chapter 7 Trustee would have to liquidate, too; however difficult. Furthermore, even if a plan proves unfeasible years after confirmation, that's tough. You can only revoke confirmation for six months, and then only for fraud, not mistake. Sec. 1144, Bkcy. Code.

<div align="center">II. <u>Additional Considerations</u>.</div>

6. <u>Can't "Convert" Effectively Post-Confirmation</u>. Once a plan has been confirmed, a "conversion" is a nullity, because the Plan terms continue to govern and apply to the "converted" case. An appointed Trustee gets no title to any assets, and there is nothing he can administer unless the Plan specifically says so. <u>In re Pavlovich (Pavlovich v. Bk. of So. La.)</u>, 952 F.2d 114 (5th Cir. 1992). So conversion is a useless act, and equity will not order a useless act. <u>Haase v. Chapman</u>, 308 F.Supp. 319 (WD Mo. 1969), followed in <u>Bowen Engr'g. v. Estate of Reeve</u>, 799 F.Supp. 467, 489 (D N.J. 1992) (Anne Thompson, Dist. J.).

7. <u>Cloud Title</u>. All that adding a Chapter 7 trustee would do at this point in the case is add an additional party with the capability of clouding title to the various properties, and make them more unsaleable than ever. This could cause problems for the Reorganized Debtor, Mr. Feldman, as well as the Plan Trustee.

<div align="center">2</div>

R0452

8. <u>Brief Follows</u>. The local rules require that a pleading contain adequate citations, or that it be accompanied or followed by a brief. Plan Trustee is not satisfied with the adequacy of the citations herein, but time presses. So Plan Trustee is filing a brief shortly to provide them.

III.   <u>Conclusion</u>.

9. <u>Finis</u>. The Court should deny the attempt to convert as a useless act.

WHEREFORE, PREMISES CONSIDERED, the Plan Trustee respectfully requests that this Court deny CKS' Motion to Convert, and let him go hence without day free from same.

Respectfully submitted,


Colin Kelly Kaufman, Plan Trustee, Pro Se
State Bar of Texas # 11113000
So. Dist. Fed. ID # 9242

Address and Of Counsel:

Colin Kelly Kaufman, Atty. at Law
1106 Third St. 78404-2312
PO Box 1662
Corpus Christi, TX. 78403-1662

Telephone (512) 888-8865
TeleFAX (512) 888-8172

### Certificate of Service

I certify I had one of the personnel at my law office serve a copy of the foregoing writing on the persons shown on the service list attached to the original of this document on file with the captioned bankruptcy court this 27th day of June, 1997.


Colin K. Kaufman

3

R0453

## FELDMAN SERVICE LIST

Mr. Charles B. Feldman
Charles Feldmann Investments
926 Lantana St.
Harlingen, TX  78550-8080

Office of the US Trustee
Wilson Plaza Building
606 N. Carancahua, Room 1107
Corpus Christi, TX  78476

Ms. Nancy Holley
US Trustee's Office
The Lyric Center, Suite 2500
440 Louisiana St.
Houston, TX  77002

~~Ronald A. Simank~~   Delete per CBF
Pipitone, Schauer & Simank, P.C.
2000 First City Bank Tower, FCB 159
615 North Upper Broadway
~~Corpus Christi, TX  78476~~

Christopher M. Weil
Weil & Petrocchi, P.C.
1900 N. Tower, LB 3674
Dallas, TX  75201

Angela C. Dickerson
Pape,Sapp,Zivley,Hill & LaBoon
700 Lavaca, Suite 800
Austin, TX  78701

Paul T. Curl
Pape,Murray,McClenahan & Sparr
200 NBC Bank Building
430 Soledad
San Antonio, TX  78205

Colin K. Kaufman
Powers & Kaufman
P.O. Box 1662
Corpus Christi, TX  78403

Millard O. Anderson, Jr.
Ludwick & Anderson
5944 Luther Lane, Suite 80
Dallas, TX  75222

~~Phil F. Snow~~   Delete Per
Snow & Fogel
1331 Lamar St., Suite 1070
~~Houston, TX  77010~~

Nancy L. Abell
Assistant US Attorney
P.O. Box 1671
Brownsville, TX  78251

MBNA Amercia
c/o Becket & Watkins
P.O. Box 512, Dept. N
Malvern, PA  19355

~~Charles M. Jefferson~~   Dele
James M. Stoffer, Jr.
Smith,Barshop,Stoffer & Mil
One Riverwalk Place, Suite
700 North St. Mary's St.
~~San Antonio, TX  78205~~

James P. Moon, Esq.
James P. Moon & Assoc., P.
2602 McKinney Ave., Suite
Dallas, TX  75204

R. Kirk Newsom
Newson,Terry & Newsom, LLP
Sterling Plaza, Suite 600
5949 Sherry Lane
Dallas, TX  75225

R0454

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

IN RE:                                          |       BANKRUPTCY CASE NO. 90-01254-B-11
                                                |
Charles B. FELDMAN dba                          |
Charles B. Feldman Investments                  |       IN CHAPTER 11
Soc. Sec. # 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, Debtor                 |

---

## ORDER SUSTAINING
## PLAN TRUSTEE'S RESPONSE TO CKS' MOTION TO CONVERT

CAME ON to be considered the motion to convert contained in CKS' Response to Plan Trustee's

Sixth Report and Motion to Extend Plan Term to January 31, 1998; and it appearing to the Court that good

grounds have been alleged to show that conversion would be a useless act;

It is accordingly therefore hereby ORDERED that conversion is DENIED.

_____
Hon. Richard S. Schmidt, Esq.
United States Bankruptcy Judge

After entry, copies to:
Charles B. Feldman, Debtor
Jas. P. Moon, Debtor's Atty., 2602 McKinney Ave., Suite 350, Dallas, TX. 75204
C. K. Kaufman, Plan Trustee, FAX # 1-512-888-8172
R. Kirk Newsom, 600 Sterling Plaza, 5049 Sherry Ln., Dallas, TX. 75225

R0455

38.  08/13/97 — docket #287: plant trustee's original partly unopposed motion to employ accountant — filed by Colin K. Kaufman; order enclosed. *{Used as Exhibit 1(1c) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge — dated 03/08/02 & Richard Russell w/State Bar — dated 03/12/02}*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| ·IN RE: | BANKRUPTCY CASE # 90-01254-B-11 |
| Charles B. FELDMAN dba | |
| Charles B. Feldman Investments | |
| Soc. Sec. # 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, Debtor | IN CHAPTER 11 |

BLR Rule 9013 Notice (Version of Jan. 1, 1993):

IF YOU WANT A HEARING, YOU MUST ASK FOR ONE IN WRITING. YOU MUST
ANSWER EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR
RESPONSE WITH THE BANKRUPTCY COURT CLERK WITHIN TWENTY DAYS FROM
THE DATE THIS WAS SENT TO YOU. YOU MUST SEND THE PERSON WHO GAVE
YOU THIS NOTICE A COPY OF YOUR RESPONSE. OTHERWISE, THE COURT MAY
TREAT THIS PLEADING AS UNOPPOSED AND GRANT THE RELIEF.

IF SOMEONE ASKS FOR EMERGENCY CONSIDERATION, THE COURT MAY ACT
EXTRA SOON ON THE MATTER. IF THE COURT SETS A RESPONSE TIME OF LESS
THAN TWENTY DAYS, YOU MUST MEET THE SHORTER DEADLINE. IF THE COURT
SETS AN EMERGENCY HEARING BEFORE THE RESPONSE TIME EXPIRES, YOUR
RIGHTS CAN BE PRESERVED ONLY BY ATTENDING THE HEARING. IF NO
EMERGENCY HEARING IS SET, YOU MUST ANSWER BEFORE THE RESPONSE TIME
EXPIRES.

PLAN TRUSTEE'S ORIGINAL PARTLY UNOPPOSED
MOTION TO EMPLOY ACCOUNTANT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Colin Kelly Kaufman, the Plan Trustee herein, and for his

Original Motion to Employ Accountant, respectfully shows the Court as follows:

1. Work Requested. R. Kirk Newsom has requested various data and

information be assembled. See Exhibit REQS attached. Mr. Moon has, on behalf of his

client, declined to do the work himself, but offered to cooperate if Plan Trustee wishes

to employ an accountant to do the work.

2. Accountant Selected. Plan Trustee thought it would save time and money to

R0457

AUG 1 5

use an accountant who is already familiar with this account.  Mr. Al White at Chidester,

Marlow & White, P.C., CPAs, has agreed to do the work at his firm's usual rate from

time to time for partner CPA's, currently $150 an hour. See his letter attached as

Exhibit ACCT.

3.  Attachments.  Mr. White's prior affidavit and the like used when this court

approved his employment as accountant for the Debtor-in-Possession are also attached,

see Exhibit PRIOR and establish him as sufficiently disinterested to be employed

herein.

4.  Trustee's Knowledge.  Your Plan Trustee also knows of no reason why Mr.

White ought not to be employed to do the work requested by Mr. Newsom.

WHEREFORE, PREMISES CONSIDERED, Plan Trustee Colin Kelly Kaufman

respectfully requests this Court to approve the employment of Al White to do such of

the things requested to be done by R. Kirk Newsom as Plan Trustee actually chooses to

have done.

Respectfully Submitted,

Colin Kelly Kaufman, Plan Trustee, in
*Propria Personam*
State Bar of Texas # 11113000
Southern Dist. Fed.  ID # 9242

ADDRESS AND OF COUNSEL:

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
PO Box 1662
Corpus Christi, TX. 78403-1662

R0458

Telephone (512) 888-8865
TeleFAX # (512) 888-8172

## Certificate of Conference

I certify I conferred with James P. Moon by phone cerca Friday, August 8, 1997; and he did not oppose the employment of Mr. White as accountant.

Colin Kelly Kaufman

## Certificate of Service

I certify I had someone at this law office serve a copy of the foregoing writing by U.S. Mail, first class postage prepaid, to the persons shown on the following service list, this 13th day of August, 1997.

Colin K. Kaufman

## POST-CONFIRMATION SERVICE LIST

1.  Steve A. Ditto, Pres.
    CKS Asset Mgt., Inc.
    6116 N. Central Expwy., Suite 255
    L-B 25
    Dallas, TX. 75206

    FAX # 214-361-9380

2.  R. Kirk Newsom, Esq., CKS' Atty.
    Newsom, Terry & Newsom
    600 Sterling Plaza, 5949 Sherry Lane
    Dallas, TX. 75225

    FAX # (214) 739-9009

3.  Charles B. Feldman, Reorganized Debtor
    Address
    Harlingen, TX.

    FAX # (956) 423-1670

4.  James P. Moon, Esq., Debtor's Atty.
    2602 McKinney Ave., Suite 350
    Dallas, TX. 75204

R0459

FAX # (214) 220-0562

5.  Colin Kelly Kaufman, Plan Trustee
    1106 Third St. 78404-2312
    P. O. Box 1662
    Corpus Christi, TX. 78403-1662

    FAX # (512) 888-8172

6.  Al White, CPA
    Chidester, Marlow & White, P.C., CPAs
    2202 Treasure Hills Blvd.
    Harlingen, TX. 78550

    FAX # (956)

R0460

JAMES P. MOON
ERIC A. LIEPINS
SIMPSON, DOWD, & MOON
4800 First Interstate Bank Tower
1445 Ross Avenue, L.B. 214
Dallas, Texas 75202
(214) 855-6250

ATTORNEYS FOR DEBTOR

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES B. FELDMAN, d/b/a | § | CASE NO. 90-01254-B-11 |
| CHARLES B. FELDMAN INVESTMENTS, | § | |
| | § | |
| Debtor. | § | |

APPLICATION TO APPROVE EMPLOYMENT OF ACCOUNTANTS
PURSUANT TO 11 U.S.C. §327

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, CHARLES B. FELDMAN, d/b/a CHARLES B. FELDMAN
INVESTMENTS, in the above styled and numbered cause and files this
its Application To Approve Employment Chidester, Marlow & White,
P.C. (the "Firm") as accountants Pursuant to 11 U.S.C. §327 and in
support thereof would respectfully show unto the Court as follows:

I.

On July 11, 1990, Debtor filed its Voluntary Petition under
Chapter 11 of the United States Bankruptcy Code and has continued
in possession of its property and the operation of its business as
a Debtor-in-Possession pursuant to §§1107 and 1108 of the United
States Bankruptcy Code.

APPLICATION TO APPROVE EMPLOYMENT OF ACCOUNTANTS
PURSUANT TO 11 U.S.C. §327 - Page 1



R0461
EXHIBIT Prior

## II.

Debtor-in-Possession wishes to employ the Firm as accountants. Your applicants have chosen these accountants for the reason that they are experienced in matters of this character and are qualified to perform the work required of them in this case.

## III.

The professional services the Firm is to render include the following:

1.  To close out Debtor's books as of the date of filing, and to open and maintain new books as of the next day thereafter;

2.  To prepare the necessary reports on the operations of the Debtor as required by the Court;

3.  To help Debtor in formulating its Plan of Reorganization;

4.  To provide Debtor with a liquidation analysis; and

5.  To prepare any tax returns for Debtor which may come due during the pendency of this matter.

## IV.

The terms of the employment of said accountants agreed to by the Debtor-in-Possession, subject to the approval of the Court, are the following:

| Name | Position | Rate |
|------|----------|------|
| Albert White | Shareholder | $110.00/per hr. |
| Willie Chidester | Shareholder | $110.00/per hr. |
| John L. Marlow | Shareholder | $110.00/per hr. |
| Kallye Kidd | Staff | $ 75.00/per hr. |
| Ernst Garcia | Staff | $ 75.00/per hr. |

APPLICATION TO APPROVE EMPLOYMENT OF ACCOUNTANTS
PURSUANT TO 11 U.S.C. §327 - Page 2

R0462

V.

The Firm is familiar with the books and records of Debtor and have been employed as accountants of the Debtor for approximately thirty (30) years. Albert White, shareholder in the Firm, at the time of Debtor's filing its Voluntary Petition was a Defendant along with Debtor in a law suit entitled NCNB Texas National Bank d/b/a NCNB Texas v. Charles B. Feldman, et al, Case No. 89-03-1156-C. Mr. White is also Trustee of the Feldman Family Life Insurance Trust. Applicants believe such outstanding litigation and duties of Mr. White as Trustee do not and will not render the Firm's interest materially adverse to the estate or to the creditors. The Firm further believes their familiarity with the books, records and financial condition of the Debtor will be beneficial to the estate. In support thereof Applicant has attached the Affidavit of Albert White to this Application as Exhibit "A".

VI.

To the best of Applicant's knowledge, the accounting firm has no connections with Debtor other than those set forth above, or any of the creditors or any other party in interest in this case, or any of their respective attorneys and accountants, and are disinterested persons as that term is defined in 11 U.S.C. §101(13).

WHEREFORE, PREMISES CONSIDERED, Debtor-in-Possession, Charles B. Feldman, d/b/a Charles B. Feldman Investments prays that this

APPLICATION TO APPROVE EMPLOYMENT OF ACCOUNTANTS
PURSUANT TO 11 U.S.C. §327 - Page 3

R0463

honorable Court approve its employment of Chidester, Marlow & White, P.C. as accountants to perform the professional services required by it in connection with this case.

Respectfully submitted,

SIMPSON, DOWD & MOON
4800 First Interstate Bank Tower
1445 Ross Avenue, L.B. 214
Dallas, Texas  75202
(214) 855-6250

By: _____
James P. Moon
State Bar No. 14316300

Eric A. Liepins
State Bar No. 12338110

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing Application to Approve Employment of Accountants Pursuant to 11 U.S.C. §327 was served upon all parties on the attached matrix, via U.S. First Class Mail, on this the ____ day of May, 1990.

_____
Eric A. Liepins

c:\feldman\ch11\account.app\90019-1

APPLICATION TO APPROVE EMPLOYMENT OF ACCOUNTANTS
PURSUANT TO 11 U.S.C. §327 - Page 4

R0464

JAMES P. MOON
ERIC A. LIEPINS
SIMPSON, DOWD, & MOON
4800 First Interstate Bank Tower
1445 Ross Avenue, L.B. 214
Dallas, Texas  75202
(214) 855-6250

ATTORNEYS FOR DEBTOR

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHARLES B. FELDMAN, d/b/a | § | CASE NO. 90-01254-B-11 |
| CHARLES B. FELDMAN INVESTMENTS, | § | |
| | § | |
| Debtor. | § | |

### AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | ) |
| | ) |
| COUNTY OF _Cameron_ | ) |

BEFORE ME, on this day personally appeared, Albert White, who is personally known to me and after being duly sworn according to the law, deposed as follows:

"My name is Albert White.  I am over eighteen (18) years of age, of sound mind and am fully competent to make this Affidavit. I have personal knowledge of each of the facts stated in this Affidavit, and they are true and correct.

"I am a shareholder in the accounting firm of Chidester, Marlow & White, P.C., (the "Firm") and said Firm have been the accountants for the Debtor Charles B. Feldman, since, approximately

AFFIDAVIT - Page 1

R0465

1960, and as such are familiar with the operations, books and records of Charles B. Feldman.

"As of July 11, 1990, Charles B. Feldman was a Defendant with Albert White in a case pending in the 197th Judicial District Court, entitled <u>NCNB Texas National Bank d/b/a NCNB Texas v. Charles B. Feldman, et al</u>., Cause No. 89-03-1156-C. I am also the Trustee in the Charles B. Feldman Life Insurance Trust.

"To the best of my knowledge, Albert White has no connections with the Debtor, any of the creditors or any other party in interest in this case or any of their respective attorneys or accountants, except as set forth above, and are otherwise disinterested parties as the term is defined in 11 U.S.C. §101(13).

"It is Affiant's opinion that Affiant's status as a Defendant with Charles B. Feldman in the above-entitled action will not materially adversely affect the interest of the estate or the creditors of the estate, and will not impair Albert White's ability to adequately perform the tasks required by the Debtor.

"Affiant further believes that the employment of accounting professionals that are unfamiliar with the books, records, and financial condition of the Debtor would be detrimental to the estate by reason of the need of such accountants to become familiar with such matters.

<u>AFFIDAVIT</u> - Page 2

R0466

"FURTHER AFFIANT SAYETH NOT."

CHIDESTER, MARLOW & WHITE, P.C.
2202 Treasure Hills Blvd.
Harlingen, Texas 78550

By: _____
     Albert White

SUBSCRIBED AND SWORN TO BEFORE ME on the $\jmath\jmath^{\mathrm{th}}$ day of _Julu_, 1990, to certify which witness my hand and official seal.



My Commission Expires:

_11-3-93_

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS, DALLAS COUNTY

_Karen Ancell_
Typed or Printed Name

c:\feldman\ch11\white.aff\2714-6

R0467

# NEWSOM, TERRY & NEWSOM, L.L.P
*a Limited Liability Partnership*
## ATTORNEYS AND COUNSELORS
600 Sterling Plaza
5949 Sherry Lane
Dallas, Texas 75225
(214) 739-1000
Facsimile (214) 739-9009

R. Kirk Newsom

## FACSIMILE TRANSMISSION

**DATE:**      July 28, 1997

**TO:**        Colin K. Kaufman, Esq.  James P. Moom, Esq.

**FAX #:**     1-512-888-8172  220-0562

**FROM:**      R. Kirk Newsom

**SUBJECT:**   Charles B. Feldman Chapter 11

Number of pages of this transmission, including this page: 3  page(s).

If you have any difficulty receiving this transmission, please call (214) 739-1000.
The number of our facsimile machine is (214) 739-9009.

Letter of today's date attached, with original, or hard copy, to follow via regular mail.

cc     Steve Ditto - 361-9380

       Arnaldo Cavazos - 748-6750

R0468

EXHIBIT

**JM, TERRY & NEWS**

**ATTORNEYS AND COUNSELORS**

600 Sterling Plaza
5949 Sherry Lane
Dallas, Texas 75225
Telephone (214) 739-1000
Facsimile (214) 739-9889

R. Kirk Newsom

July 28, 1997

**Via Telefacsimile To**
**1-512-888-8172**
Colin K. Kaufman, Esq.
P. O. Box 1662
Corpus Christi  78403-1662

RE:    Case No. 90-1254-B-11
         Charles B. Feldman

Dear Colin,

I know that you are currently in the process of obtaining the appraisals on the partnership assets which appear to be required under the Plan prior to any disposition of the assets. I also understand that you are going to complete a report shortly in early August to submit to both James Moon and me for our review prior to the date and time for the hearings now scheduled at 9:00 AM on August 21, 1997, in McAllen, Texas.

Now, it also appears to us at this time, after further in depth study of this Plan, that as Plan Trustee, you appear to be primarily a disbursing agent only for money delivered to you by the Debtor, but coupled with a few extra duties, including at least (i) a duty to make semi-annual disbursements to creditors, and (ii) a duty to give the Debtor a notice of default if such became appropriate.

Therefore, I am not requesting that you undertake any new action; however, in addition to preparing the foregoing information on which you are working, I would respectfully ask that you supply me information with respect to what actions you have previously completed over the past five years of the Plan, including the following information:

1)    Please specifically identify from what source you have received any funds, and to whom and for what purposes you have disbursed any funds of the estate;

2)    Please specifically provide all information you have obtained on the profitability of entities from which the Plan indicated that creditors would receive some net profits;

R0469

Colin K. Kaufman
07/28/97
Page - 2

    3)    Please provide any information you have received on values and sales efforts with respect to those assets indicated in the Plan to be sold, or which have been sold under the Plan; and,

    4)    Please provide a specific accounting on all funds you have received and paid out indicating all sources and the use of all funds disbursed from your accounts, including the names of all recipients.

    Again, I am not asking that you take any new action, but only that you provide information which is surely contained in your files. I would like to be able to receive all of this information from you by at least August 11th. Please let me know if a problem exists either with providing me with the requested information or being able to do so by August 11th.

    Thank you for your assistance and cooperation.

    Very truly yours,

    R. Kirk Newsom

cc    James P. Moon, Esq.
    James P. Moon & Assoc.
    2602 McKinney Avenue
    Suite 350
    Dallas, Texas 75204 - via telefacsimile to 220-0562

    Steve A. Ditto
    CKS Asset Management - via telefacsimile to 361-9380

    Arnaldo Cavazos, Esq. - via telefacsimile to - 748-6750

R0470

Case 1:02-cv-00074   Document   Filed 03/20/2002   Page 76 of 173

GRUBBY, TERRY & NEW, L.L.P.
*a Limited Liability Partnership*

## ATTORNEYS AND COUNSELORS

600 Sterling Plaza
5949 Sherry Lane
Dallas, Texas 75225
(214) 739-1000
Facsimile (214) 739-9009

R. Kirk Newsom

### FACSIMILE TRANSMISSION

**FAX # 2**

**DATE:**      July 28, 1997

**TO:**      Colin K. Kaufman, Esq.  James P. Moom, Esq.

**FAX #:**      1-512-888-8172  220-0562

**FROM:**      R. Kirk Newsom

**SUBJECT:**      Charles B. Feldman Chapter 11

Number of pages of this transmission, including this page: 3 page(s).

If you have any difficulty receiving this transmission, please call (214) 739-1000. The number of our facsimile machine is (214) 739-9009.

Letter of today's date attached, with original, or hard copy, to follow via regular mail.

cc      Steve Ditto – 361-9380

Arnaldo Cavazos – 748-6750

R0471

ATTORNEYS AND COUNSE

600 Sterling Plaza
5949 Sherry Lane
Dallas, Texas 75225
Telephone (214) 739-1000
Facsimile (214) 739-9009

R. Kirk Newsom

July 28, 1997

**Via Telefacsimile To**
**220-0562**
James P. Moon, Esq.
James P. Moon & Associates
2602 McKinney Avenue
Suite 350
Dallas, Texas 75204

RE:    Case No. 90-T254-B-11
Charles B. Feldman

Dear James,

In connection with the above referenced case, I would respectfully request that by August 11, 1997, you provide me with the following information:

1)    A current Balance sheet and Profit and Loss statements on:

    a)    Feldman, individually; and,
    b)    on each entity from which the Plan indicated that creditors would receive some net profits.

2)    Balance Sheets and Profit and Loss statements for the past five years on:

    a)    Feldman, individually; and,
    b)    on each entity from which the Plan indicated that creditors would receive some net profits.

3)    Federal Income Tax Returns for the past five years on:

    a)    Feldman, individually; and,
    b)    each entity from which the Plan indicated that creditors would receive some net profits.

In addition, we have decided that it is necessary to have our own appraisers review the assets indicated in the Plan to be sold, or which have been sold under the Plan, and so I would request that as soon as possible, you allow free access to the various properties

R0472

James P. Moon, Esq
07/28/97
Page - 2

involved in order to complete this process. We would like to start this process by no later than August 11th.

Lastly, I would also request that by August 11th, you allow auditors that we will engage, access to the books and records of:

a)    Feldman, individually; and,
b)    each entity from which the Plan indicated that creditors would receive some net profits.

Please let me know if there is any problem either with your providing me with the requested information or allowing me access to the properties and books and records as requested above, or being able to do so by August 11, 1997.

Thank you for your assistance.

Very truly yours,

R. Kirk Newsom

cc    Colin K. Kaufman, Esq.
P. O. Box 1662
Corpus Christi, Texas 78403-1662 - via telefacsimile to 1-512-888-8172

Steven A. Ditto
CKS Asset Management - via telefacsimile to 361-9380

Arnaldo Cavazos, Esq. - via telefacsimile to 748-6750

R0473

W

ALBERT WHITE, C.
WILLIE CHIDESTER, C.
JOHN L. MARLOW, C

TREASURE HILLS BOULEVARD
IGEN, TEXAS 78550
210-423-1222

July 31, 1997


Mr. Colin Kelly Kaufman
Attorney at Law
P. O. Box 1662
Corpus Christi, Texas 78403


Re: Charles B. Feldman, Chapter 11


Dear Mr. Kaufman:

I will be able to review financial statements as requested in the
enclosed letter to you from Mr. R. Kirk Newsom. It is my
understanding that you will, in writing , specifically request
what is to be done after the court approves my employment.

My fee for services rendered will be at my normal rate of $150.00
per hour. I notice that Mr. Newsom has established a time frame to
do the work. My concern is that I be granted the time to do the
work properly, and I request such assurance from you.

Very truly yours,

Al White, C.P.A.

R0474

EXHIBIT Acct

MEMBERS
AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS
TEXAS SOCIETY OF CERTIFIED PUBLIC ACCOUNTANTS

44. 10/15/97 — docket #315: order entered. Unopposed order granting plan trustee's application for employment of accountant (Al White) - Granted. *{Used as Exhibit 16(d) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq., United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02}*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:                   |   CASE NO. 90-01254-B-11

Charles B. FELDMAN, dba Charles   |   IN CHAPTER 11
Feldman Investments, Debtor       |

---

## UNOPPOSED ORDER GRANTING PLAN TRUSTEE'S
## APPLICATION FOR EMPLOYMENT OF ACCOUNTANT

CAME ON to be considered the Application of Colin Kelly Kaufman, the Plan

Trustee for employment of an accountant, and it appearing to the Court that C.K.S.

Management failed to appear and assert any opposition thereto; and that the Plan Trustee's

application ought to be granted;

NOW THEREFORE, it is accordingly hereby ORDERED that the employment of

Al White, former accountant for the debtor-in-possession be, and it hereby is APPROVED;

PROVIDED HOWEVER, that this approval does not bind the court to approve any

particular fee at any particular rate, all of which must await subsequent applications for

approval of payment for particular work done.

So ordered this date _____

Hon. Richard S. Schmidt, Esq.
UNITED STATES BANKRUPTCY JUDGE

APPROVED for Plan Trustee:

Colin Kelly Kaufman, Plan Trustee

No Objection as to Form for C.K.S.:

Karen Stevens-Minor, Local Counsel

OCT 1 6 1997

R0496

84.  6/5/01 -- docket #413 Opposed Expedited Motion By Trustee Colin Kelly Kaufman To Compel Production of Documents . Hearing set for 9:00 6/8/01 at 1133 N Shoreline Corpus Christi to lg (swm) [EOD 06/06/01] [90-1254] *{Used as Exhibit G to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar — dated 08/31/01}*



IN THE UNITED STATES BANKRUPTCY COURT U.S. DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS SOUTHERN DISTRICT TEXAS
BROWNSVILLE DIVISION

|  |  |  |
|---|---|---|
| IN RE: | | |
| Charles B. FELDMAN dba | | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | | MICHAEL N. MILBY. CLERK |
| Debtor | In Chapter 11 | |

**JUN -5 2001**

**FILED**

Font: Goudy Old Style

Bkcy. Local Rule 9013 Notice (Version of 1-1-93): IF YOU WANT A HEARING, YOU MUST REQUEST ONE IN WRITING AND YOU MUST RESPOND SPECIFICALLY TO EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN 20 DAYS FROM THE DATE YOU WERE SERVED AND GIVE A COPY TO THE PERSON WHO SENT YOU THIS NOTICE. OTHERWISE THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.

IF A REQUEST FOR EMERGENCY RELIEF IS MADE, THE COURT MAY ACT EXPEDITIOUSLY ON THE MATTER. A HEARING MAY BE SET IN LESS THAN 20 DAYS. IF SO, ANSWERING THIS PLEADING WILL NOT PRESERVE YOUR RIGHTS. ONLY ATTENDANCE AT THE HEARING IS NECESSARY FOR YOU TO OBJECT. IF THE HEARING OCCURS MORE THAN 20 DAYS AFTER YOU WERE SENT THIS WRITING, YOU MUST FILE A WRITTEN OBJECTION OR THE COURT MAY GRANT THE RELIEF AS UNOPPOSED.

The Court has set an expedited hearing on this motion on Friday, June 8, 2001 at 9:00 AM, in the Bankruptcy Courtroom, 2nd Floor, in the new United States Courthouse, I-37 at Shoreline Blvd., Corpus Christi, TX. 78401. You may appear by telephone by making prior arrangements with Colin Kaufman, P. O. Box 1662, Corpus Christi, TX. 78403-1662; Telephone (361) 888-8865; FAX (361) 888-8172., who will arrange a conference call to the Court.

PLAN TRUSTEE'S ORIGINAL
OPPOSED EXPEDITED MOTION TO COMPEL PRODUCTION OF DOCUMENTS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Colin Kelly Kaufman (sometimes "Plan Trustee" or "Movant"), and for his

Original Opposed Expedited Motion to Compel Production of Documents (sometimes, this

"Motion"), respectfully shows the Court as follows:

1. <u>Plan Provision</u>. The confirmed plan in the captioned case calls for Plan Trustee to

monitor the Debtor's performance. It requires the Debtor to furnish tax returns, and books and records to enable Plan Trustee to do so. Plan Trustee has asked for these, at first during meetings, by phone, and recently in writing, by letter. See Exhibits X and Y attached.

A. Stubborn. Although Plan Trustee first asked for these records prior to Debtor submitting his final report, pointing out that it was impossible to tell if Debtor did what he promised without looking at the tax returns, very little was actually produced. And Plan Trustee believes that the Debtor has no intention of producing any more records than it already has.

B. Typical Term. There is nothing unusual about requiring bankruptcy debtors to furnish bank statements and tax returns. This was not an unconscionable or overreaching term. The debtor had already furnished two years of tax returns for his Sec. 341 meeting, when the bankruptcy first began.

C. Due Date. Although Plan Trustee agreed to give Debtor's Counsel more time to respond to the Proposed Final Report, given the additional pleadings that have been filed concerning it, see Exhibit Z; Plan Trustee left a phone message pointing out that this would NOT extend the due date of the documents requested by letter. And no reason exists why this should, as the records do not change, whatever anyone pleads. The Plan contemplates that records will be furnished within 30 days, and this deadline is long past.

D. Who Should Do It. Plan Trustee has sought these records from Debtor, his attorney, and the accountant. Under Bkcy Code Sec. 1142, anyone of these three persons (or all) may be ordered by the Court to make it possible for the Plan's provisions for Plan Trustee review to be complied with. Mr. White has Mr. Feldman's tax returns, because he was doing them before Trustee hired Mr. White, and this was disclosed to the Court when Mr. White was hired.

As for the other records, though no impossibility of production has been claimed, other avenues of production are available if these three parties cannot find checks and bank statements – federal law requires banks to keep these records, and Debtor could have ordered copies to be made by the bank if they had been lost, and if that claim is made hereafter, Debtor should be ordered at his cost to avail himself of this option for reproduction of requested records. Debtor's attorney needs to recognize that this Court follows the (majority) rule that debtor's attorneys owe duties to the Court as well as to their clients.

      E.  Additional Documents. Plan Trustee has not heretofore previously written to ask for post-1998 tax returns. However, something in the missing 1993-1998 tax returns and bank statements may suggest that this would be a good or necessary idea, and Plan Trustee asks that the Court agree that if his review of the 1993-1998 documents suggest that review of these is important, then the Debtor will have to produce them for Plan Trustee as well. We don't need to have another separate hearing on an issue that is substantially overlapping with the issues already before the Court.

      F.  Dealing with CKS. CKS has asked for its own (lesser) discovery from Mr. Feldman. But CKS cannot lessen Plan Trustee's rights, whatever it requests from Mr. Feldman. CKS's plans are not a defense to Plan Trustee's right to discover what he needs to. As long as any creditor exists (and Plan Trustee himself is a creditor), the Feldmans owe to comply with the Plan and furnish the information promised to the Plan Trustee by the Plan. Furthermore, it is not a defense that Mr. Rosenstein succeeded in letting Feldmans know that the bankruptcy estate is insolvent. If anything, his efforts at proving the estate is insolvent makes it that much more urgent that Feldmans comply with their obligation to pay set out in the Plan, and that much more

R2037

urgent that they furnish the information needed to calculate their liability.

2. Jurisdiction. The Plan reserves post-confirmation jurisdiction to the Court to enforce motions to compel compliance with Debtor's obligations under the Plan.

A. Disclosure Statement. Article XI, Paragraph E of the Disclosure Statement says:

E. Plan Trustee

Upon entry of the Confirmation Order by the Court, Harlingen National Bank ("HNB") will act as the Plan Trustee (referred to herein as the "Plan Trustee") to receive and make the payments and/or distributions under the Plan. **The Plan Trustee shall have the authority to review and investigate the performance of the Debtor, FREI and the Feldman Family Interests in carrying out the obligations under the Plan and may in its discretion, file a motion in the Bankruptcy Court if it believes the terms of the Plan have not been complied with.** Along with his powers and duties specifically set forth herein and in any agreement with such entity, the Plan Trustee shall have the powers, duties, and responsibilities set forth in the Texas Trust Act. The Plan Trustee shall take such other action as is necessary and required in order to implement his duties hereunder. The Plan Trustee, and its officers, employees, agents, and representatives who sign disbursement checks on behalf of Debtor in the capacity as Plan Trustee, shall not be liable for any acts or failures to act hereunder in the absence of proof of bad faith or gross negligence. If HNB shall refuse or become unable to serve as Plan Trustee, the Court shall appoint a successor or replacement Plan Trustee. On and after the Effective Date of the Plan, the Plan Trustee shall administer all funds deposited at Confirmation and any future funds for the disbursement and payment of the claims hereunder.

B. The Plan. The Plan provisions on this point are similar. They are found at Sec. 7.3, which says as follows:

7.3 Plan Trustee. Upon entry of the Confirmation Order by the Court, Harlingen National Bank ("HNB") will act as the Plan Trustee (referred to herein as the "Plan Trustee") to receive and make the payments and/or distributions under the Plan. The Plan Trustee shall be entitled to open and maintain such bank or other accounts as are necessary in its judgment for the holding, investment, payment, and distribution of the funds required under the Plan. **The Plan Trustee shall have the authority to review and investigate the performance of the Debtor,**

-4-

R2032

FREI and the Feldman Family Interests in carrying out the obligations under the Plan and may in its discretion, file a motion in the Bankruptcy Court if it believes the terms of the Plan have not been complied with. Along with his powers and duties specifically set forth herein and in any agreement with such entity, the Plan Trustee shall have the powers, duties, and responsibilities set forth in the Texas Trust Act. The Plan Trustee shall take such other action as is necessary and required in order to implement his duties hereunder. If HNB shall refuse or become unable to serve as Plan Trustee, the Court shall appoint a successor or replacement Plan Trustee. On and after the Effective Date of the Plan, the Plan Trustee shall administer all funds deposited at Confirmation and any future funds for the disbursement and payment of the claims hereunder.

3. <u>Can't Be Heard Timely Without Expediting</u>. Plan Trustee's proposed final report is set for hearing on June 22, 2001. Plan Trustee needs the tax returns, and bank statements and cancelled checks and the like in time to prepare for that hearing. Since there are not twenty days between now and that hearing date, hearing on these motions must be expedited if the documents are to be examined prior to that hearing.

4. <u>Shorten Time</u>. For those reasons, it would be useful to shorten the time for a hearing herein.

5. <u>Separate; Supported by Affidavit</u>. A separate motion to expedite is being filed at the same time as this motion. This motion to expedite is supported by affidavit, as required by the Bankruptcy Local Rules. Orders accompany both this substantive motion and the motion to expedite, as required by the Bankruptcy Local Rules.

6. <u>If They Don't</u>. If Debtor doesn't want to produce the entire required records, then Debtor and his family need to pay the $225,000 that Plan Trustee estimates would be his and his family's minimum (expectation) liability for underpayments to the bankruptcy estate. If Debtor continues recalcitrant, Plan Trustee proposes to go ahead and file an adversary proceeding against Feldman family members and other Feldman group entities.

-5-

R2039

WHEREFORE, PREMISES CONSIDERED, Movant respectfully asks that this Court set a hearing on June 8, 2001 at 9:00 AM or another appropriate time to determine whether to expedite hearing hereon; and at that time determine to hold this hearing; and after such hearing, to order that Charles B. Feldman, the Debtor, and James P. Moon, his attorney, and Al White, the accountant, turn over to Plan Trustee any writings described in Exhibits X or Y within three days after this order is entered (i.e., a week after this motion was noticed, and more than two months after written demand was made, presumably by Tuesday, June 12, 2001), and grant Plan Trustee such other and further relief as may be fair or just.

                                        Respectfully Submitted,


                                        _____
                                        Colin Kelly Kaufman, Plan Trustee
                                        In propria personam
                                        State Bar of Texas # 11113000
                                        So. Dist. Fed. ID No. 9242

Address of Counsel:

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone #   (361) 888-8865
TeleFAX No. (361) 888-8172

Board Certified, Business & Consumer Bankruptcy
Law, Texas Board of Legal Specialization


## Certificate of Conference

I certify that I conferred with James P. Moon by leaving him a message on his voice mail on Friday, June 1, 2001, telling him that unless he called me back, I would treat him as opposing this

R2040

motion.

Colin Kelly Kaufman
_____
Colin Kelly Kaufman

<u>Certificate of Service</u>

I certify that I had one of the personnel at this law office serve the foregoing writing and its associated order on the persons shown on the attached Service List by FAX or US mail, first class postage prepaid, this 5th day of June, 2001.

Colin Kelly Kaufman
_____
Colin Kelly Kaufman

## FELDMAN SERVICE LIST

Mr. Charles B. Feldman
Charles Feldman Investments
926 Lantana Street
Harlingen, TX 78550-8080

Office of US Trustee
Wilson Plaza Building
606 N. Carancahua
Corpus Christi, TX 78476

Ms. Nancy Holley
Assistant US Trustee
515 Rusk, #3516
Houston, TX 77002

Christopher M. Weil
Weil & Petrocchi, P.C.
1601 Elm Street, #1900
Lock Box 100
Dallas, TX 75201

Colin Kelly Kaufman
P.O. Box 1662
Corpus Christi, TX 78403-1662

Ronald A. Simank, Esq.
615 N. Upper Broadway, #2000
Corpus Christi, TX 78477

Al White, CPA
2202 Treasure Hills Blvd.
Harlingen, TX 78550

MBNA America
c/o Becket & Watkins
P.O. Box 512, Dept. N
Malvern, PA 19355

James P. Moon, Esq.
1401 Elm Street, #3300
Dallas, TX 75202

Richard G. Grant
3102 Oak Lawn Avenue, #700
Dallas, TX 75219

Matthew A. Rosenstein
American Bank Plaza, #420
711 N. Carancahua
Corpus Christi, TX 78475

R2042

### COLIN KELLY KAUFMAN
## ATTORNEY AT LAW
P.O. Box 1662
Corpus Christi, TX 78403
Telephone (512) 888-8865 • FAX (512) 888-8172

Board Certified, Business Bankruptcy Law, Consumer Bankruptcy Law

March 26, 2001

James P. Moon, Esq.
2611 W. Ovilla Rd.
Red Oak, TX. 75154
By FAX to (972) 617-7910

Dear James:

Just completed two briefs last week, and am working on another brief due Monday this week. But I did remember an occurrence during the last hearing, which was that the counsel for CKS (i.e., Steve Ditto's organization) asked if he could have the checks and bank statements, etc. I had no opposition to that, and you were not there to object, so the judge said, fine. So I checked with the office to see what we had, so the documents could be assembled to be sent to CKS. We did have some writings; but we do not have all these writings for the plan term, from 1992 - 1997.

So I am asking that you have your client (or Mr. White, if he has them instead) to send me (with a copy to Steve Ditto) the Feldman group bank statements and checks (we aren't talking about Mr. & Mrs. Feldman's personal bank accounts here, I assume) for the plan term. Also, I would like to have the Feldmans' income tax returns for this time period; which I requested before – but of which we have no copy, nor any record of ever receiving them.

Also, can I have an update on your fees to date?

Could the foregoing be done before April 2nd? Thanks very much for your time.

Sincerely,

Colin Kelly Kaufman

CKK:

Copy to:    Mr. Al White, Esq., Chidester, Marlow & White, CPAs, 2202 Treasure Hills Boulevard, Harlingen, TX. 78550; FAX (956)

X R2043



**COLIN KELLY KAUFMAN**
# ATTORNEY AT LAW
P.O. Box 1662
Corpus Christi, TX 78403
Telephone (512) 888-8865 • FAX (512) 888-8172

Board Certified, Business Bankruptcy Law, Consumer Bankruptcy Law

April 27, 2001

James P. Moon, Esq.
Law Offices of James P. Moon, PLLC
1401 Elm St. Suite 3300
Dallas, TX. 75205

Dear James:

At the hearing today, CKS's new counsel again repeated their prior request for bank statements, checks and tax returns. And Mr. Ditto has personally asked for these things, not just his counsel. While we will give the new attorneys again what we have, this reminds me that we do NOT HAVE copies of all these things for the plan term, from October 2, 1992 - October 2, 1997, though we have previously asked for them.

We want the Mr. Feldman's bank statements and checks for the special and reserve accounts into which Mr. Feldman put the amounts withheld from the remittances he made to the bankruptcy estate (typically 31% taxes and 15 or 20% for expenses), for October-December of 1992, 1993, 1994, 1995, 1996, and January-October, 1997. So I am asking that you have your client (or Mr. White, if he has them instead) to send me (with a copy to Matt Rosenstein) these and the Feldman group bank statements and checks for the same time period. Again, we aren't talking about Mr. & Mrs. Feldman's regular general personal bank accounts at this time. Also, I would like to have the Feldmans' income tax returns for this time period; which I requested before – but of which we have no copy, nor any record of ever receiving them.

Judge Schmidt asked that the requested items be delivered to Mr. Rosenstein by the end of next week. Thanks very much for your time.

Sincerely,

Colin K.

Colin Kelly Kaufman

CKK:

Copies to:    Mr. Al White, Esq., Chidester, Marlow & White, CPAs, 2202 Treasure Hills Boulevard, Harlingen, TX. 78550; FAX (956)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:                                        |
Charles B. FELDMAN dba                        |    In Bankruptcy Case # 90-01254-B-11
Charles B. Feldman Investments                |
        Debtor                                |    In Chapter 11

Font: Book Antiqua

ORDER GRANTING PLAN TRUSTEE' ORIGINAL
OPPOSED EXPEDITED MOTION TO COMPEL PRODUCTION OF DOCUMENTS

CAME ON to be considered the Plan Trustee's Original Opposed Expedited Motion to Compel Production of Documents; and it appearing to the Court that the same ought to be granted;

It is accordingly therefore hereby ORDERED that Charles B. Feldman, or his agents or representatives, including James Moon and Albert White, shall within three days after entry hereof, produce to Colin Kelly Kaufman originals or copies of the following documents, to wit:

1. Tax Returns.  The individual tax returns for Charles Feldman (and his wife) for tax years 1993, 1994, 1995, 1996, and 1997.

2. Bank Statements.  The bank statements and cancelled checks for the tax and expense retainer accounts set up by Charles Feldman from the beginning (cerca 1992) to the end of their existence (presumably 1999), and for Feldman Real Estate, Inc. for 1993 through 1997, and for Clara Feldman Properties for 1993 through 1997, and for Feldman Rentals for 1993 through 1997.

3. Additional Information.  Charles B. Feldman, the Reorganized Debtor, shall furnish additional tax returns for the same entities as mentioned in Paragraphs 1 or 2

R2045

above for tax years 1998 through 2000 within three days after written demand by Plan

Trustee.

So ordered this _____.

_____
Hon. Richard S. Schmidt, Esq.
United States Bankruptcy Judge

After entry, copies to:
Charles B. Feldman, Debtor, 926 Lantana St., Harlingen. TX. 78550-8080
James P. Moon, Esq., 2611 W. Ovilla Rd., Red Oak, TX. 75154; FAX (972) 617-7910
Matt Rosenstein, Esq., American Bk. Plaza Suite 420, 711 N. Carancahua, Corpus Christi, TX. 78475; FAX (361) 883-5590
Ron Simank, Esq., Schauer & Simank, 615 N. Upper Broadway #2000, Corpus Christi, TX. 78477; FAX (361) 884-2822
C. K. Kaufman, Esq., P.O. Box 1662, Corpus Christi, TX. 78403-1662; FAX (361) 888-8172.
Curtis Bonner, Esq., P.O. Box 288, Harlingen, TX. 78551; FAX (956) 428-0671

R2046

91.  6/8/01 -- docket # 420 Hearing Re: [413-1] Motion To Compel Production of
Documents by Colin Kelly Kaufman continued to 9:00 6/22/01 at 1133 N Shoreline Corpus
Christi. Arguments presented. Tax returns to be provided by 6/13/01. (swm) [EOD 06/08/01]
[90-1254]

Item # 91

Docket # 420: Hearing held 6/8/01
re: [413-]

R 20646

95.  6/13/01 -- docket # 424  Opposed Expedited Motion By Trustee Colin Kelly Kaufman to Cancel CKS's Claim, Or Alternatively To Assign CKS's Claim , Or Set-Off Its Potential Dividend To Plan Trustee To Secure Fees (swm) [EOD 06/13/01]  [90-1254] *{Used as Exhibit H to Hon. Keith P. Ellison, Esq., U.S. District Judge -- dated 08/13/01 & to Richard Russell w/State Bar -- dated 08/31/01}*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | |
| Debtor | In Chapter 11 |

Font: Goudy Old Style

Bkcy. Local Rule 9013 Notice (Version of 1-1-93): IF YOU WANT A HEARING, YOU MUST REQUEST ONE IN WRITING AND YOU MUST RESPOND SPECIFICALLY TO EACH PARAGRAPH OF THIS PLEADING. YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN 20 DAYS FROM THE DATE YOU WERE SERVED AND GIVE A COPY TO THE PERSON WHO SENT YOU THIS NOTICE. OTHERWISE THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF.

IF A REQUEST FOR EMERGENCY RELIEF IS MADE, THE COURT MAY ACT EXPEDITIOUSLY ON THE MATTER. A HEARING MAY BE SET IN LESS THAN 20 DAYS. IF SO, ANSWERING THIS PLEADING WILL NOT PRESERVE YOUR RIGHTS. ONLY ATTENDANCE AT THE HEARING IS NECESSARY FOR YOU TO OBJECT. IF THE HEARING OCCURS MORE THAN 20 DAYS AFTER YOU WERE SENT THIS WRITING, YOU MUST FILE A WRITTEN OBJECTION OR THE COURT MAY GRANT THE RELIEF AS UNOPPOSED.

The Court has set an expedited hearing on this motion on Friday, June 22, 2001 at 9:00 AM, in the Bankruptcy Courtroom, 2nd Floor, in the new United States Courthouse, I-37 at Shoreline Blvd., Corpus Christi, TX. 78401.

PLAN TRUSTEE'S ORIGINAL OPPOSED EXPEDITED MOTION TO CANCEL
CKS'S CLAIM, OR ALTERNATIVELY TO ASSIGN CKS'S CLAIM OR
SET-OFF ITS POTENTIAL DIVIDEND TO PLAN TRUSTEE TO SECURE FEES

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Colin Kelly Kaufman (sometimes "Plan Trustee" or "Movant"), and for his

Original Opposed Expedited Motion to Cancel CKS's Claim, or Alternatively to Assign CKS's

Claim or to Set-Off its Potential Dividend to Plan Trustee to Secure Fees (sometimes, this

"Motion"), respectfully shows the Court as follows:

1. Plan Provision. The Plan is silent as to who will object to claims if new grounds for

-1-

Exhibit AA

#424
R2083

objection arise post-confirmation. But bankruptcy law provides for Plan Trustees to have the

power to object to claims, when new grounds arise for such objection post-confirmation. *See*,

*e.g.*, cases cited in the Plan Trustee's original Proposed Final Report.

     2. <u>Jurisdiction</u>. The Plan reserves post-confirmation jurisdiction to the Court to

determine controversies over distributions under the Plan.

     3. <u>Excessive Litigiousness</u>. Claims in bankruptcy court may be disallowed because the

excessive litigiousness of the creditor have cost the bankruptcy estate money. For examples of

this is <u>In re Wonder Corp. of America</u>, 72 B.R. 580, 15 B.C.D. 1168 (Bkcy., D Conn. 1987),

where the creditor was significantly over-secured, and would normally get reasonable attorneys

fees as well as the amount of the debt. But the Court disallowed attorneys' fees because the

creditor had engaged in "blatant and totally unproductive obstruction." And what was the

blatant and totally unproductive obstruction that was done in that case – objecting to the fees of

the attorneys for the bankruptcy estate! *See likewise*, In re W. S. Sheppley & Co., 62 B.R. 279

(Bkcy., ND Iowa 1986) (disallowing half of all post-petition attorneys fees to a secured creditor,

because it was engaging in "all-out war" against the debtor). *See also*, <u>In re Beverages Intl., Ltd.</u>,

50 B.R. 273 (D Mass. 1985) (bankruptcy courts may deny or equitably subordinate claims for the

unconscionable conduct of the claimant); <u>In re Moody (Mil-Ger Enterprises v. Moody)</u>, 16 B.R.

763 (Bkcy., D Md. 1982) (held, relief from stay would be denied for probable invalidity of claim

vs. debtor for unconscionability, where no usury law applied, but creditor made a $55,000

advance in late 1980, and 15 months later was demanding a $355,000 balance on the claim, and

also demanded $833,000 for a prepayment penalty); <u>In re Russell</u>, 109 B.R. 359 (Bkcy., WD Ark.

1989) (held, SP's expert admitted that property was worth at least $624,000, but SP only credited

R2084

debtor with $140,000 at the foreclosure sale, therefore bankruptcy court would disallow SP's deficiency claim for unconscionability); In re Tastyeast, Inc., 126 F.2d 879 (3d Cir. 1942), cert. denied sub nom. Modern Factors, Inc. v. Tastyeast, Inc., 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942) (though New York statute forbade corporations from raising defense of usury, where creditor charged 100% interest, court would deny its claim for unconscionability). The classic casebook case of denying a claim for unconscionable conduct of the claimant is In re Elkins-Dell Mfg. Co., 253 F.Supp. 864 (ED Pa. 1966) (Lord, Dist. J.). In this Circuit, see FSLIC v. Mmahat, 89 B.R. 573 (ED La. 1988) (held, district court would remand to bankruptcy court to consider Chapter 11 debtor's claim that vulture fund purchaser of mortgage should have its claim reduced or eliminated because of unfairness, unconscionability, and potential abuse); In re Multiponics, Inc., 622 F.2d 709 (5th Cir. 1980) (unconscionability of claimant's conduct is a defense to a claim in bankruptcy; given a choice, the bankruptcy court should prefer to disallow a claim rather than merely subordinate it). For a general history of disallowing claims in bankruptcy because of unconscionable conduct, see Prof. Doug Whaley's article, "Unconscionable Claims and the Proposed Bankruptcy Act," 53 N. Car. L. Rev. 1237 (1975).

    4. CKS Is Excessively Litigious. CKS is a perfect fit to the Wonder Corp. pattern. It is excessively litigious.

        A. Filed Abstracts of Judgment. When CKS bought its claim, it went out and put abstract of judgment liens on the Debtor's properties, clouding title and preventing him from carrying out the duty to sell given the Debtor in the Plan. This caused much litigation to get the liens removed, and also, there was a motion for sanctions granted, though later changed on motion for rehearing. When CKS got sanctioned, and spent over a year getting the sanctions

R2085

lifted, one of the things it told the court to persuade it to lift the order, was that Plan Trustee did not need an order awarding attorneys fees, as he would still get paid his Trustee's fees under the Plan. Having gained a benefit by taking that position earlier in the litigation, it would be judicially estopped to argue that Plan Trustee cannot get his fees under the Plan now. <u>Tennessee ex rel. Sizemore v. Surety Bank</u>, 200 F.3d 373 (5th Cir. 2000), where the court said at p. 382, citing <u>Ergo Science, Inc. v. Martin</u>, 73 F.3d 595, 598 (5th Cir. 1996), as follows: "Judicial estoppel prevents a party from taking a position contrary to a position previously taken in the same or any earlier proceeding." *See also,* <u>In re Coastal Plains, Inc. (Browning Mfg. v. Mims),</u> 179 F.3d 197, 205 (5th Cir. 1999) (held, federal judicial estoppel applied here, as this was a bankruptcy case and, effect of party assuming a certain position in bankruptcy court is a matter of federal law.)

      B. <u>Demanded CPA hired</u>. CKS insisted that the estate hire a CPA. Plan Trustee proposed to hire Al White, who was familiar with the estate, and inexpensive. CKS demanded someone else, someone independent. So Plan Trustee offered CKS the choice between Al White, the debtor's prior CPA, and Kathy Kirk, a new CPA less closely associated with the Debtor, but who would cost more money. CKS's then attorney, Karen Stevens Minor, told Plan Trustee CKS would take Al White. Now CKS complains about even the time and expense that were incurred by the Plan Trustee in dealing with Al White.

      C. <u>Demanded Appraisals</u>. Although Plan Trustee was aware that many real estate prices in the Valley had declined since the Plan was confirmed (malls and adjacent properties being notable exceptions), CKS insisted on the carrying out of the Plan term calling for appraisals of the realty before Mr. Feldman's various real properties were sold. This cost a lot of

<div align="center">-4-</div>

R7.086

money, and because the appraisals documented the lower values of the properties, resulted in the sale of the properties for less than might have been achieved but for CKS's unreasonableness. Now CKS is complaining that Mr. Kaufman spent the time and expense of doing what CKS demanded in respect to these appraisals.

      D. <u>Objected to Parkwell's Claim because of Insider Status.</u>   An enormous amount of estate resources was wasted when CKS insisted on litigating the question whether the Parkwell claim could be cancelled because of insider status of the principals of Parkwell (some Bonners were involved in realty-owning partnership entities in which Mr. Feldman had an interest, and a Bonner was a principal in the group that owned Parkwell.)  This litigation was initiated by CKS despite the doubts and weaknesses of that claim.  These doubts and weaknesses were raised by the prior settling of claim litigation with Parkwell when the Plan was confirmed (i.e., think res judicata), raised again by the fact that Curtis Bonner and Chip Bonner are two different people, even if they are cousins, raised further by the fact that insiders have a legal right to lend money to the enterprises in which they are interested, and something more than insider status has to be shown to deny their claims, under <u>In re Multiponics, Inc.</u>, 622 F.2d 709 (5th Cir. 1980) (insider status shows opportunity to do wrong, but that alone is not grounds to disallow a claim, unconscionable conduct or other wrong is needed as well), etc.  This litigation was ultimately unsuccessful by CKS, who asked to withdraw their claims objection.  <u>But it was impossible to close the case when such an enormous percentage (75%) of the outstanding claims all depend on a single ruling like that.</u>

      E. <u>Got Worse.</u>  The recent replacement of CKS's prior attorneys by its current team of Mr. Grant and Mr. Rosenstein has not resulted in any reduced litigiousness.  If anything,

R 2087

it has gotten even worse.

5. <u>Mr. Rosenstein's Theory</u>. Mr. Rosenstein's recent flurry of billing activity centers around his contention that because the Plan reserved jurisdiction to let the Court hear attorneys' fee applications, therefore bringing them before the Court was mandatory. Then, Mr. Rosenstein goes on, since the Plan Trustee is an attorney, he cannot file what Plan Trustees always file (a final accounting, after all receipts and disbursements have been made), he has to file an attorneys' fee application. And, Mr. Rosenstein continues, although Mr. Kaufman WAITED FIVE YEARS before paying his fees, still Mr. Rosenstein contends, the Plan Trustee committed a breach of fiduciary duty to be paid AT ALL, because he should have filed a fee application as though he were employed by a Plan Trustee, rather being the Plan Trustee himself.

 A. <u>Just Think About It</u>. A little bit of thought will make it clear that the Plan could not possibly have meant that. How could it have contemplated the Plan Trustee would file an attorneys fee application, when the Plan as drafted contemplated that the PLAN TRUSTEE WAS GOING TO BE A BANK. A bank cannot possibly apply for attorneys fees. It doesn't have a law license. Trustees are never expected to apply for attorneys fees, whether they are attorneys or not. Do Mike and Cindy Boudloche, well-known trustees, apply for attorneys fees? Does Barbara Kurtz apply for attorneys fees? Does Anthony Juarez, III apply for attorneys fees? Nobody could possibly believe that this Plan contemplated that the Plan Trustee would apply for attorneys fees. At most it contemplated that the Plan Trustee would do what every other trustee does – ask the court to approve the list of receipts and expenditures that the Trustee made, and close the case.

 B. <u>Effect of Continued Jurisdiction</u>. What causes all these strange and unusual

-6-

R2088

duties claimed by Mr. Rosenstein?  Well, says Mr. Rosenstein, look at the plan.  It had a provision for continued bankruptcy court jurisdiction.  This provision, we are now to discover for the first time, 11 years after filing and 9 years after plan confirmation, and nearly a month after Mr. Rosenstein suddenly entered the case to enlighten us all, made it illegal for Plan Trustee to pay post-confirmation administrative expenses without a fee application and a subsequent court order.  There is no way this could possibly be accurate.

       C. <u>No Support</u>.  No authority has been cited for Mr. Rosenstein's position.  And none is known.

       D. <u>Many Cases Contra</u>.  Besides the cases cited in the Proposed Final Report pointing out that confirmation ends the requirement that bankruptcy court permission be sought to do what a party proposes to do, <i>see also e.g.</i>, <u>In re Sure-Snap (Shure v. State of Vermont)</u>, 983 F.2d 1015 (11th Cir. 1993) (post-confirmation attorneys fees are a debt of the reorganized debtor and cannot ever be destroyed by the plan's discharge provisions), followed on this point in <u>Siegel v. Federal Home Loan Mtge. Corp.</u>, 143 F.3d 525, 533 (9th Cir. 1998).

       E. <u>Alien Concept to a Free Society</u>.  Mr. Rosenstein's position is that if a court is authorized to hear something, then that party is supposed to put something before the Court for it to hear.  So if an attorney is authorized to do something in the Plan, then he must be REQUIRED to do it.  This could only appeal to someone with a totalitarian mindset.  In a free society, we do not readily infer that everything must be either forbidden or required.  We do not readily infer that people do not have, or should not have, any choices.  We do not readily infer that people should have no freedoms.  We do not readily infer that anything that is authorized must be mandatory, and that nothing in life is optional.  We infer that most of what people do in life is

R2089

what they can do, not what they have to do.  And the attorneys had a choice on post-petition attorneys fees here.

F.  <u>Reserving Jurisdiction</u>.  Sure, the Plan really does reserve jurisdiction to hear fee applications.  Why does that give anyone a DUTY to file them?  The Plan also says that the Court will have reserved jurisdiction to issue injunctions.  Does this mean someone has a duty to try to enjoin someone?  The Plan also reserves jurisdiction to the court to "interrupt" (probably an error, and actually meaning "interpret") the Plan.  Does this mean that someone has a duty to file an application to do that?  If the Plan gives a court jurisdiction to deal with intentional torts post-confirmation, does someone have a duty to commit one, so the Court can deal with it?  Most people would certainly disagree with that.  But that's the logic used by counsel for CKS.

G.  <u>Benefit to the Estate</u>.  The reason why the Plan reserves jurisdiction for post-confirmation attorneys fees is this:  suppose a creditor wants to say that it benefitted the estate, and its attorneys fees thus ought to be paid some amount out of the estate.  Cases exist where creditors have tried to make people pay what they owe the estate, and have been paid.  (CKS is taking the opposite tack, and helping Feldmans resist paying what they owe the estate; but there are good creditors as well as bad ones.)  A good example is <u>In re Zupancic</u>, 8 F.3d 34 (9th Cir. 1993), where citing <u>In re DeLaurentiis Entertainment Group, Inc.</u>, 963 F.2d 1269, 1273 (9th Cir. 1992), *cert. denied sub nom.* <u>Carolco Television, Inc. v. Natl. Broadcasting Co., Inc.</u>, ___ U.S. ___, 113 S.Ct. 330, __ L.Ed.2d ___ (1992) the court held that a creditor which spent attorneys fees in litigating someone into paying money to an estate could recover the attorneys fees.  In cases like that, it is helpful to have the bankruptcy court determine how much benefit exists and how much can be paid to the creditor's attorneys.

-8-

R2090

H. Jurisdiction Laundry List Seldom Used. The Court is well aware that every plan lists twenty things that the bankruptcy court may lawfully continue to do post-confirmation; and 99% of the time, they are never used. So they cannot possibly be mandatory. They give people to option to come back to court, not a requirement. No explanation is given by Mr. Rosenstein why this Plan was supposed to be different.

I. Ignores Sec. 9.2.4. Section 9.2.4 of the Plan says that if Mr. Moon has to file a fee application and get court approval of his fees he will do so, and if not, he will not. (And no doubt he would not have had to file at all, under the mentioned authorities, if Plan Trustee had not determined, given all the toxic conduct of CKS and its threats to sue everyone, that Plan Trustee would make him do so.) If the Plan had meant that everyone must always file a fee application for post-confirmation fees, as Mr. Rosenstein claims, no reason would exist to give Mr. Moon that option. So, if even Mr. Moon had the option not to file attorneys fee applications; how could Plan Trustee, who was serving in a different capacity, have a duty to apply for "attorneys fees?"

6. Plan Trustee Demanded. Plan Trustee demanded a plan provision continuing jurisdiction to approve Plan Trustee's final accounting (paragraph 5 of the Plan Amendments), when he agreed to serve as plan trustee at all, so there would be an ability to deal with nut-case plaintiffs. He wanted to have the option to litigate in bankruptcy court rather than in state court. And what he had in mind was W. J. Service. This case was decided shortly before Plan Trustee was agreed to be employed.

A. In re W. J. Services, Inc., 139 B.R. 824 (Bkcy., SD Tex. 1992) involved a well-known Victoria litigant who sued his bankruptcy attorney, well-known practitioner Larry Woody, for malpractice in state court. Mr. Woody removed the case to bankruptcy court and

R2091

moved for summary judgment on the ground that the Court's approval of his fee application barred the suit under principles of res judicata and collateral estoppel. Judge Greendyke agreed. The Fifth Circuit later adopted the reasoning followed in this case. In re Southmark Corp. (Southmark Corp. v. Coopers & Lybrand), 163 F.2d 925 (5th Cir. 1999); In re Intelogic Trace, Inc. (Osherow, Trustee v. Ernst & Young), 200 F.3d 382 (5th Cir. 2000).

      B.  No Reason to Use.  Up until just recently, at least, the Plan Trustee did not have someone  to deal with, of the class of people such as the W. J. Services decision protects against.  So he had no need to worry about the delays in his ability to file his final accounting and get his expenditures and receipts approved by the bankruptcy court.  After all, approval of the final accounting would be all Plan Trustee would need to protect himself.  Recent developments have altered that view somewhat.

    7.  CKS Still, and More than Ever, Runs up Fees and Expenses.  Mr. Rosenstein, however, is the frosting on the CKS cake.  He continues with CKS's usual and customary tactic of complaining about the cost while simultaneously demanding more work.  He complains that Mr. Kaufman's billing rate is now $400 an hour.  But he keeps causing the Plan Trustee to do more work, so that rate is voluntarily incurred.

      A.  That's His Rate.  There is no evidence that Mr. Kaufman's billing rate is not $400 an hour.  That's what he has been charging.  And he took two new cases this past week at that billing rate.  Caselaw establishes that if other people will pay you a particular billing rate, then so should the bankruptcy court.

      B.  Typical Case.  Consider for example, In re Jefsaba, Inc., 172 B.R. 786 (Bkcy., ED Pa. 1994) (held, a bankruptcy attorney's usual and customary rate is prima facie reasonable

R2092

and appropriate, and should be allowed by the Court absent proof to the contrary).

    C. <u>Lowering It Doesn't Help</u>    It really doesn't matter what Mr. Rosenstein thinks about Mr. Kaufman's billing rate. Plan Trustee does not think it is too high for a double-board certified attorney with a law degree from Harvard, a masters in law degree from Harvard, and over 30 years experience practicing and teaching bankruptcy law. Furthermore, what difference would it make to lower it some? When you are already at a $100,000 deficit in unpaid fees, even a LOT of tinkering with the fee rate will not alter that the Plan Trustee is owed a deficiency. Furthermore, most of the billed fees in the current billing were charged at a MUCH LOWER rate; Mr. Kaufman's $400 an hour rate is less than a year old. And since the current use of Mr. Kaufman's time is defending against Mr. Rosenstein's reckless and unwarranted claims that Mr. Kaufman ought to be disbarred, the higher-than-usual stakes of the litigation has to justify a higher-than-usual fee. Plan Trustee should have gone up!

    D. <u>Wrong Issue</u>.  The issue is not whether the court would have wanted a lower rate in the first place (though the Court in fact approved an application to pay Mr. Kaufman a $400/hour rate in the <u>Trans-Texas</u> case a year or two back). The issue is whether Mr. Kaufman could in good faith BELIEVE that $400/hour is in fact his billing rate. And there is not a scintilla of evidence to the contrary of that.

    E. <u>Charging Mr. Kaufman for Another's Duties</u>.  Mr. Rosenstein complains that Mr. Kaufman should have filed the tax returns and paid the taxes that the Plan provided were the responsibility of Mr. Feldman, and that Mr. Al White was hired (at CKS's insistence) to take care of. Mr. Kaufman could not possibly have been in bad faith or grossly negligent in expecting Mr. Feldman and Mr. Al White (who is a licensed CPA) to do what they promised to do, at least until

R2093

he knew that they had been derelict in their duties to do so. Since Mr. Feldman's tax returns have never been produced as yet as of June 11, 2001 (a state of affairs that apparently is to the entire satisfaction of Mr Rosenstein, judging by the position he took at the hearing on June 8), it is not yet possible for the Trustee to determine that any necessary tax return went unfiled.

8. Reinventing the Wheel. Because CKS is always bringing in new attorneys to try to restart the case from scratch, much time and expense is incurred duplicating efforts.

A. The Bond. Another of the many complaints and allegations that CKS recently engaged in is that it complained that Plan Trustee was acting illegally by not having a bond, as required by the Texas Trust Code. But, the statute cited by Mr. Rosenstein specifically says that before a Trustee has to put up a bond under that provision of the statute, there must be a court order setting an amount of the bond – and CKS had never (still hasn't) filed a motion asking the court to set an amount of any bond. And CKS's predecessor in interest, the FDIC, had expressly declined to require a bond because of what it would cost. The estate owes to pay the cost of the bond, not the trustee individually. Because CKS never bothered to investigate, Plan Trustee had to spend time and money re-looking into something that had been settled long ago.

B. Eight More Attorneys. Plan Trustee so far has had to deal with approximately eight attorneys on this one claim. The FDIC's attorney on this claim was Charles Jefferson. Then CKS came along, and there have been another eight attorneys to deal with. Besides past notables including Keith Kennedy, Janice Anderson, Karen Stevens Minor, Vicki Skaggs, Kirk Newsom, and Paul Gabriel, Plan Trustee now has to deal with Mr. Grant and Mr. Rosenstein. And many times, Plan Trustee and the Court had to deal with Mr. Ditto himself in addition. These people kept asking for documents and re-asking questions that were old history, each trying to start the

-12-

R2094

case anew from the beginning. This has increased the cost of the estate.

C. <u>Tax Returns</u>. A fiduciary return for a bankruptcy estate is required ONLY WHILE CONFIRMATION IS PENDING, not post-confirmation. Sec. 1146, Bkcy. Code. Once the plan is confirmed, unless it specifically says otherwise, it is the Reorganized Debtor who must file the tax returns, not the bankruptcy estate  See likewise, Sec. 346(i)(2) (individual debtor reassumes unused tax attributes post-confirmation).  And this Plan specifically reserved to Mr. Feldman the possession of the money to pay and the payment of all taxes, and did not give such a duty to the Plan Trustee.  Despite that, Mr. Rosenstein has rushed in, accusing the Plan Trustee of violating his fiduciary duties by not doing what the statute requires Mr. Feldman to do.  This has caused Trustee to have to look into these matters, even though he should have been able to rely on the Plan, and the ability of the accountant who was hired to do whatever accounting work that was necessary.   Defending against this, still another baseless charge from Mr. Rosenstein, has increased the time spent and the cost of the estate.

9. <u>Preventing Trustee from Collecting Assets</u>. CKS's current counsel is also engaging in other activities that can most charitably be called malpractice.  When an attorney goes down a path that he knows will keep his client from getting money that the client would otherwise get, and no other interest of the client is served, that is malpractice.   Plan Trustee told Mr. Rosenstein when he deposed Plan Trustee  that his actions would encourage Mr. Feldman to resist paying what Mr. Feldman owed.  Mr. Rosenstein didn't care.  But then, in the hearing on June 8, Mr. Moon stated exactly that – Mr Moon wasn't going to have Mr. Feldman settle with Plan Trustee or anyone else or pay anything to anyone, because Mr. Rosenstein was trying to get a new trustee.  Slam dunk malpractice.  The problem is, Mr. Rosenstein's malpractice is affecting

-13-

R2095

the other creditors, and costing them their money, too.  So the Court needs to stop CKS from intentionally inflicting harm on the other creditors, and wasting Plan Trustee's time and effort.

A.  Spite and Malice.  This Court's power to stop CKS from doing so derives from its historic power to stop spiteful and malicious actions: it has been the law for 500 years that a court of equity will enjoin a spite fence, or prohibit vexatious and harrassing litigation.  That's why courts will order that pro se litigants will not file any future lawsuits without permission from the court.  It's the very same principle.

B.  Economic Waste.  A court of equity also has the inherent power to prevent economic waste.  The law school first-year Contracts course casebook case which usually is used to illustrate this power is Peevyhouse v. Garland Coal Co., an Oklahoma case.  CKS is causing the bankruptcy estate to become more insolvent every day by its attacks on the Plan Trustee, every one of which must be answered, and for every one of which $400 an hour time will be spent.  It's economic waste.  And disallowing CKS's claim will stop it, because it will have no future standing to make any more attacks.

11.  Assigning Claim.  The path of a court of equity historically was much influenced by the various "equitable maxims" which the chancellors relied on.  One important equitable maxim is that "Equity regards as done that which ought to be done."  This maxim was the genesis of the rule creating equitable liens and allowing subrogation to prevent unjust enrichment.  David G. Epstein, Bankruptcy and Other Debtor-Creditor Laws 93, "Equitable Liens" (5th Ed. 1995).  If only a lien is needed to protect a party, an equitable lien is created; if a transfer outright is needed, a "constructive trust" is created.  See also, In re Ashford, 73 B.R. 37 (Bkcy., ND Tex. 1987) (Akard, Bkcy J.) (equitable assignment).

-14-

R2096

A. <u>Knows He Is Creating A Deficiency</u>.  Now, Mr. Rosenstein has mentioned in Court, on June 8, 2001, that he is aware that Mr. Kaufman's current billing rate is $400 an hour. And the bankruptcy estate currently owes Mr. Kaufman $100,000 or more for unpaid but earned fees and expenses.  Despite that, CKS is still filing more papers, alleging more baseless claims against Plan Trustee, failing to investigate anything before making these wild accusations, giving aid and comfort to the Debtor in his efforts to avoid paying the estate the six-figure liabilities that have already been identified by Plan Trustee as being owed to the estate by the Debtor.  Under the Plan, Plan Trustee is entitled to be paid for his time spent defending against these assertions by CKS, and CKS is guilty of misuse of its claim when it keeps running up these huge deficiencies like this.  Soon, if CKS is not stopped, CKS will have created a deficiency so large, it will eat up the Feldman liability claims, and creditors will become entitled to nothing.

B. <u>Assignment</u>.  Since CKS is making Plan Trustee work without giving him any security for repayment of the attorneys fees and expenses which CKS is running up in this case, the Court may impose an equitable lien or constructive trust on its claim in this case.  Assign the claim to Plan Trustee in partial security for his future attorneys fees being run up by CKS.  Be sure and give Plan Trustee the right to vote the claim that usually and customarily accompanies a claim when it is assigned.  Then CKS can be denied standing to file any more wild pleadings and run up any more fees and expenses in the case.

C. <u>Set-Off</u>.  Normally, you don't set-off pre-petition claims (entitled only to a dividend) against post-petition counter-claims (entitled to payment priority as administrative expenses) or post-confirmation counter-claims (entitled to be paid in full), because the different claims arise in a different right, and are worth very different values.  But you can set-off the post-

-15-

R2097

confirmation dividend against the post-petition or post-confirmation counter-claim, because it is what is left of the pre-petition claim after it has been fully administered post-petition, and so is in the same right or capacity, and worth the same value. If the set-off of CKS's potential future dividend is allowed here, CKS ends up with nothing left, and loses standing, and cannot file any more wild pleadings and run up any more administrative expenses and cost everyone else their dividend in this case.

12. Quasi-Estoppel. CKS can be denied any claim on the basis of election or other form of quasi-estoppel, which is well-recognized both in state and federal courts in Texas. Quasi-estoppel is a doctrine related to estoppel. Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd., 817 S.W.2d 160 (Tex. App. Houston 14th 1991, no writ), says "'Quasi estoppel' is a term applied to certain legal bars, such as ratification, election, acquiescence, or acceptance of benefits. 31 C.J.S. Estoppel § 107 (1964)." Quasi-estoppel is effective not because of reliance of the plaintiff, but because of the receipt and retention of benefit by the defendant. This doctrine says that once a party has accepted the benefits of a particular position under a contract or statutory right, it will thereafter be estopped to repudiate the burdens which come along with those benefits. Lopez v. Munoz, Hockema & Reed, LLP, ___ S.W.3d ___, 2000 W.L. 758457 (Tex. 2000); citing Atkinson Gas Co. v. Albrecht, 878 S.W.2d 236, 240 (Tex.App.--Corpus Christi 1994, writ denied), which cites Steubner Realty 19. And there are about another 25 or 30 Texas cases, at least, recognizing the doctrine of quasi-estoppel, not to mention federal cases, such as In re Robb (Robb-Fulton v. Robb), 23 F.3d 895 (4th Cir 1994); In re Sampson (Sampson v. Sampson), 997 F.2d 717, at 726 in note 6 (10th Cir. 1993); In re Kritt (Kritt v. Kritt), 190 B.R. 382 (9th Cir. BAP 1995); all following In re Davidson (Davidson v. Davidson), 947 F.2d 1294, 1297 (5th Cir. 1991).

-16-

R2098

In the cited federal cases, people who filed post-divorce tax returns deducting payments to their ex-spouse as "alimony" (which is non-dischargeable in an ordinary bankruptcy case) later tried to prove that the payments were (non-deductible for tax purposes, but dischargeable in bankruptcy) payments for property settlements; but the courts said that quasi-estoppel will prevent someone from repudiating a contractual or statutory position whose benefits they have retained. Many of the state court cases are oil and gas cases, but none of them purport to limit the scope of the doctrine.

13. <u>Benefits Retained</u>. Here CKS has taken advantage of the following contractual or statutory position: that it wanted Colin Kelly Kaufman to do an enormous amount of work (and still is demanding more) in the captioned bankruptcy case, on the theory that this work is part of what the Plan Trustee should be doing in the case. Having received the benefit of getting all that work which Plan Trustee has done for the last nine years, CKS cannot now change its mind. Under quasi-estoppel, having accepted the benefit of all that work, CKS cannot now claim that it was not valuable or should not have been paid for at the contract rate which was then in effect.

14. <u>Pleading Quasi-Estoppel</u>. A pleading which generally sets out a right of "estoppel" adequately pleads a claim of quasi-estoppel   <u>Vessels v. Anschutz Corp.</u>, 823 S.W.2d 762, 765 (Tex. App. Texarkana 1992) (court considered claim of quasi-estoppel where motion for summary judgment stated merely "estoppel" as the ground); <u>New Braunfels Factory Outlet Center, Inc. v. IHOP Realty Corp.</u>, 872 S.W 2d 303, 307 (Tex. App. Austin 1994) (submission "Are the plaintiffs estopped" would allow appellee to defend jury's verdict on a theory of quasi-estoppel as well as ordinary equitable estoppel), following <u>Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.</u>, 817 S.W.2d 160, 163-64 (Tex App. Houston 14th 1991. no writ). Movant is relying

R2099

on both estoppel and quasi-estoppel as specific grounds to cancel CKS's claim.

15.  <u>CKS Retained Benefits</u>.  It has been shown above that to invoke quasi-estoppel to cut off another's defenses, it is necessary only to show that someone received and retained the benefits of a transaction, and so it would be inequitable for him to avoid its burdens.  Although CKS wants to avoid paying Mr. Kaufman the fees that were promised him asserting various theories, these theories will not withstand the fact that CKS demanded and kept the benefits of Mr. Kaufman's work.

A.  <u>Relative Benefit</u>.  Although CKS has tried to allege that the amount of the benefit it got was less than the amount of Mr. Kaufman's bill, nothing in the law of quasi-estoppel says that the amount of benefit retained has to exceed the return consideration, for quasi-estoppel to be effective.  Inadequate benefit is not a defense.  Anyway, CKS and the bankruptcy estate got the benefit it asked for, and everyone knew that Plan Trustee was expecting to be paid for his work on the estate.  Plan Trustee did not guarantee a return to creditors, and neither did the Plan.  It often happens that trustees administer cases with no distributions, and it should be clear to creditors that their actions driving up the costs of administration are calculated to lead to that result.  It is well-known that 7/8ths of all bankruptcy cases produce no payment to unsecured creditors at all; and CKS must bear responsibility for its contribution to that result in this case, if it happens.

B.  <u>Accepting Another Benefit</u>.  The estate is insolvent, unless Mr. Feldman and his family can be made to pay the money they promised under the Plan.  But CKS's conduct (particularly in the hearing on June 8, 2001 where Mr. Rosenstein impliedly agreed with James Moon's position that he ought not to have to pay or turn over any documents so long as there is a

-18-

R2100

motion pending to remove the Plan Trustee, saying he had nothing more to "add to that") shows that CKS is not in favor of making the Feldman Family Interests pay what they owe. So, they are effectively waiving or effectively estopped or effectively quasi-estopped from asserting their claim against the Feldmans. But that's the only remaining asset of value in the estate. So they have effectively lost their claim. The benefit CKS thinks it is getting by hindering Plan Trustee's efforts to collect for the estate in this way is getting Mr. Feldman's support for their attempt to replace the Plan Trustee. So accepting the benefits of cooperation with Feldman means that, by judicial estoppel or quasi-estoppel, CKS's claim should be lost to it.

16. <u>Another Equitable Maxim</u>. If the Plan Trustee's bills are excessive (which Plan Trustee denies, but assume arguendo it is right), then it is CKS's fault for demanding so much. If it is CKS's fault, the equity court can fix it, because of the equitable maxim, "Equity treats as done that which ought to be done." <u>Cavender v. Cavender</u>, 114 U.S. 464, 472, 5 S.Ct. 955, 29 L.Ed. 212 (1885). To paraphrase slightly a well-known commercial law casebook case, "Let him who complains of the fire pay for the firewood." Plan Trustee's extra time and expense charges ought to be paid out of the share of the creditor who forced those extra charges to be incurred. That is CKS. If CKS's dividend is charged with the extra costs and work that it ran up with its unreasonable demands, then it will be entitled to no dividend at all (in fact, would owe money back). So its claim should be CANCELLED ENTIRELY. <i>See e.g.</i>, <u>In re Multiponics, Inc.</u>, 622 F.2d 709(5th Cir. 1980) (claim should be cancelled, where possible, not just equitably subordinated). And that will have the benefit of denying CKS standing to create any MORE time-wasting, estate-liability-creating, estate-asset-eating, attacks on the Plan Trustee. CKS knows that the Plan requires that Plan Trustee's expenses have to be paid first.

-19-

R 2101

WHEREFORE, PREMISES CONSIDERED, Movant respectfully asks that this Court cancel the claim of CKS for inequitable conduct, specifically in costing the other creditors and the Plan Trustee money by running up the costs and expenses of administration in this case in an amount exceeding CKS' probable dividend, or alternatively assign the CKS claim to Plan Trustee or set-off the CKS dividend against the Plan Trustee's deficiency claim, because of Plan Trustee's fees and expenses run up by CKS, and grant Plan Trustee such other and further relief as may be fair or just.

Respectfully Submitted,

_____

Colin Kelly Kaufman, Plan Trustee
In propria personam
State Bar of Texas # 11113000
So. Dist. Fed. ID No. 9242

Address of Counsel:

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone #   (361) 888-8865
TeleFAX No. (361) 888-8172

Board Certified, Business & Consumer Bankruptcy
Law, Texas Board of Legal Specialization

Certificate of Conference

I certify that I conferred with Matt Rosenstin by sending him the attached FAX on Friday, June 8, 2001, saying that unless he called me back, I would treat him as opposing this motion.

_____

R2102

Colin Kelly Kaufman

Certificate of Service

I certify that I had one of the personnel at this law office serve the foregoing writing and its associated order on the persons shown on the attached Service List by FAX or US mail, first class postage prepaid, this 12th day of June, 2001.

_____

Colin Kelly Kaufman

R2103

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:                                      |
Charles B. FELDMAN dba                      |   In Bankruptcy Case # 90-01254-B-11
Charles B. Feldman Investments              |
          Debtor                            |   In Chapter 11

ORDER GRANTING
PLAN TRUSTEE'S ORIGINAL OPPOSED MOTION
TO CANCEL CKS'S CLAIM, OR ALTERNATIVELY TO ASSIGN CKS'S CLAIM OR
SET-OFF ITS POTENTIAL DIVIDEND TO PLAN TRUSTEE TO SECURE FEES

At Corpus Christi, Texas on the day and year written below, came on to be heard pursuant

to lawful notice "**Plan Trustee's Original Opposed Motion to Cancel CKS's Claim, or**

**Alternatively to Assign CKS's Claim or Set-Off Its Potential Dividend to Plan Trustee to**

**Secure Fees.**" After conducting a full and complete evidentiary hearing, it is clear that the Court

has jurisdiction over the parties and subject matter, and that the law and facts are with Colin Kelly

Kaufman, the Chapter 11 Plan Trustee, and against CKS Asset Management, Inc. and its attorney,

Matthew A. Rosenstein.  It further appears to the Court that CKS Asset Management, Inc. is

guilty of malfeasance and misfeasance in making extraordinary litigious demands of the Plan

Trustee and the bankruptcy estate, that this Court should immediately cancel the claim of CKS

Asset Management, Inc. for cause, disallow all claims, fees and expenses sought by CKS Asset

Management, Inc., and allow the Plan Trustee to be secured for all unpaid fees and expenses by

any right that CKS Asset Management, Inc. (hereafter sometimes "CKS") would ever have had in

this case, and grant the other relief ordered below.  The Court hereby makes the following

findings of fact and conclusions of law:

## NATURE OF THE SERIOUS PROBLEM AND EGREGIOUS CONDUCT

CKS has been guilty of serious malfeasance and misfeasance in connection with its

Exhibit AA - Continued -1-

R2104

activities as a creditor of the captioned bankruptcy estate. CKS has been guilty of excessive litigiousness and economic waste of the assets of the captioned bankruptcy estate. CKS's violations have resulted in a material financial loss to the Bankruptcy Estate. In an attempt to cover up its unlawful activities, CKS has made its egregiously shocking, unwarranted and totally unreasonable attacks on the Bankruptcy Estate, the Plan Trustee and others interested in the case, without any benefit to the Bankruptcy Estate or its creditors, thereby causing the fees and expenses of the Plan Trustee to be so high that the Bankruptcy Estate has been entirely consumed, and a $100,000 deficiency exists. Of the cerca $354,066.92 that Mr. Kaufman collected, only cerca $278,631.50 of his cerca $400,000 in fees and expenses were paid by the Bankruptcy Estate. Despite CKS's efforts which have hindered and delayed the Plan Trustee in collecting the assets of the Bankruptcy Estate, and which have multiplied his fees and expenses in dealing with the estate, Plan Trustee stood ready to insure a dividend to unsecured creditors, until very recently when CKS's counsel made it clear that he intended to make baseless and manufactured attacks on the Plan Trustee's integrity and conduct, attempting to get findings that would take Plan Trustee's law license, because of CKS's artificial, unreasonable, highly strained, and completely-at-odds-with-common-sense interpretation of a Plan that has been for nine years interpreted completely differently, and which interpretation had been acquiesced in by CKS' prior counsel and by its predecessor in interest, the FDIC.

## V. Overt Acts.

CKS is guilty of and has intentionally committed the following overt acts of wrongdoing while acting as a creditor of the captioned bankruptcy estate.

(1). <u>Filed Abstracts in Contravention of the Plan.</u> CKS has filed abstracts of judgment

R2105

R2107

alone, not counting the cost of the Plan Trustee's time at $250 an hour to deal with them, cost $4,600, or nearly 25%), but also had the tendency and effect of lowering the values. Even after Plan Trustee had gone through this process, not to mention having real estate agents deal with the property, CKS objected to the sale of the property at the appraised values, though nobody else ever made an offer on them, and there were multiple owners, and the Plan assumed the partnership agreements as executory contracts, rather than rejecting them, and other owners had a right of first refusal, all tending to reduce value. CKS forced the parties to attend two more hearings before the properties were finally sold, one in the Valley and another one in Corpus Christi, based on its various contentions from time to time that the property "ought to be sold on the internet" or that CKS wanted to make a competing bid on the properties, or the like. CKS went down fighting, insisting to the very end that the Court should deny the Plan Trustee's motion to sell the properties.

(4). <u>Wasting Assets in Efforts to Knock Out Parkwell's Claim</u>.  Enormous amounts of time in litigation were spent, and pages and pages of the docket are spent, dealing with CKS's efforts to knock out the claim of Parkwell Investments, Inc.  These matters began on 8-18-97 with docket # 290, and ended on 7-2-98 with docket # 353.  CKS made no progress on defeating the claim with its objections, and ultimately asked to withdraw its objections.  Yet, from the very beginning, CKS's objections were plagued by the weaknesses that objections to Parkwell's claim were originally settled when the Plan was confirmed, so that res judicata was a potential defense to the objection; and that the Bonner who was so closely affiliated with Charles Feldman was Curtis Bonner, while the Bonner who was part of the control group in Parkwell was his cousin Chip Bonner, so that the insider affiliation of Parkwell was more tenuous than it might have been;

R2108

that insiders have a legal right to lend money to their affiliates and caselaw such as In re

Multiponics, Inc., 622 F.2d 709(5th Cir. 1980) establishes that mere insider status, without

accompanying wrongdoing, is not sufficient grounds to disallow a claim.

(5). CKS Intentionally Ignores Standards. CKS has intentionally, knowingly or recklessly

ignored that the test of wrongdoing by the Plan Trustee is whether he acted in bad faith or with

gross negligence. If any reasonable lawyer could have believed that he had a right to charge what

Plan Trustee has charged, Plan Trustee's fees cannot be considered excessive. If any reasonable

lawyer could interpret the Plan as meaning that Plan Trustee could pay his own fees first, and

report his accounts to the Court later, Plan Trustee's actions cannot be considered improper.

Plan Trustee has answered EVERY attack of CKS, and his position has been reasonable and

defensible on EVERY point. A reasonable lawyer could believe in what Plan Trustee has done.

Furthermore, CKS has ignored that even an UNREASONABLE lawyer would not necessarily be

guilty of bad faith or gross negligence. A lawyer could be unreasonable and commit ordinary

negligence. A lawyer could be unreasonable and still not intend to commit a wrong, and so have

good faith. CKS has not come close to proving misconduct in this case.

(6). Still Costing Estate. CKS is still raising expenses and costs to the bankruptcy estate

today. It is doing so by alleging wrongdoings and misconduct by the Plan Trustee, when Plan

Trustee's conduct of his duties has been at least substantial performance of what he contracted to

do for the bankruptcy estate. Specific examples of recent erroneous accusations and claims of

misconduct by CKS include those listed in the following paragraphs.

(7). Accusing Plan Trustee of Not Carrying Out Someone Else's Duties. CKS has

alleged that Mr. Kaufman should have filed tax returns and paid taxes. But it was never Mr.

R2109

Kaufman's duty to file tax returns and pay taxes. The Plan specifically reserved funds to pay taxes to the Reorganized Debtor, Charles Feldman. And a fiduciary return for a bankruptcy estate is required ONLY WHILE CONFIRMATION IS PENDING, not post-confirmation. Sec. 1146, Bkcy. Code. Once the plan is confirmed, unless it specifically says otherwise, it is the Reorganized Debtor who must file the tax returns, not the bankruptcy estate. See likewise, Sec. 346(i)(2) (individual debtor reassumes unused tax attributes post-confirmation). Since this Plan specifically reserved to Mr. Feldman the possession of the money to pay and the payment of all taxes, and did not give such a duty to the Plan Trustee, he could not have violated a duty. Furthermore, it has not been proven that Mr. White and Mr. Feldman did not carry out the duty to file any tax returns that were necessary. Plan Trustee filed a motion to compel to get Mr. Feldman to turn over his tax returns, and that had to be done before Plan Trustee would have any reason to believe that Mr. White and Mr. Feldman violated their duties to take care of these matters. It is not even clear that the estate took in enough income (other than that on which taxes were paid by Mr. Feldman) even to owe a duty to file a tax return. Despite that, Mr. Rosenstein has rushed in accusing the Plan Trustee of violating his fiduciary duties by not doing what the statute requires Mr. Feldman to do.

(8). <u>Demanded a Bond</u>. Plan Trustee has previously pointed out that the FDIC did not want the Bankruptcy Estate to pay the cost for a bond. Plan Trustee has previously pointed out that the statute does not require a bond until a party moves for and gets a court order setting a bond requirement, and requiring a bond of a specific amount. Plan Trustee has previously pointed out that CKS has never made such a motion, nor obtained such a court order. Despite the fact that the bond has been effectively waived by CKS's predecessor in title, and it is estopped or

-6-

R2110

quasi-estopped from demanding one now, and that seeking a bond would be barred by laches or limitations by waiting for nine years to seek it, CKS is still litigating on the issue that Plan Trustee did not put up a bond. This is more typical harassing and vexatious litigation by CKS.

(9). Eight More Attorneys   After FDIC sold its claim to CKS, Plan Trustee has had to deal with eight more attorneys on behalf of CKS, plus dealing with Mr. Ditto, its president, himself. This has resulted in great multiplication of time and effort as the same old things had to be re-explained and re-dealt with because of the lack of knowledge on the part of the new attorneys.

(10). Prevented Plan Trustee from Collecting Assets. Mr. James P. Moon, counsel for Debtor Charles B Feldman, stated at the hearing on June 8, 2001, that the reason he didn't want to deal with Plan Trustee was because Mr. Rosenstein was trying to get him removed, and Mr. Moon didn't feel any need to deal with him until that possibility was over with. This is strong evidence showing that CKS's conduct in this case has hindered the Plan Trustee's efforts to collect assets and make the Debtor pay deficiencies to the Bankruptcy Estate. Extra time and costs have already been caused, as proven by the fact of having the hearing on June 8. And, even if Plan Trustee succeeds in collecting in the future, there will in all probability be more extra time and extra costs involved, than would have been expended but for CKS's unwarranted attacks.

(11). CKS Is Guilty of Misuse of Its Claim When It Keeps Running Up Huge Deficiencies Like This.   CKS is knowingly, intentionally or recklessly running up the Bankruptcy Estate's current deficit in assets. CKS knows that Plan Trustee is getting $400 an hour in his other cases (except for one at $375 an hour). CKS knows that the Bankruptcy Estate was insolvent prior to the current accusations made by CKS against Plan Trustee. Despite that, CKS is still filing more

R2111

papers, and alleging more baseless claims against Plan Trustee, failing to investigate anything before making these wild accusations, or ignoring what investigations reveal. This is a misuse of CKS's claim and its status as a creditor.

(12). <u>Attorneys File Fee Applications; Plan Trustees Are Seldom Attorneys.</u> Plan Trustees do not have to be attorneys. Most of the time they are not. The Plan in this case as drafted provided for the Plan Trustee to be a bank. Banks do not file attorneys fee applications. They do not have law licenses. There is no reason why the Court would interpret a plan drafted for a bank trustee to mean that a non-bank trustee is supposed to file attorneys' fee applications. Paragraph 5 of the amendments to the Plan provides that the Plan Trustee will file a final accounting. That is what Plan Trustee must file, and that is contemplated to be filed and ruled on AFTER paying the expenses of administration and at the time of any potential distribution to creditors.

## VI. Applicable Law.

(13). <u>An Equitable Maxim.</u> A well-known equitable maxim says that, "Equity treats as done that which ought to be done." <u>Cavender v. Cavender</u>, 114 U.S. 464, 472, 5 S.Ct. 955, 29 L.Ed. 212 (1885). This maxim gives rise to equitable liens and constructive trusts. David G. Epstein, <u>Bankruptcy and Other Debtor-Creditor Laws</u> 93, "Equitable Liens" (5th Ed. 1995). It also justifies cancellation of claims where what "ought to be done" is prevent a creditor such as CKS from engaging in harassing and vexatious litigation against the Plan Trustee, to the detriment of all others interested in the bankruptcy estate. See also, <u>In re Multiponics, Inc.,</u> 622 F.2d 709(5th Cir. 1980).

(14). <u>Assignment.</u> A court of equity can find that a claim has been equitably assigned

R2112

because of the conduct of the potential assignor. In re Ashford, 73 B .R. 37 (Bkcy., ND Tex. 1987) (Akard, Bkcy. J.); Sorenson v. Dawdy, 196 S.W.2d 687 (Tex. Civ. App. Ft. Worth 1946, no writ); Steinbrecher v. Fairfield County Trust Co., 5 Conn. Cir. Ct. 393, 255 A.2d 138, 6 UCC Rep. 703 (1968). The Court has power to treat CKS's claim as equitably assigned to Plan Trustee as partial compensation for his fees. However, the law favors cancellation of claims when that is one of several alternatives for dealing with wrongdoing of the claimant. See e.g., In re Multiponics, supra.

(15).  Equitable Liens and Constructive Trusts.  If only a lien is needed to protect a party, an equitable lien is created; if a transfer outright is needed, a "constructive trust" is created. See also, In re Ashford, 73 B.R. 37 (Bkcy., ND Tex. 1987) (Akard, Bkcy. J.) (equitable assignment).

(16).  Set-Off.  Although normally set-off of pre-petition claims and post-petition claims cannot be done, because the debts are in different capacities, the same is not true for set-off of dividends against post-petition claims.

(17).  Unconscionability.  Unconscionable conduct by a claimant can cause a claim to be disallowed entirely. Claims in bankruptcy court may be disallowed because the excessive litigiousness of the creditor have cost the bankruptcy estate money. See, In re Wonder Corp. of America, 72 B.R. 580, 15 B.C.D. 1168 (Bkcy., D Conn. 1987) (oversecured creditor would normally get reasonable attorneys fees as well as the amount of the debt, but attorneys' fees disallowed because the creditor's "blatant and totally unproductive obstruction" objecting to fees of attorneys for bankruptcy estate). See likewise, In re W. S. Sheppley & Co., 62 B.R. 279 (Bkcy., ND Iowa 1986) (disallowing half secured creditor's post-petition attorneys fees for engaging in

R2113

"all-out war" with debtor). *See also*, In re Beverages Intl., Ltd., 50 B.R. 273 (D Mass. 1985)
(bankruptcy courts may deny or equitably subordinate claims for the unconscionable conduct of
the claimant); In re Moody (Mil-Ger Enterprises v. Moody), 16 B.R. 763 (Bkcy., D Md. 1982)
(held, relief from stay denied for invalidity of claim invalidity for unconscionability, where no
usury law applied, but creditor advanced $55,000 in late 1980, and 15 months later demanded
$355,000 balance, and also $833,000 prepayment penalty); In re Russell, 109 B.R. 359 (Bkcy.,
WD Ark. 1989) (held, where SP only credited debtor with $140,000 on foreclosure of property
worth at least $624,000, court would disallow SP's deficiency claim for unconscionability); In re
Tastyeast, Inc., 126 F.2d 879 (3d Cir. 1942), *cert. denied sub nom.* Modern Factors, Inc. v.
Tastyeast, Inc., 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942) (though New York statute
forbade corporations to raising defense of usury, where creditor charged 100% interest, court
would deny its claim for unconscionability). *See generally*, In re Elkins-Dell Mfg. Co., 253
F.Supp. 864 (ED Pa. 1966) (Lord, Dist. J.); FSLIC v. Mmahat, 89 B.R. 573 (ED La. 1988) (held,
district court would remand to bankruptcy court to consider Chapter 11 debtor's claim that
vulture fund purchaser of mortgage should have its claim reduced or eliminated because of
unfairness, unconscionability, and potential abuse); In re Multiponics, Inc., 622 F.2d 709 (5th Cir.
1980) (unconscionability of claimant's conduct is a defense to a claim in bankruptcy; given a
choice, the bankruptcy court should prefer to disallow a claim rather than merely subordinate it);
Prof. Doug Whaley's article, "Unconscionable Claims and the Proposed Bankruptcy Act," 53 N.
Car. L. Rev. 1237 (1975).

(18). <u>Cancel Claim Entirely</u>. The Court has concluded that the proper treatment of
CKS's claim here is to cancel it entirely.

-10-

(19). <u>Quasi-Estoppel (Election)</u>. Quasi-estoppel is a doctrine related to estoppel. <u>Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.</u>, 817 S.W.2d 160 (Tex. App. Houston 14th 1991, no writ), says "'Quasi estoppel' is a term applied to certain legal bars, such as ratification, election, acquiescence, or acceptance of benefits. 31 C.J.S. Estoppel § 107 (1964)." **Quasi-estoppel is effective not because of reliance of the plaintiff, but because of the receipt and retention of benefit by the defendant.** This doctrine says that once a party has accepted the benefits of a particular position under a contract or statutory right, it will thereafter be estopped to repudiate the burdens which come along with those benefits. <u>Lopez v. Munoz, Hockema & Reed, LLP</u>, ___ S.W.3d ___ , 2000 W.L. 758457 (Tex. 2000); citing <u>Atkinson Gas Co. v. Albrecht</u>, 878 S.W.2d 236, 240 (Tex.App --Corpus Christi 1994, writ denied), which cites <u>Steubner Realty 19</u>. Another 25 or 30 Texas cases, at least, recognize the doctrine of quasi-estoppel, as do federal cases, such as <u>In re Robb (Robb-Fulton v. Robb)</u>, 23 F.3d 895 (4th Cir. 1994); <u>In re Sampson (Sampson v. Sampson)</u>, 997 F.2d 717, at 726 in note 6 (10th Cir. 1993); <u>In re Kritt (Kritt v. Kritt)</u>, 190 B.R. 382 (9th Cir. BAP 1995); all following <u>In re Davidson (Davidson v. Davidson)</u>, 947 F.2d 1294, 1297 (5th Cir. 1991). In the cited federal cases, people who filed post-divorce tax returns deducting payments to their ex-spouse as "alimony" (which is non-dischargeable in an ordinary bankruptcy case) later tried to prove that the payments were (non-deductible for tax purposes, but dischargeable in bankruptcy) payments for property settlements; but the courts said that quasi-estoppel will keep people from repudiating a contractual or statutory position whose benefits they have retained.

(20). <u>Benefits Retained</u>. Here CKS has taken advantage of the following contractual or statutory position: that it wanted Colin Kelly Kaufman to do an enormous amount of work (and

-11-

R 2115

still is demanding more) in the captioned bankruptcy case.  Having received the benefit of getting

all that work which Plan Trustee has done for the last nine years, CKS cannot now change its

mind and argue Plan Trustee should not be paid for it.  Under quasi-estoppel, having accepted the

benefit of all that work, CKS cannot now claim that it was not valuable or should not have been

paid for at the contract rate which was then in effect.

(21).  <u>Judicial Estoppel</u>.  Judicial estoppel prevents one who gained a benefit from taking a

position in a prior or current case from coming back and arguing the reverse of the position

previously taken.  <u>Tennessee ex rel. Sizemore v. Surety Bank</u>, 200 F.3d 373 (5th Cir. 2000), where

the court said at p. 382, citing <u>Ergo Science, Inc. v. Martin</u>, 73 F.3d 595, 598 (5th Cir. 1996), as

follows: "Judicial estoppel prevents a party from taking a position contrary to a position

previously taken in the same or any earlier proceeding."  *See also*,  <u>In re Coastal Plains, Inc.</u>

<u>(Browning Mfg. v. Mims)</u>, 179 F.3d 197, 205 (5th Cir. 1999) (held, federal judicial estoppel

applied here, as this was a bankruptcy case and, effect of party assuming a certain position in

bankruptcy court is a matter of federal law.)  CKS got relief from the order granting sanctions

against it in this case by arguing that Plan Trustee would get paid his fees anyway, sanctions or

not, and so CKS cannot now argue that Plan Trustee should not get paid his fees anyway.

## VII.  Conclusion.

Accordingly, it is hereby **ORDERED, ADJUDGED AND DECREED**:

1.  <u>Jurisdiction</u>.  The Court has jurisdiction over the parties and subject matter,

2.  <u>Prevailing Party</u>.  The law and facts are with Colin Kelly Kaufman, the Chapter 11 Plan

Trustee, and against CKS Asset Management, Inc. and its attorney, Matthew A. Rosenstein.

3.  <u>Wrongs Committed</u>.  CKS Asset Management, Inc. is guilty of serious malfeasance and

R2116

misfeasance and interference with the confirmed Plan in making extraordinary litigious demands of the Plan Trustee and the bankruptcy estate.

A.  Bound by Plan  As a creditor of the captioned estate, CKS became bound by the Plan when it acquired the claim of the FDIC, and had a duty not to interfere with its implementation  Sec. 1141(a), Bkcy Code  CKS has been guilty of excessive litigiousness and economic waste of the assets of the captioned bankruptcy estate.  CKS's violations have resulted in a material financial loss to the Bankruptcy Estate.  This has interfered with carrying out the Plan in violation of Sec. 1141(a).

B.  Created a Deficiency.  CKS has made its egregiously shocking, unwarranted and totally unreasonable attacks on the Bankruptcy Estate, the Plan Trustee and others interested in the case, without any benefit to the Bankruptcy Estate or its creditors, thereby causing the fees and expenses of the Plan Trustee to be so high that the Bankruptcy Estate has been entirely consumed, and a $100,000 deficiency exists  This has interfered with carrying out the Plan in violation of Sec. 1141(a).

C  Attacked Plan Trustee  CKS's counsel made baseless and manufactured attacks on the Plan Trustee's integrity and conduct, attempting to get findings that would take Plan Trustee's law license, because of CKS's artificial, unreasonable, highly strained, and completely-at-odds-with-common-sense interpretation of a Plan that has been for nine years interpreted completely differently, and which interpretation had been acquiesced in by CKS' prior counsel and by its predecessor in interest, the FDIC.  This has interfered with carrying out the Plan in violation of Sec. 1141(a).

D.  Hindered and Delayed, Multiplied Costs.  CKS's efforts have hindered and

-13-

R2117

delayed the Plan Trustee in collecting the assets of the Bankruptcy Estate, and have multiplied his fees and expenses in dealing with the estate

4. <u>Claim Cancelled</u>. The claim of CKS Asset Management, Inc. is hereby cancelled for cause.

5. <u>Fees Disallowed</u>. The Court disallows all claims, fees and expenses sought by CKS Asset Management, Inc., or any of its attorneys, agents or representatives.

6. <u>Alternatives to Claim Cancellation</u>. Alternatively, if it should be improper to cancel the claim of CKS Asset Management, Inc., then it is equitably assigned to Plan Trustee, as part compensation for the deficiency in payment of his fees and expenses in the case. Alternatively, if an equitable assignment should be improper, then the Plan Trustee is granted an equitable lien to be secured for all unpaid fees and expenses by any right that CKS Asset Management, Inc. (hereafter sometimes "CKS") would ever have had in this case.

7. <u>Interim Report</u>. Plan Trustee's Proposed Final Report and its Amendments are allowed as an interim report, as requested by Plan Trustee..

8. <u>Trustee Remains</u>. Plan Trustee Colin Kelly Kaufman will remain as Plan Trustee.

9. <u>Complaints about Fees Reserved to Final Accounting</u>. Complaints about compensation of Plan Trustee are premature, and shall be taken up by the Court when Plan Trustee submits a really final accounting. This will be due when the Plan Trustee's litigation with the Feldmans ends. No money will be ordered returned, nor will any damages be awarded, nor will any exemplary damages be awarded; all this is ordered without prejudice to the Court's right at that later time to consider all the things it usually considers when it approves a final accounting, and to make any such order at that time as it might usually make.

-14-

R2118

10. _Standing Lost._ CKS no longer has standing in this case to file motions and objections and complaints about what the Plan Trustee or the Court is doing or not doing. The parties will delete it and its attorneys from the service list in this case.

11. _CKS Order Denied._ CKS Asset Management, Inc.'s request for an order denying Plan Trustee's Proposed Final Report, removing Plan Trustee for cause, requiring disgorgement of fees, and other relief is denied as moot because proof is lacking of any wrongdoing by Plan Trustee and because CKS now lacks standing to seek any such order.

12. _CKS Demand for Sanctions Denied._ CKS Asset Management, Inc.'s request for an order sanctioning Plan Trustee under Rule 9011, F.R.Bkcy.P. is denied as moot because proof is lacking of any wrongdoing by Plan Trustee. CKS did not follow the proper procedure to sanction a party under Rule 9011, and because CKS now lacks standing to seek any such order

13. _No Unlawful Activities._ There is no evidence of any unlawful activities in this case by Plan Trustee; and accordingly the Court declines to find that Plan Trustee ever had any intent to conceal any unlawful activities, as alleged by CKS. In any case, a motion for a delay of a month in the holding of a deposition is not the sort of motion calculated to "conceal" unlawful activities if there had been any such activities. Federal law requires banks to keep records of transactions in bank accounts, and a delay of a month in producing such records does not impose a great risk of loss or inability to re-create such records.

14. _Plan Trustee Had a Right to Be Paid._ The Plan Trustee had a right to pay his fees and expenses as well as the fees and expenses of others whom he paid in this case, before bringing the issue before the court in his final accounting, instead of waiting for nine years to be paid, as argued by CKS.

-15-

R٦119

15. <u>No Bad Faith or Gross Negligence</u>. The Plan Trustee is not guilty of bad faith nor of gross negligence.

16. <u>Bond Not Required</u>. Plan Trustee had no duty to get a bond until a creditor or other party in interest asked this Court to require a bond and set the amount of bond required, and such an order was entered. Waiting eight and a half years to raise the issue is laches, and accordingly it would be too late to ask for a bond now.

17. <u>Not an Express Trust</u>. The Plan which was confirmed in this case did not provide that there would be an express trust, and it accordingly therefore did not create an express trust. A bankruptcy estate is a creature of federal law, and does not require resort to state trust law to have a legal existence.

18. <u>Accountings Were Not Concealment</u>. The evidence shows that Mr. Kaufman completed 7 accountings and furnished them to CKS prior to the time of the Proposed Final Report. No motion or other pleading was ever filed in this Court complaining of the nature of, or the too limited scope of, any such accounting. Accordingly, it is not possible to conclude that Plan Trustee's furnishing of the information he furnished was "concealment" of other information about the estate, as alleged by CKS.

19. <u>Which Order Terms are Interim and Which Are Final</u>. Except as to the matters ruled on in paragraphs 7, 8 and 9 above, this order fully and finally disposes of CKS's claims in this case. All relief that is not expressly granted herein concerning its claims is denied.

So ordered this _____

_____
Hon. Richard S. Schmidt, Esq.

-16-

United States Bankruptcy Judge
for the Southern District of Texas,
Brownsville Division

After entry, copies to:

Charles B. Feldman, Debtor, 926 Lantana St., Harlingen. TX. 78550-8080

James P. Moon, Esq., 2611 W. Ovilla Rd., Red Oak, TX. 75154; FAX (972) 617-7910

Matt Rosenstein, Esq., American Bk. Plaza Suite 420, 711 N. Carancahua, Corpus Christi, TX. 78475; FAX (361) 883-5590

Ron Simank, Esq., Schauer & Simank, 615 N. Upper Broadway #2000, Corpus Christi, TX. 78477; FAX (361) 884-2822

C. K. Kaufman, Esq., P.O. Box 1662, Corpus Christi, TX. 78403-1662; FAX (361) 888-8172.

Curtis Bonner, Esq., P.O. Box 288, Harlingen, TX. 78551: FAX (956) 428-0671

-17-

R2171

     105. 6/22/01 -- docket #433  Creditor CKS Asset Management Witness and Exhibit List (swm) [EOD 06/25/01] [90-1254]

Exhibit 21
R2351-467

COLIN KELLY KAUFMAN
ATTORNEY AT LAW
1106 Third Street, Corpus Christi, TX. 78404-2312
P O. Box 1662, Corpus Christi, TX. 78403-1662
Phone (361) 888-8865, FAX (361) 888-8172
Board Certified, Business Bankruptcy Law and Consumer Bankruptcy Law,
Texas Board of Legal Specialization

Date: __May 7, 2001_____

Notice This FAX is confidential  Only an addressee may see it.  A privilege protects it.  If you get it instead, please don't pass
it on, but call the number below for advice.   Thanks.

Name of Addressee                          Facsimile Telephone Number:

_Curtis Bonner_____          __1-956-428-0671_____

_____              _____

_____              _____

_____              _____

_____              _____

_____              _____

Note  If one of the following boxes is checked, then the original will follow: |_| by regular mail
_ by overnight delivery  Number of pages, including this page _____. Additional Message:
Casi is making Ron Simank a copy of the exhibits to the Proposed Final Report, and will deliver this along
with those exhibits to him tomorrow morning.  Can you FAX a copy to James P. Moon, and try to arrange a
time when we can talk to Mr. Feldman?  This week.  I'll be unavailable at my office both today and most of
tomorrow, so I'll call you tomorrow and see what could be worked out.  Thanks very much for your time.
Sincerely, Colin K._____

_____

_____

_____

_____

_____

If pages are missing or illegible please call (361) 888-5888, and ask for (circled name) Casi or
Debra  Or call 888-8865 if no one answers  Thanks very much for your time and attention
Sincerely  Colin Kelly Kaufman  Attorney

R2351-468



EXHIBIT
CKS 21

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| IN RE: | |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | |
| Debtor | In Chapter 11 |

Confidential:
A Settlement Proposal

The factors underlying this proposed deal are that one creditor (Steve Ditto's claimant, CKS) has been running up the administrative expenses, attorneys and accounting fees, for as long as it has been in the case. Even though it only has 25% of the claims, it has caused a majority of the litigation fees and costs. Ron Simank's client has caused very little of these expenditures and is entitled to nearly 3/4 of the estate's recovery after the administrative expenses. So CKS has been spending Parkwell's money. It is apparent that we are (or ought to be) at the very end of this litigation, and we do not need new attorneys coming in and trying to drag the case on for another ten years. We need to STOP the running of fees and expenses, and settle all possible claims against anyone, so creditors can be paid something. Mr. Ditto's new attorneys are already sending out expensive discovery requests, and preparing to make a career out of this case, and will make the cost of litigation so great that creditors will get nothing. Note that the Plan expressly provides for the Plan Trustee to be exonerated by the estate from all this litigation.

The Plan Trustee was hired in the first place because creditors trusted the Debtor's business ability, but wanted a check on what he did; and they wanted a way to settle out claims without there being a veto of any deal in favor of the most obnoxious creditor. So this proposal is exactly the kind of thing Plan Trustee was expected to do in this case.

The proposal to Mr. Feldman is that the Feldman interests will pay $225,000. In return Mr. Feldman, his wife, his children, and any Feldman-related business will be released from all claims by the Estate and all creditors of the estate. It is believed that, after additional administrative expenses, analyzed below, $175,000 in payments to or for unsecured creditors will result. The $99,000 proposed for payment for creditors in the original report came because Plan Trustee waived $100,000 of fees and expenses. That will be changed in this deal. But if this deal is made, and the $225,000 paid, then Plan Trustee will still reduce or limit his fees and expenses, so that the distributions set out below will be met, though fees and expenses are still accruing, keeping only what otherwise remains in the estate. And in the event of an appeal, Plan Trustee may claim additional fees and expenses, which may be paid out of the distribution which would otherwise be made to the appealing creditor or creditors.

The proposal to Parkwell is that their claim will be amended, and after deducting the interest accrued against Island Moorings Marina from the amount of the resale proceeds from the Marina collateral, its claim will be recognized in the amount of circa $5.4 million. (This is

-1-

R2351-469

assuming that the amended claim can be completed and reviewed by Plan Trustee by the time all parties sign ) This is down $81,828 16 from the original claim of Parkwell.

The proposal to administrative creditors is that they will all be released from any claims or defenses by the estate and all creditors of the estate

The distribution to unsecured creditors would be divided approximately as follows:

| Amount of Claim | Name of Claimant | Percentage of Total. | Amount to Be Paid |
|---|---|---|---|
| $5,400,000 00 | Parkwell | 74 632% | $130,606.00 |
| $1,617,171 55 | CKS | 22 354% | 39,119 50 |
| 20,000 00 | Cadle Co | 0.276% | 483 00 |
| 196,204 87 | Franklin Fed | 2 712% | 4,746 00 |
| 1,863 14 | Shearson | 0 026% | 45 50 |
| $7,235,539 56 | Total | 100 00% | $175,000 00 |

The $50,000 estimated additional administrative distribution goes this way
| | |
|---|---|
| $  3,000 | Colin K |
| $20,000 | Ron S |
| 8,000 | Al White |
| $19,000 | James Moon |

On the making of this deal, all pending discovery would be mooted   The Court order approving this deal will also close the administration of the bankruptcy estate.

Mr Feldman would transfer the settlement amount to Al White for distribution. (Plan Trustee believes that Mr White's receipt of the money, plus adequate parties agreeing to this deal, would terminate the creditors' rights to continue with discovery, and the writing to be signed will so provide ) Parties would get their money after the court order was signed approving the deal, if they have previously or upon their then signing of a writing representing that they have no intention of appealing the order or otherwise engaging in further litigation about the estate, its administration, its assets, or the debtor or other persons connected with the estate   If a party appeals the approved deal, instead, then that party's distribution will be withheld by Mr. White to await the outcome of the appeal

In the event of an appeal, administrative expenses will continue to accrue   Additional attorneys fees will be expended by Mr Feldman and the Plan Trustee, not to mention Mr. Ditto's attorneys. If there is no appeal, or if an appeal is won, because this deal settles all post-confirmation claims by and against the estate, it is the fullest and most complete discharge available, what Mr Feldman no doubt hoped to get when he first proposed to confirm a plan   If Mrs Feldman has separate property, she keeps it   If Mr Feldman had secret assets hidden away in a Swiss bank

-2-

R2351-470

account, the creditors will have assumed that risk, and he will get to keep it. If there was $500,000 in cash in the bank in related Feldman entities, this settlement moots that. Any undisclosed stocks, bonds, realty, or whatever, whether it was on the schedules or not, he will keep. No fraud, no negligence, no fraudulent conveyance claims. No more fighting about anything. No more trials or litigation over claims that Mr. Simank's clients ought to be penalized for being related parties, or that Parkwell's claim should be zero. No gazillion years of harassment of the Plan Trustee by CKS trying to get back some of the fees charged by the Plan Trustee for having to deal with CKS in the first place. Peace for everyone. Although the Proposed Final Report discloses potential liability of Mr. Feldman, his family, and businesses in a range exceeding $600,000, getting it would require enormous litigation expenses and delays of years, and Plan Trustee believes the Court will approve this $225,000 deal despite the release of the excess claims against the Feldman entities.

The Plan provides that the Plan Trustee may make compromises and settlements without seeking Court approval (i.e., theoretically, Plan Trustee and Charles Feldman could sign a writing, and have a deal, and that's enough). And Plan Trustee reserves the right to proceed without court approval, and would be glad to do so if everyone agreed. (But it seems unlikely that Mr. Ditto's attorneys will agree, and indeed, Plan Trustee proposes to approach them only when everyone else is willing to make the deal.) So, assuming a party or parties will want to litigate on, mostly at someone else's expense, Plan Trustee wants a Court order that will bind dissenters, before distributing any more money.

This offer expires ten days after the first date written below.

Approved in principle, subject to approval of the final writings, and necessary client approval:


_____          _____
Ron Simank, Esq., for himself and Parkwell          Colin Kelly Kaufman, Plan Trustee
Date                                 Date  May 7, 2001


_____          _____
James P. Moen, Esq., for himself and          Christopher Weil, Esq., for the Feldman
Charles Feldman and wife             Children
Date                                 Date


_____
Curtis Bonner, Esq., for the other Feldman
Group Entities
Date

R2351-471

-3-

COLIN KELLY KAUFMAN
ATTORNEY AT LAW
1106 Third Street, Corpus Christi, TX. 78404-2312
P.O. Box 1662, Corpus Christi, TX. 78403-1662
Phone (361) 888-8865; FAX (361) 888-8172
Board Certified, Business Bankruptcy Law and Consumer Bankruptcy Law,
Texas Board of Legal Specialization

Date: _May 7, 2001_____

Notice: This FAX is confidential. Only an addressee may see it. A privilege protects it. If you get it instead, please don't pass it on, but call the number below for advice.   Thanks.

Name of Addressee·                          Facsimile Telephone Number:

_Curtis Bonner_____          ____1-956-428-0671_____

_____          _____

_____          _____

_____          _____

_____          _____

Note:  If one of the following boxes is checked, then the original will follow: |_| by regular mail |_| by overnight delivery.  Number of pages, including this page: _____.  Additional Message: Casi is making Ron Simank a copy of the exhibits to the Proposed Final Report, and will deliver this along with those exhibits to him tomorrow morning.  Can you FAX a copy to James P. Moon, and try to arrange a time when we can talk to Mr. Feldman?  This week.  I'll be unavailable at my office both today and most of tomorrow, so I'll call you tomorrow and see what could be worked out.  Thanks very much for your time. Sincerely, Colin K.

_____

_____

_____

_____

_____

If pages are missing or illegible please call (361) 888-5888, and ask for (circled name) Casi or Debra.   Or call 888-8865 if no one answers.  Thanks very much for your time and attention. Sincerely, Colin Kelly Kaufman, Attorney.

R2351-472

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | \| |
| Charles B. FELDMAN dba | \|    In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | \| |
| Debtor | \|    In Chapter 11 |

Confidential:
A Settlement Proposal

The factors underlying this proposed deal are that one creditor (Steve Ditto's claimant, CKS) has been running up the administrative expenses, attorneys and accounting fees, for as long as it has been in the case. Even though it only has 25% of the claims, it has caused a majority of the litigation fees and costs. Ron Simank's client has caused very little of these expenditures and is entitled to nearly 3/4 of the estate's recovery after the administrative expenses. So CKS has been spending Parkwell's money  It is apparent that we are (or ought to be) at the very end of this litigation, and we do not need new attorneys coming in and trying to drag the case on for another ten years. We need to STOP the running of fees and expenses, and settle all possible claims against anyone, so creditors can be paid sooner. Mr. Ditto's new attorneys are already sending out expensive discovery requests, and preparing to make a career out of this case, and will make the cost of litigation so great that creditors will get nothing. Note that the Plan expressly provides for the Plan Trustee to be exonerated by the estate from all this litigation.

The Plan Trustee was hired in the first place because creditors trusted the Debtor's business ability, but wanted a check on what he did; and they wanted a way to settle out claims without there being a veto of any deal in favor of the most obnoxious creditor. So this proposal is exactly the kind of thing Plan Trustee was expected to do in this case.

The proposal to Mr. Feldman is that the Feldman interests will pay $225,000.  In return Mr. Feldman, his wife, his children, and any Feldman-related business will be released from all claims by the Estate and all creditors of the estate  It is believed that, after additional administrative expenses, analyzed below, $175,000 in payments to or for unsecured creditors will result.  The $99,000 proposed for payment for creditors in the original report came because Plan Trustee waived $100,000 of fees and expenses.  That will be changed in this deal.  But if this deal is made, and the $225,000 paid, then Plan Trustee will still reduce or limit his fees and expenses so that the distributions set out below will be met, though fees and expenses are still accruing, keeping only what otherwise remains in the estate.  And in the event of an appeal, Plan Trustee may claim additional fees and expenses, which may be paid out of the distribution which would otherwise be made to the appealing creditor or creditors

The proposal to Parkwell is that their claim will be amended, and after deducting the interest accrued against Island Moorings Marina from the amount of the resale proceeds from the Marina collateral, its claim will be recognized in the amount of cerca $5 4 million.  (This is

-1-

*R2351-475*

assuming that the amended claim can be completed and reviewed by Plan Trustee by the time all parties sign.) This is down $81,828.16 from the original claim of Parkwell.

The proposal to administrative creditors is that they will all be released from any claims or defenses by the estate and all creditors of the estate.

The distribution to unsecured creditors would be divided approximately as follows:

| Amount of Claim: | Name of Claimant: | Percentage of Total: | Amount to Be Paid: |
|---|---|---|---|
| $5,400,000.00 | Parkwell | 74.632% | $130,606.00 |
| $1,617,471.55 | CKS | 22.354% | 39,119.50 |
| 20,000.00 | Cadle Co | 0.276% | 483.00 |
| 196,204.87 | Franklin Fed | 2.712% | 4,746.00 |
| 1,863.14 | Shearson | 0.026% | 45.50 |
| $7,235,539.56 | Total | 100.00% | $175,000.00 |

The $50,000 estimated additional administrative distribution goes this way:

| | |
|---|---|
| $ 3,000 | Colin K. |
| $20,000 | Ron S. |
| 8,000 | Al White |
| $19,000 | James Moon |

On the making of this deal, all pending discovery would be mooted. The Court order approving this deal will also close the administration of the bankruptcy estate.

Mr. Feldman would transfer the settlement amount to Al White for distribution. (Plan Trustee believes that Mr. White's receipt of the money, plus adequate parties agreeing to this deal, would terminate the creditors' rights to continue with discovery, and the writing to be signed will so provide.) Parties would get their money after the court order was signed approving the deal, if they have previously or upon their then signing of a writing representing that they have no intention of appealing the order or otherwise engaging in further litigation about the estate, its administration, its assets, or the debtor or other persons connected with the estate. If a party appeals the approved deal, instead; then that party's distribution will be withheld by Mr. White to await the outcome of the appeal.

In the event of an appeal, administrative expenses will continue to accrue. Additional attorneys fees will be expended by Mr. Feldman and the Plan Trustee, not to mention Mr. Ditto's attorneys. If there is no appeal, or if an appeal is won; because this deal settles all post-confirmation claims by and against the estate, it is the fullest and most complete discharge available, what Mr. Feldman no doubt hoped to get when he first proposed to confirm a plan   If Mrs. Feldman has separate property, she keeps it   If Mr Feldman had secret assets hidden away in a Swiss bank

R2351-474

account, the creditors will have assumed that risk, and he will get to keep it. If there was $500,000 in cash in the bank in related Feldman entities, this settlement moots that. Any undisclosed stocks, bonds, realty, or whatever, whether it was on the schedules or not, he will keep. No fraud, no negligence, no fraudulent conveyance claims. No more fighting about anything. No more trials or litigation over claims that Mr. Simank's clients ought to be penalized for being related parties, or that Parkwell's claim should be zero. No gazillion years of harassment of the Plan Trustee by CKS trying to get back some of the fees charged by the Plan Trustee for having to deal with CKS in the first place. Peace for everyone. Although the Proposed Final Report discloses potential liability of Mr. Feldman, his family, and businesses in a range exceeding $600,000, getting it would require enormous litigation expenses and delays of years; and Plan Trustee believes the Court will approve this $225,000 deal despite the release of the excess claims against the Feldman entities.

The Plan provides that the Plan Trustee may make compromises and settlements without seeking Court approval (i.e , theoretically, Plan Trustee and Charles Feldman could sign a writing, and have a deal, and that's enough). And Plan Trustee reserves the right to proceed without court approval, and would be glad to do so if everyone agreed. (But it seems unlikely that Mr. Ditto's attorneys will agree, and indeed, Plan Trustee proposes to approach them only when everyone else is willing to make the deal.) So, assuming a party or parties will want to litigate on, mostly at someone else's expense, Plan Trustee wants a Court order that will bind dissenters, before distributing any more money

This offer expires ten days after the first date written below.

Approved in principle, subject to approval of the final writings, and necessary client approval:

_____
Ron Simank, Esq., for himself and Parkwell
Date:

_____
Colin Kelly Kaufman, Plan Trustee
Date: May 7, 2001

_____
James P. Moon, Esq., for himself and
Charles Feldman, and wife
Date:

_____
Christopher Weil, Esq., for the Feldman
Children
Date:

_____
Curtis Bonner, Esq , for the other Feldman
Group Entities
Date:

R2351-475

-3-

Exhibit 22
R 2351-476

## COLIN KELLY KAUFMAN
### ATTORNEY AT LAW
1106 Third Street, Corpus Christi, TX. 78404-2312
P.O. Box 1662, Corpus Christi, TX. 78403-1662
Phone (361) 888-8865; FAX (361) 888-8172
Board Certified, Business Bankruptcy Law and Consumer Bankruptcy Law,
Texas Board of Legal Specialization

Date: __May 15, 2001__

Notice: This FAX is confidential. A privilege protects it. Only an addressee may see it. If you get it instead, please don't pass it on, but call the number below for advice.  Thanks.

Name of Addressee:                          Facsimile Telephone Number:

Matt Rosenstein, Esq.                       883-5590

Re: Schedules, Offer to Hire CKS Attys,
    as Special Counsel for Plan Trustee

Note:  If one of the following boxes is checked, then the original will follow: |_| by regular mail |_| by overnight delivery.  Number of pages, including this page: _____.  Additional Message: Deposition cannot possibly work on May 23 – you will recall Judge Schmidt extended the answer date til May 31 because I have three federal district court hearings May 22, May 25 and May 30.  You can well imagine that Judge Jack is not going to consider your noticed deposition more important than the hearings she set last January and February. Since we have only one week after the responses to prepare for the June 8 hearing; it is clear to me we have to do the deposition after June 8.  It seems likely to me that we will need at least 3 weeks to prepare for that deposition – hey, it may take me a week just to do the privilege log!  That makes June 29 a good day, or some other time just before or just after the 4th of July.  Please confirm a time that is good for you.  Also, a second matter needs to be discussed.  I made an offer to the Feldman interests to settle for $225,000, the expectation damages of what they promised under the plan but failed to deliver.  That expires May 17, and no particular interest has been expressed in it by Moon. From talking to Curtis Bonner, I infer that their position is that Feldman is broke and can't pay it (which incidentally I don't at all believe, since we are just talking about funds that he withheld, not creation of an unfunded liability, not even having to mention the liability of the children for the value surrendered to them in the plan).  So I need to get on with what had to be done next.  So I want to hire a special counsel for the estate to go forward, effective May 18.  Now that they had their chance to carry out the original deal terms, it seems to me that Judge Schmidt will be much less reluctant to let us hold Mr. Feldman and the children to a reliance-restitution measure of damages (what was given up when the properties remained as they were when the plan was confirmed).  Caselaw shows that a trustee may hire a creditor's attorney to work to bring assets back into the estate. And the Plan gives me the right to hire attorneys for the estate; though it

R2351-477



EXHIBIT
CKS 22

seems advisable to me that the Bankruptcy Court should approve any such   Ron Simank does not seem interested in suing Feldman, his wife and children to bring back the value of what they took from the bankruptcy estate, but did not fully deliver..  He also doesn't want me to distribute causes of action against the wife and children in kind.  (Feldman transferred his half of Feldman Valley-Wide and FREI to his children; and they promised the payments under the plan as well as he did, in exchange for the discharge and releases to be granted therein, so we can pursue these from the children.)  Ron indicates his client just wants some money.  So its seems that your client, CKS, is the only creditor interested enough to go after the Feldman interests.  Of course, I could hire someone else entirely, but it seems to me that creditors ought to get first chance.  If you did undertake the work, I would still retain the ultimate decision-making power over the claims, including the power to make or accept or reject offers in settlement.  (Caselaw indicates it would be illegal for me to do otherwise.)  I would expect that a contingent fee basis would be appropriate under the circumstances.  Your costs and expenses would come out of any new money, first; and you would get one-third of any new receipts above that  – $350 an hour out of the new receipts, if circumstances require and the Court wants to order payment on that basis instead of the one-third, because the one-third is clearly excessive or inadequate. (Obviously, I wouldn't oppose the one-third, but conceivably someone else might).  If Mr. Grant is to help you, you would need to make arrangements about who would be paid what between you; as I would prefer to deal with you, and let you deal with him.  Would you talk to your client and let me know if I need to look elsewhere, or whether you will be able to to handle?  A third matter: If you are going to get discovery in on Feldman's wife and children before hearing, it seems to me we will need to have the June 8 hearing put off, or limit its scope.  It seems to me very important that there be no hearing on the merits of any claims against the wife and children until we have our ducks in a row that they lose on the merits, and we are entitled to judgment and for what.  Maybe we need an adversary proceeding against them.   Fourthly and finally, let me discuss Mr. Feldman's tactics as I see them.  Time means nothing to him.   He thinks he has more patience than creditors or the Court, and if he just keeps on passively resisting long enough, everyone will get tired and close the estate with him not having to pay.  He isn't under the illusion that the plan said he could keep most (even part) of the net income of the Feldman Group for the five-year term of the Plan.  And I don't know what writings he thinks he will produce concerning expenses and taxes.  But I've asked since 1998, and if it was just a need for time to assemble stuff, it would have been here by now.  And the report he made in November, 2000 (which we gave you) had to have been made looking at these documents.  Because Mr. Feldman's maneuvers are intentional, and are now expressly aimed at eating up time, it is difficult to find a way to get any dividend for creditors – administrative expenses constantly threaten to eat up the entire estate.  While I as Plan Trustee can go after Mr. Feldman and his family without a contingent fee; at the end there is no guarantee that creditors will be pleased with the amount they get.  It seems to me that this path will offer creditors the greatest input, and is calculated to cost them the smallest amount of administrative expenses.  Please let me know if your client wants to do this.  Colin K., Plan Trustee.

If pages are missing or illegible please call (361) 888-5888, and ask for Casi.  If no one answers, call 888-8865.  Thanks very much for your time and attention.  Sincerely, Colin Kelly Kaufman, Attorney.

R 2351-478

144. 3/5/02 -- docket # 468  Notice Re: Filing of Colin K Kaufman's Post-Hearing Letter Memorandum of Issues to be Presented. (seh) [EOD 03/06/02] [90-1254] *(Used as Exhibit 2(2o) to Hon. George P. Kazen, Esq, Chief U.S. District Judge & Hon. Keith P. Ellison, Esq. United States District Judge -- dated 03/08/02 & Richard Russell w/State Bar -- dated 03/12/02)*

United States Courts
Southern District of Texas  PR
FILED

MAR − 5 2002

Michael N. Milby, Clerk of Court

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | |
| Debtor | In Chapter 11 |

NOTICE OF FILING OF COLIN K. KAUFMAN'S
POST- HEARING LETTER MEMORANDUM OF ISSUES PRESENTED

TO ALL CREDITORS AND PARTIES IN INTEREST:

Please note I filed March 5, 2002 a 15- page letter memorandum dated March 4, 2002

with a certificate of service for March 5, 2002, setting out the issues presented by my fee

application heard on February 22, 2002. A copy is enclosed.

Colin K. Kaufman, Applicant
State Bar of Texas # 11113000
So. Dist. Federal ID # 9242

Colin Kelly Kaufman, Attorney at Law
P. O. Box 1662
Corpus Christi, TX. 78403-1662
Telephone:  (361) 888-8865
Facsimile:  (361) 888-8172

Board Certified, Business & Consumer Bankruptcy Law,
Texas Board of Legal Specialization

Certificate of Service

I certify that I had one of the personnel at this law office serve a copy of the foregoing
writing by U.S. mail, first class postage prepaid, to the persons shown on the attached service list,
this 5th day of March, 2002.

Colin Kelly Kaufman

R 3585

COLIN KELLY KAUFMAN
ATTORNEY AT LAW
1106 Third Street 78404-2312
P. O. Box 1662
Corpus Christi, TX. 78403-1662
Telephone (361) 888-8865 - FAX (361) 888-8172

Board Certified, Business & Consumer Bankruptcy Law, Texas Board of Legal Specialization

-----

March 8, 2002

Hon. Richard S. Schmidt, Esq.
United States Bankruptcy Judge
2nd Floor, United States Courthouse
I-37 at Shoreline
Corpus Christi, TX. 78401

RE:    Post-Hearing Summary of the Issues Presented
       concerning Former Plan Trustee's Application for
       Compensation in Charles B. Feldman, Bankruptcy
       No. # 90-01254-B-11

Dear Judge Schmidt:

At the hearing on February 22, 2002, you mentioned you needed to write your opinion by March 8, 2002. A glance at your docket shows you will be very busy. And some of the issues before the Court at the hearing on February 22, 2002 were first presented in summer of 2001. So it seemed to us that a post-hearing summary of the issues might help the Court in not skipping anything the Court wanted to talk about.

    1. <u>Trustee's Fees vs. Attorneys' Fees</u>.  The basic theme for CKS in the pleadings it filed for the June, 2001 hearing was that Colin Kaufman could not lawfully pay his own fees as former plan trustee, without first filing an attorneys fee application to the Bankruptcy Court – because he really was employed as though solely an attorney for the estate, not as a plan trustee at all. (When this looked like it wouldn't fly, CKS raised other points, some for the first time on the day of trial). But at the hearing on February 22, 2002, just the opposite tack was pressed on the Court. Former plan trustee could not recover because he was only an plan trustee, not also an attorney. On neither occasion was a good explanation given why a plan trustee may not act both as plan trustee and as attorney; and the Court has already ruled in its ruling of last summer that he could do both.

    2. <u>Should He Do Nothing, or Didn't He Do Enough</u>.   Another issue on which the former

-1-

R3586

plan trustee's opponents took contradictory positions, from time to time, is the issue of whether former plan trustee's duties were broad or narrow.   For purposes of Mr. Browning's testimony as to a fair price to be paid to the plan trustee for his efforts on behalf of the estate; it was claimed that the former plan trustee had no duties at all except to receive money from the reorganized debtor.  (Any bank allegedly could do that.)  But the last exhibit received at the hearing on February 22, 2002 was Mr. Moon's application, barely a month after plan confirmation, to extend time to object to claims -- because the plan trustee needed to look at those claims along with the reorganized debtor.  The replacement plan trustee's explanation for this was that, of course the plan trustee had to do those sorts of things that a trustee normally does post-confirmation.  Both those positions cannot be right simultaneously.  A plan trustee cannot have a duty to do nothing and a duty to do a lot at the same time.

   A.  Should Have Done More?  Mr. Boudloche's testimony on February 22, 2002 was to the tenor that Mr. Kaufman was NOT ACTIVE ENOUGH – that is, that he should NOT EVER have tried to be "King Log" and sit back and give Mr. Feldman enough rope to do what he was going to do; before challenging him to give back to the bankruptcy estate what he had originally promised.  That testimony also is inconsistent with the view that the former plan trustee exceeded the scope of his duties when he dealt with the claims objections between CKS and Parkwell, or when he drafted a final report analyzing over a foot of new documents and several feet of old files before concluding that Mr. Feldman had liabilities to the estate of cerca $1 million, or when he dealt with other issues that came up in the administration of the case.

   B.  Should Do It When?  Accepting that Mr. Kaufman had a duty to do the things he was doing does not require the Court to accept Mr. Boudloche's conclusion, that Mr. Kaufman should have done it all a lot sooner.  Mr. Kaufman could give good reasons why he (or any reasonable trustee) might have wanted or needed to wait as he did; and why he would have thought he was maximizing the estate's recovery.  (And as to that, the evidence does not show that the former plan trustee was wrong to think that assets would still be there, when the Feldmans finally produced documents proving they didn't do what the plan promised.)  The former plan trustee testified he didn't get documents to analyze, sufficient to conclude that Mr. Feldman had done anything wrong, until cerca Thanksgiving, 2000.  That's some evidence he was timely.  The former plan trustee has over 31 years of experience in bankruptcy; and a bankruptcy court properly gives due deference to the business judgment of bankruptcy estate fiduciaries.

   3.  Whether Sec. 326-330 Apply Post-Confirmation.  At the hearing on February 22, 2002, the Court noted that there was an issue between the parties whether a contractual trustee was identical to bankruptcy trustee.  Contrary to the general understanding of Chapter 11 bankruptcy attorneys, former plan trustee's opponents have insisted that Secs. 326-330 of the Bankruptcy Code govern "liquidating" or "plan" trustees post-confirmation, because he is labeled a "trustee" (though with a qualifier) in the plan.

   A.  Congress Put in the Limits.  Normally, one would think it was Congress's decision what a bankruptcy trustee is.  If Congress puts a limit on a bankruptcy trustee, someone

-2-

R3587

else acting outside that limit is not a bankruptcy trustee. The plain language of the statute, Sec. 1103 of the Bankruptcy Code, begins with the limitation that a Chapter 11 trustee may only be appointed, "After commencement of the case and before confirmation of a plan." Obviously, someone who is appointed in or at confirmation of a plan cannot be a Chapter 11 bankruptcy trustee. So the provisions of Secs. 326-330 of the Code governing bankruptcy trustees cannot apply to him.

B. Not Intended. Using the same word as Congress used might indicate an intent to have a similar legal effect of course. A private party can make an enforceable contract even if he cannot make public legislation But at least, the Plan must express the intention to extend the scope of what Congress legislated before one would infer that. And this Plan expressed the intention that those provisions requiring bankruptcy court approval of attorneys fees under Sec. 326-330 of the Code would NOT apply unless they must be.

C. Issue Obvious at the First. Everyone knew before the plan was confirmed, that Mr. Kaufman had served as an examiner in the case (i.e., before confirmation). All parties were notified that Mr. Kaufman had been hired to be the new plan trustee. They had to know that Secs. 326-330 WOULD BAR SUCH SERVICE, if those sections still applied post-confirmation. If they had believed back then that Secs. 326-330 continued to apply post-confirmation, they could have (and should have) said so then. Waiver, estoppel, laches. Furthermore, in the Manges case, in which Mr. Kaufman was local counsel, the confirmed plan retained jurisdiction for the court to rule on a great deal of different kinds of litigation involving the trustees therein appointed (and the plan proponents and their attorneys), but it did not contemplate any subsequent fee applications by the fiduciary to the bankruptcy estate under the standards of Secs. 326-330. So Mr. Kaufman at least was well aware that confirming Chapter 11 plans was thought to make the resulting trustees something other than an actual bankruptcy trustee governed by Secs. 326-330.

D. US Trustee View: Case Closed? Ms. Kurtz thought that for Sec. 326-330 to cease to apply, a case has to be closed. But this case has been closed and reopened three or four times. Note also that the U.S. Trustee's office originally asked Mr. Kaufman to take on the case, since nobody else could be found, just so a plan could be confirmed. If the U.S. Trustee's office had felt that it wanted Secs. 326-330 to apply post-confirmation, it could have said so, and insisted that the plan say so.

E. There Was a Final Order. Even if there had been controversy over whether Secs. 326-330 applied post-confirmation, that controversy could not survive all these years later. When the Court's order confirmed the plan, and was not appealed, it became a final order, and that was the end of it. Nobody can come back now ten years later and argue that the court's order confirming the plan was wrong. Res judicata.

4. Whether Res Judicata Applies to the District Court's Decision. In addition to making its complaint in this court, CKS also filed grievances against the former plan trustee in the federal district court, which dismissed all of them, except for one on which it awaits this Court's decision.

R3588

Since only CKS was a party to the complaint it made against the former plan trustee in the federal district court, only CKS is bound by res judicata and collateral estoppel by that decision. But still, principles of stare decisis militate against relitigating a matter a court has already determined; and no reason exists why this Court should attempt to redetermine something already heard and decided by the federal district court.

5. Res Judicata Bars Claim of More Accountings. CKS has claimed it was entitled to more accountings, and didn't get adequate ones in the past. That position is barred by res judicata and collateral estoppel.

A. A Final Order. Docket entry # 312, made August 25, 1997, shows that CKS's motion to compel further accountings was denied. The reason was for want of prosecution. Even if that decision was error (which it wasn't under the procedural facts, and couldn't have been error on the merits either, since none of CKS's current claims about Texas Trust Act standards and the like were ever mentioned to the Court at that time), still it WAS a final judgment. It was not appealed. CKS could not relitigate that 1997 decision in June of 2001, nor in February of 2002.

B. Another Final Order. Also before the Court on February 22, 2002 was the August 13, 1997 application (docket # 287) and the order of October 15, 1997 (docket # 315) to hire Al White as accountant for the bankruptcy estate. These show clearly that Al White was hired so CKS could ask HIM for what accountings CKS wanted, in the future, instead of the plan trustee; and then Al White could handle assembling all the requested records into an intelligible report. CKS immediately stopped asking for accountings, once Al White was hired. (Although, to be fair, it should be mentioned that CKS did ask for documents later, which the former plan trustee furnished them whenever he got any from Mr. White or Mr. Feldman).

6. Extra Work. Another issue between the parties that was obvious at the hearing on February 22, 2002 was the issue whether a former plan trustee has a claim against the estate for costs of defense against grievances and other complaints made about his work in his official capacity. There is no dispute that besides the pleadings it filed in this Court, CKS filed complaints against the former plan trustee in two other forums, all alleging official wrongdoing.

A. Work in this Court. Former plan trustee pointed out in his Seventh Accounting that no distributions had been made to creditors yet, and so therefore under the Manges case, the Fifth Circuit would still allow amendments to be made to the plan. Any lawyer in the case could have read that (and if he were planning to attack the sufficiency of the former plan trustee's accountings, SHOULD have read that, since that was one of the accountings). So all that was needed to replace the plan trustee was an application to do so, signed off on by the plan proponent (Mr. Feldman), and by the voting creditors or their successors, i.e., by Parkwell, and by CKS. The former plan trustee said last summer he would not have opposed such an application (there would have been no defense); but he had to oppose the pleadings as actually filed because those attacked his honesty, integrity, reputation, fortune, law license, and even his

-4-

R 3589

liberty. The Court cannot consider it unreasonable for a plan trustee to want to keep these things; and if large amounts were spent defending the claims made against the former plan trustee, those large amounts were justified by the seriousness of the case and the consequences if those allegations had been sustained. Furthermore, when such allegations of wrongdoing are made against a fiduciary of a bankruptcy estate it is the duty of the fiduciary to make an adequate response to them, if he can do so. Bankruptcy courts need to know if bankruptcy estates are being taken care of properly. So there can be no doubt that the work done defending against the allegations in this Court was within the scope of the former plan trustee's duties, and is compensable.

B. Ratified. Furthermore, suppose any of the parties who appeared at the hearing on February 22, 2002 could have said, if they so felt, that they didn't want people attacking Mr. Kaufman, because it was a waste of the estate's assets to engage in this kind of litigation. None of them pled that. Instead, those who appeared joined in the opposition to and attacks on Mr. Kaufman's position. So they ratified the complaints which were made. They cannot now be heard to say now that nobody should have spent the estate's funds prosecuting or defending this kind of litigation.

C. Work in the Federal District Court. No authority has been cited to the Court (and none is known to counsel) which states that fiduciaries for bankruptcy estates cannot earn compensation for work done in other courts. Many cases have let bankruptcy trustees and other types of trustees be compensated for work done in other courts. So the district court complaint was no less entitled to a defense than the bankruptcy court complaint.

D. Work before the State Bar of Texas. No difference exists in theory between the treatment of work done before the State Bar of Texas and the federal district court.

E. Who Prevailed. Although CKS suggests that the removal and replacement of the former plan trustee shows he was found to have committed wrongdoing sufficient to bar him from exoneration; no wrongdoing had to be found to remove him or replace him, since this could be done without cause, just because the plan proponent and the voting creditors wanted to. So far CKS has not prevailed in proving wrongdoing in any of the three forums where it has pressed its claims. That is enough to support payment for exoneration.

7. Nature of a Bankruptcy Court's Review of a Plan Trustee's Application. When the former plan trustee pointed out that Secs. 326-330 of the Bankruptcy Code could not govern approval of applications for post-confirmation work, the question arose as to what does govern in such situations. The Court asked, and former plan trustee agreed, if these would not continue to be governed by the First Colonial case. First Colonial factors are not exclusively applicable in bankruptcy. They derived from Johnson v. Georgia Highway Express, a non-bankruptcy case. They apply in ANY court of equity. So those are the standards applicable here, to work post-confirmation.



A. <u>Full-Time Travel</u>. The fee bill shows Mr. Kaufman agreed with FDIC's counsel that he would charge full-time for travel. Whether that would be permissible for pre-petition work (Mr. Kaufman usually did other work during the travel time) does not come into question in this case, because <u>First Colonial</u> governs. Whatever the Court might have been obliged to rule in a case in which the U.S. Trustee guidelines apply, and in which the Bankruptcy Code makes review mandatory (rather than here, where the parties exercised their option to make a contract at plan confirmation for this court to give a review), this is not that case. When review is mandatory, the system's set of rules governs. When the parties contract for review of fees, the parties' contract governs.

B. <u>Fee Rates</u>. For the same reasons, the usual guidelines do not limit what the former plan trustee could charge for himself (though the evidence was clear that Mr. Kaufman charged the estate what he usually and customarily charged in other cases). And he could charge what he usually and customarily charged for his paralegal supervisor, Sharon Kaye Kaufman, without regard to the usual guidelines. (Though the evidence also showed that his charges for her time were not excessive, see Paragraph 8-B, below.)

C. <u>The W. J. Services Charges</u>. The charges for time spent writing checks to Colin Kaufman were all originally shown as "no charge" items. Or they were supposed to be. Later, it became apparent that Mr. Rosenstein was determined to go back to attack Mr. Kaufman, justified or not. So the <u>W.J. Services</u> case became important. <i>See</i>, <u>In re Intelogic Trace, Inc. (Osherow, Trustee v. Ernst & Young, LLP)</u>, 200 F.3d 382, 35 Bankr.Ct.Dec. 152 (5th Cir. 2000; <i>following</i>, <u>In re Southmark Corp.</u>, 163 F.3d 925 at 931 (5th Cir.), cert. denied, ___ U.S. ___, 119 S Ct 2339, 144 L.Ed.2d 236 (1999); and, to show that, "Res judicata bars claims that should have been litigated in a previous proceeding," citing <u>Jones v. Sheehan, Young & Culp, P.C.</u>, 82 F.3d 1334, 1341 (5th Cir.1996); and <u>In re Howe (Howe v. Vaughan)</u>, 913 F.2d 1138 (5th Cir.1990). The <u>Intelogic</u> decision affirmed a lower court decision which relied on and followed the decision of <u>In re W.J. Services, Inc.</u>, 139 B.R. 824, 828 (Bkcy. SD Tex. 1992). This doctrine is particularly important where parties have significant differences of opinion; and litigation threatens. Under those circumstances, it is appropriate for the bankruptcy court to consider whether allegations of wrongdoings at the time of the fee application, and resolve the issue once and for all. (No doubt this is why Mr. Rosenstein attacked in the bar grievances BEFORE Judge Schmidt could rule -- he feared he would have been barred by res judicata and collateral estoppel if he had waited for Judge Schmidt to decide.) The <u>W. J. Services</u> doctrine says that if you were paid for something and payment was approved in bankruptcy court, res judicata and collateral estoppel apply, and the objecting party cannot thereafter go out and complain in another court. So given Mr. Rosenstein's attitude, it seemed wise to charge for and be PAID for the no charge items, and so have the bankruptcy court decision be final. And a tenth of an hour minimum is the way it is done in bankruptcy court. So former plan trustee's office had to change these items to show an hourly rate on these slips, for the 1/tenth of an hour minimum time period. This was calculated to save the bankruptcy estate a great deal of money, given that former plan trustee had an administrative expense claim for the costs of defense against CKS's multiplicitous litigation on these points, and doing that was calculated to avoid further

-6-

expensive litigation. .

8. Amounts Charged by Bankers. Former plan trustee's opponents made considerable efforts to say that Mr. Kaufman must have been wrong to say that he understood $25,000 a year was the minimum charge that would have been required by a bank, and so he probably deserved more than that, since they couldn't get a bank to do the work, even when they told the bank that could have at least that much per year. But the investigation requested by the Court of the parties over the noon hour break at the hearing on February 22, 2002 showed that the usual fee charged by a bank would not have been applicable to this case anyway.

A. Couldn't Get It through Committee. The evidence showed that to take a new case for the trust department of a bank, the matter has to go through committee, and that committees do not want to accept work where litigation is already on-going, and the bank might end up a target. They don't want cases like this one, where World War III breaks out when a required report is made suggesting that the promisor reneged on his deal to pay the estate a bunch of money.

B. Hire Two People. The evidence showed that a bank would have had to hire attorneys, and pass on their charges, in addition to the amounts banks would have charged for their trust officers' time in dealing with the same matters and with the attorneys involved. Having a bank would not have reduced fees any; it would just have added another layer of fees since attorneys would still have been required.

C. Too Cheap. The evidence also showed that Mr. Kaufman does not charge enough for Mrs. Kaufman's work. The banks charge more than Mr. Kaufman does for Mrs. Kaufman's time – $125 an hour for someone experienced in the field, but without a law or professional degree. This puts into context the complaint made in June, 2001 by CKS that the former plan trustee charged $95 and $105 an hour for work done by Sharon Kaufman (she had a law degree and about 15 years of experience) as paralegal supervisor and paralegal. This was too high, said CKS, until it came out in the hearing that CKS's counsel was asking that his paralegal (with a law degree, but without experience) be paid $130 an hour. What is wrong for the Plan Trustee to have done was perfectly acceptable conduct to be done by CKS.

9. Hearsay. The former plan trustee pointed out that what Charles Jefferson said to him about the terms and conditions of his employment was not hearsay to the extent offered to prove what he reasonably expected that he could charge. It is only hearsay when it is offered to bind the bank as to what it would charge. As to Mr. Kaufman, the statement was made in his presence, and it was offered not to prove it was true, but merely that it was said -- so that it was reasonable for Mr. Kaufman to believe it -- to rely on it. It was a legal act, for them to tell Mr. Kaufman how much he could get paid. It made up part of the terms in the contract.

C. CKS Bound. Despite its oft-stated position contra, CKS was bound by the contract terms that the FDIC agreed to, because it did not buy the FDIC's claim until 5 years after

-7-

R3592

the case began.

10. <u>Why Mr. Kaufman Would Be Paid So Much</u>.  Generally, there was a lot of work in the case, lots of hearings, lots of demands, most of them attributable to CKS.  But it was an expensive case even without CKS.  Mr. Moon was getting $91,513.57 ($66,413.58 of this from the assets administered by the former plan trustee), for work done before CKS got into the case. P. 54, proposed final report.  Outside of that general circumstance, Mr. Kaufman's evidence at the hearing in June of 2001 showed that Mr. Feldman had been caught making fraudulent conveyances at the time of the original bankruptcy, and the liability for these wrongs had been settled in the Plan.  (And the former plan trustee, as the third person appointed examiner, was involved in the negotiations – and made a recommendation – which led to that settlement.)

A. <u>Predicted to Sin Again</u>.  Former plan trustee's evidence at the June, 2001 hearing was that the FDIC's attorney had predicted that Mr. Feldman would sin again, and wanted a mechanism to exist to catch him when he did.  The reason the FDIC's attorney hired Mr. Kaufman as Plan Trustee was because he believed that Mr. Kaufman would not take a little bit of money to let Mr. Feldman get away with a lot of it.  And Mr. Kaufman's evidence was that, as it turned out, the FDIC's lawyer was right to predict that Mr. Feldman would be unwilling to do what he promised.  Despite his favorable treatment in the Plan, Mr. Feldman was unable to carry out even this deal, as shown by the proposed final report, and the adversary complaint filed by Mr. Kaufman against the Feldmans.

B. <u>Hired to See, Perhaps to Sue</u>.  Mr. Kaufman was hired to find out the truth about how much Mr. Feldman intended to squirrel away during the plan term; and when he found out, to litigate, and get the money back.  That's not the kind of work that bank trust departments do, at least when they can help it.

C. <u>Difficulty Increased</u>.  And the difficulty of the case (and thus the reasonable compensation) was further increased when CKS bought the FDIC's claim, and began causing and demanding further work – which is why the former plan trustee asked Mike Boudloche to agree to replace him in September, 1995.  Mr. Boudloche's unwillingness to take over at that time shows that Mr. Kaufman had an undesirable case on his hands.

D. <u>Scorched Earth Litigation Tactics</u>.  Plan Trustee filed a pleading warning CKS that despite the amount of funds on hand, and the current possible surplus of funds over accrued plan trustee fees, it was still to be expected that its total dividend (at a time when CKS was claiming to be 90% of the creditors) could not exceed $10,000.  Another pleading warned CKS that its demands would cause the former plan trustee to become "King Stork" instead of "King Log," using the simile of the well-known Aesop's fable.  CKS's blithe acceptance of these warnings, without making any attempt to reduce the financial burdens of its demands for action, show assumption of the risk (Or, had it not been for the change in attorneys causing the change in position, it would have been bad faith if CKS had been demanding extra work for which it had no intention of letting the Plan Trustee be paid.)  After a year of litigation against Parkwell, CKS

-8-

R3593

gave up. But later, CKS told the former plan trustee that Parkwell had sold its collateral and refused to amend its claim, and demanded that former plan trustee object to Parkwell's claim for that reason. <u>So Parkwell's claim again came in play, and is still not fixed, because of the objection in the proposed final report.</u> Former plan trustee ultimately moved to cancel CKS's claim because of its scorched earth tactics. Although the Court commented that "scorched earth" tactics can eat up all the funds in an estate, see the transcript, p. 7, lines 1-5, no ruling was made on June 28 on Former Plan Trustee's motion to cancel CKS's claim for using exactly such tactics.

E. <u>Multiplication of Proceedings</u>. CKS's excessively litigious attitude is well illustrated by its conduct on this point: No ordinary litigant, after going through the process of litigation, and finishing the trial, and having additional evidence presented post-hearing, and finishing oral argument, would now think it proper to go into two alternative forums and file grievances with two different disciplinary bodies in advance of the pending decision. CKS is the king of double binds − it always demand more work to be done, and always denies that the work is compensable when it is time for the work to be paid for.

F. <u>Attempt to Gain an Unfair Advantage</u>. CKS appears to be trying to use the grievance proceedings as a means of gaining an advantage in a pending civil case. If CKS felt it would win in the bankruptcy court proceedings, it would wait for the bankruptcy case to become final. Then it would take the position that *res judicata* and collateral estoppel would mandate the outcome in the grievance proceedings. The attempt to proceed by grievance proceeding while the bankruptcy court's decision is still not final would appear to be an improper attempt to influence the outcome of that court proceeding, since would have cost CKS nothing to wait to file something until after September 12 when CKS's motion for rehearing is currently set.

G. <u>The Court's Ruling in June</u>. The outcome of the June hearing was not perfectly wonderful from former plan trustee's viewpoint either, but we did not attempt to pressure the bankruptcy judge to change his mind by filing grievance proceedings against opposing counsel. Even though the Bankruptcy Court ruled that the Plan Trustee did nothing wrong, it did comment that it was concerned by Plan Trustee's failure to make a distribution to creditors at an earlier time. (This issue is CKS's first complaint to the bar and the federal district court.) But at the hearing on June 23, the Plan Trustee pointed out that it was not possible to make a distribution until the claims of the parties were fixed. In 1995, when CKS asked about a distribution, its claim was the subject of litigation with the Debtor, who asked for CKS to be sanctioned for violating the discharge injunction, and an order was issued that CKS's dividend would be taken to pay the sanctions. Later, because CKS claimed inadequate notice, the order was vacated. But a final decision was not made. Then CKS attacked Parkwell's claim. When CKS tried to withdraw that after over a year of litigating, Parkwell demanded sanctions. (Today, Parkwell says it no longer wants sanctions, and that the docket doesn't show its attorney actually filed an appropriate pleading for them after making that demand.) The transcript of the Court's ruling on June 28 acknowledges that no final ruling was ever issued by the Bankruptcy Court settling these issues, so that a final allowed claim amount would exist for CKS. And the issue of sanctioning CKS for violating the discharge injunction, and also of canceling CKS's claim for



scorched earth litigation tactics, remain before the bankruptcy court to this day (the replacement plan trustee is supposed to settle with CKS by March 8, or the matter is set for hearing on March 22). CKS's own witness at the June hearing (Harrell Browning) admitted that it is not possible to make a distribution until the amounts of the claims are settled.

11. <u>Why He Was Attacked</u>. Mr. Kaufman's position has been that he felt CKS's attorneys would not have decided to attack him unless they had a deal with Mr. Feldman – because Mr. Feldman's liability was the big claim of the estate, several times larger than any potential claim that could have been made against former plan trustee. Actions speak louder than words. CKS decided to complain about Mr. Kaufman only after the proposed final report said that Mr. Feldman owed the estate hundreds of thousands of dollars, not less than $225,000 and perhaps approaching a million dollars, because of his failures to pay to the bankruptcy estate the sums promised in the Plan. (Mr. Feldman's personal tax returns, delivered after the report was done, showed hundreds of thousands of dollars in certificates of deposit and treasury bills in his personal accounts, in addition to the hundreds of thousands of dollars in cash in the "Feldman Group" entities discussed in the report itself, so the amount might have been even higher. Mr. Kaufman pointed out that these cash amounts were not previously disclosed to creditors.) Mr. Kaufman contends that the major consequence (evidently intended) of CKS's path, since its new counsel came on board just before May 1, 2001, has been to insulate Mr. Feldman from having to answer for what he did with these funds and why he has them when he promised to pay his income to creditors for five years. It is perhaps not necessary to rule on this contention. But one can safely say that Mr. Kaufman was in fact diligently prosecuting his pursuit of Feldman money at the time that CKS's attacked his conduct of the matters of the estate.

12. <u>Effect of Attack</u>. When Mr. Rosenstein began to represent CKS on or after April 27, 2001, it was eleven years after the case began, nine years after Plan Trustee was involved, and six years after CKS bought the FDIC's claim. This caused a major change in the direction of the case. CKS showed no interest in the million-dollar claims against Mr. Feldman and his relatives. The only issue that CKS wanted to look at was the possibility of alleging a wrong on the part of the Plan Trustee. CKS helped block the discovery that Plan Trustee had a right to get, and asserted identical positions with Mr. Feldman on all issues after Mr. Rosenstein came into the case. (Most of the documents which Plan Trustee asked for in discovery were never ruled on by the Court – though some were, and became the basis of the adversary complaint filed by Mr. Kaufman against the Feldmans – because Mr. Feldman and Mr. Rosenstein asked that the documents not have to be furnished until a new plan trustee was appointed, who might decide not to prosecute those claims.) CKS's opposition to discovery of the Feldmans' liabilities came even though the plan provided for the Plan Trustee to get this data without requiring the adversary proceeding that Plan Trustee finally resorted to. CKS has not publicly revealed any good (or bad) reason why its attorneys would want to try to avoid recovery from Mr. Feldman in favor of attacking Mr. Kaufman.

13. <u>Plan Standard</u>. The plan requires actual bad faith or gross negligence before any wrong by the plan trustee can be complained of. Sec. 7.5. Essentially, an intentional tort is

-10-



required.

14.  <u>Intended to Do Right</u>.  Although CKS continues to claim that the former plan trustee committed wrongs; the evidence does not support this.  The Court said that, transcript of its ruling in June of 2001, on p. 6, at lines 11 - 17: "So while there's nothing illegal and I think there's no question that the drafters of this plan and the creditors that negotiated this plan in the beginning contemplated that the plan trustee as he was hired would do that, the trustee then has the fiduciary duty to be aware of all of the potential pitfalls that might occur as a result of that."

A.  <u>Secrecy</u>.  CKS took the position that Former Plan Trustee must have been doing something wrong because he was hiding things.  But the court has pointed out the evidence did not support that.  ("So I think there is no credence to the position that the plan trustee was somehow hiding everything." Tr., p. 9, lines 9-11.)  In fact, it was the Former Plan Trustee who insisted on reopening the case when Mr. Feldman tried to keep it closed.  If former plan trustee had thought he had done anything wrong, he would have been content to let the case stay closed.  He obviously thought he was doing the right thing.

B.  <u>Waited</u>.  Former plan trustee waited for many years before taking any payments for anything.  That's fairly conclusive evidence of non-greed.

15.  <u>Segregating Funds</u>.  CKS claimed that disputed funds were not kept segregated. There were two trust accounts, one a money market account for only Feldman estate funds, and one an IOLTA account into which trust funds were placed to segregate them from law office funds.  There is no dispute that trust funds were always kept segregated from general funds. CKS really meant to complain that IOLTA accounts are illegal, though the plan allowed use of such bank accounts as the plan trustee deemed appropriate; or else CKS meant to complain that trust funds could not have been used to pay plan trustee fees.

16.  <u>Legal to Pay the Trustee</u>.  CKS did expressly claim that payments to former plan trustee were unauthorized.  But the plan provided for the former plan trustee to pay himself.  Sec. 7.3 generally gave authority to "make the payments and/or distributions under the Plan" while Sec. 9.2.4 said that the reorganized debtor's post-petition attorneys fees would be dealt with as follows: "If no approval by the Bankruptcy Court is required, the Plan Trustee shall pay such amounts to counsel for the Debtor.  In the event such approval is required, the Plan Trustee shall, upon approval, pay the amounts as approved by the Bankruptcy Court."

A.  <u>Making a Dispute</u>.  CKS tries to manufacture a wrong, by alleging there was a "dispute" over the right to pay trustee fees.  But any alleged "dispute" as to Plan Trustee's right to pay himself his fees came too late.  The first time that any person ever alleged that the Plan Trustee's fees would not ALL come out of the bankruptcy estate funds before any creditor could take any money was after Mr. Matt Rosenstein was hired to represent CKS.  There was NO DISPUTE before he came along.  He came along after the proposed final report, cerca April 26, 2001.  The funds were distributed to pay fees BEFORE Mr. Rosenstein was on the case.



B.  <u>Claim Merely Colorable, Rather than Real</u>.  There never was a real "dispute" anyway.  The efforts to manufacture a "dispute" don't work.  Administrative expenses are a debt (i.e., a "legal obligation") of a bankruptcy estate entitled to priority over ordinary creditors (the only kind remaining in the case, now that Parkwell sold its collateral and has no secured claim). The Bankruptcy Code REQUIRES payment of Plan Trustee's fees IN FULL before CKS could, ever have any claim to ANYTHING.  *See e.g.*, Sec. 507(a)(1) (administrative expenses have first priority in payment), Sec. 1129(a)(9) (can't confirm a plan unless administrative expenses are guaranteed payment in cash); and see the legislative history to Sec. 1129(b) (section intended to codify the "absolute priority" rule by which over objection by any class of claimants, no plan can ever be confirmed unless all claimants with a higher priority in payment get paid in FULL before lower priority classes get ANYTHING.  This Plan did not try to evade the statutory rule.  CKS never cited a single authority or provision in the plan to support its alleged claim of a "dispute" with the rules of these sections of the statute – rules which have gone basically unchanged for hundreds of years.  CKS's claim of a "dispute" was never anything more than merely colorable.

C.  <u>What Court Ruled</u>.  The Court's opinion of last June stated that the Plan Trustee could pay himself, tr. p. 5, lines 4-15, and (much more reluctantly) also indicated that he could have been paid in advance of work done, tr. p. 11, line 19-21 ("there's nothing in the plan that would have prohibited the trustee from having a set fee over a period of time and I guess that could have been done").

D.  <u>Fees Earned</u>.  And the Plan Trustee had earned fees well in excess of what he was paid, before CKS's new counsel ever did any work on the case.  Thus no legal wrong did nor could have existed, assuming that CKS's position was right that payments exceeded the outstanding bill for a few months beginning in 2000 (an analysis based on raw data, and not the corrected bill, which is higher -- and which, as Mr. Kaufman pointed out on February 22, still did not include all the work he knew had been done in the case.)

17.  <u>Giving Copies</u>.  Mr. Rosenstein's complaint that he was entitled to a free copy (which he wasn't) and that he didn't get a copy of the fee bill from Mr. Kaufman, he had to get it from Barbara Kurtz is unfounded.  Mr. Rosenstein got a copy of the fee bill at the same time (say, about ten minutes later) as one was delivered to Ms. Kurtz.  And as stated in court, these were made and delivered as soon as Mr. Kaufman got back from Delaware.

18.  <u>Benefits to the Estate</u>.  At the hearing on February 22, 2002, the former plan trustee's testimony was that his service conferred benefits exceeding $2.25 million on the estate.  See his proffered testimony at that hearing, for a more complete list of these.  So there would be unjust enrichment if he were not now allowed to have the full amount of his fees and expenses.

A.  <u>Confirmed a Plan</u>.  A plan could not even have been confirmed, absent someone being willing to serve as plan trustee.  Nobody else was willing to take on the job.  Mr. Kaufman's service accordingly led directly to these benefits:

R3597

(1). $1 Million in Going Concern Value. Because Mr. Kaufman's service enabled a plan to be confirmed and the businesses to continue, cerca $1 million in value was made or preserved for the Feldman interests. This does not count the value of Feldman Valley-Wide, Inc., just the value of the enterprises to which the bankruptcy estate could look for payment -- Feldman Real Estate, Inc. (FREI), Feldman Rentals, Clara Feldman Properties.

(2). $50,000 Cash. Because Mr. Kaufman's service enabled a plan to be confirmed, Feldman Valley-Wide, Inc. paid $50,000 out of future income to the bankruptcy estate. This was in addition to (and even if there were no) profits earned by the Feldman group during the plan term. (Not only did Mr. Kaufman's service allow this benefit, he had especially suggested this term prior to the confirmation of the plan, while he was still examiner.) This was a benefit in this amount.

(3). Parkwell. Another significant benefit of confirming the plan was the settlement with Parkwell which was embodied in it. Parkwell avoided claims for millions of dollars in contributions as a result of this settlement; and the bankruptcy estate avoided six-figure attorneys fees in litigating with Parkwell.

   B. Good Performance. Other benefits were bestowed because of how former plan trustee carried out his duties.

(4). $200,000 on Bank Stock. Because Mrs. Kaufman, and then Mr. Kaufman, went over the schedules and checked them against the invoices, it was discovered that bank stock had not been sold. Mr. Kaufman got Mr. Feldman to get a value for it from the bank. He told Mr. Feldman to sell it. Although scheduled for $15,000, the bank stock sold for over $200,000; and the net received by the bankruptcy estate for administrative expenses and creditors (after Mr. Feldman deducted reserves for taxes and expenses) was over $148,000.

(5). $1 Million in Feldman Interests' Liability. The Feldman interests' liabilities for failing to carry out their promises to pay over 5 years of income to the estate can be figured as the amount of value the estate gave up in exchange for that promise (restitution liability). Using that measure of damages, the adversary proceeding claimed cerca $1 million in damages from the Feldman interests on behalf of the estate. Despite efforts by CKS's counsel to keep the former plan trustee from asserting these claims on behalf of the estate, the adversary was filed in time to keep limitations from barring any claims the estate had against the Feldman interests. That's a million dollar benefit to the estate. Although persons have said the former plan trustee cannot recover for this benefit, because they removed the former plan trustee; the law is clear that prevention of performance excuses it, and because of the removal, former plan trustee must now be treated as having fully earned the benefits to which bringing in that $1 million would entitle him. See Secs. 570-571, 3 Corbin on Contracts (3d Ed. 1964).

(6). Realty Commissions. Although the estate properties were listed with a real estate agent at one time; Mr. Kaufman sold the Goad-Thieme farmland, the Padre Island

-13-

R3598

about an additional $176,226, beyond what he has received already. That does not count the time spent answering the objections of Mike Schmidt and Matt Rosenstein, nor the time spent preparing for and in the hearing of February 22, 2002, nor the time spent on this memo, which former plan trustee is willing to forego (i.e., to settle his fees to date, but without giving up the right to claim more if there is significant future work required of him in the finishing out of this case. This is a small amount compared to Mr. Feldman's liabilities for failing to distribute and pay over funds to the bankruptcy estate.

       B. <u>Scorched Earth; Dividend for Creditors</u>. Also: Suppose, despite the scorched earth tactics of one creditor in particular, which has eaten up so much in terms of attorneys fees and expenses, the Court wants some assurance that unsecured creditors get some dividend. Then that's premature, and the Court should revisit the issue after the claims against Mr. Feldman are disposed of.

       C. <u>Millions</u>. <u>Mr. Feldman</u> borrowed millions of dollars that were never repaid to the banking system. P. 44-46, proposed final report ($7.377405 million in claims). He <u>has kept more than a million dollars that was never paid over to the bankruptcy estate.</u> The plan did not contemplate that he would significantly increase his wealth during the plan term. But he did. The complaints against the former plan trustee were intended to (or at least had the effect of) cutting off the pursuit of any of these millions. Mr. Kaufman's efforts being cut off in midstream, he should be compensated as though he had completed his work. His fees and expenses should all be allowed.

Thanks very much for your time.

                Respectfully submitted,

                Colin Kelly Kaufman
                (former plan trustee)

<u>Certificate of Service</u>

    I certify that I had one of the personnel at this law office serve a copy of the foregoing writing by U.S. mail, first class postage prepaid, to the persons shown on the attached service list, this 5th day of March, 2002.

                Colin Kelly Kaufman

-15-

## FELDMAN SERVICE LIST

Mr. Charles B. Feldman
Charles Feldman Investments
926 Lantana Street
Harlingen, TX 78550-8080

Office of US Trustee
Wilson Plaza Building
606 N. Carancahua
Corpus Christi, TX 78476

Ms. Nancy Holley
Assistant US Trustee
515 Rusk, #3516
Houston, TX 77002

Christopher M. Weil
Weil & Petrocchi, P.C.
1601 Elm Street, #1900
Lock Box 100
Dallas, TX 75201

Colin Kelly Kaufman
P.O. Box 1662
Corpus Christi, TX 78403-1662

Ronald A. Simank, Esq.
615 N. Upper Broadway, #2000
Corpus Christi, TX 78477

Al White, CPA
2202 Treasure Hills Blvd.
Harlingen, TX 78550

MBNA America
c/o Becket & Watkins
P.O. Box 512, Dept. N
Malvern, PA 19355

James P. Moon, Esq.
2642 Brenner Drive
Dallas, TX 75220

Richard G. Grant
3102 Oak Lawn Avenue, #700
Dallas, TX 75219

Matthew A. Rosenstein
American Bank Plaza, #420
711 N. Carancahua
Corpus Christi, TX 78475

Mike Schmidt, Esq.
712 American Bank Plaza
711 N. Carancahua
Corpus Christi, TX 78475

R3601

152. 07/13/01 — Letter from Hon. Keith P. Ellison, U.S. District Judge re: letter to notify you that a complaint has been filed.

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF TEXAS

*Keith P. Ellison*
United States District Judge

P.O. Box 6065
Laredo, Texas 78042
956-726-2242
956-794-1035 Fax

July 31, 2001

Mr. Colin K. Kaufman
Attorney at Law
P.O. Box 1662
Corpus Christi, Texas 78403

Dear Mr. Kaufman:

This letter is to notify you that a complaint has been filed against you in the Southern District of Texas pursuant to Rule 5, Appendix A of the local Rules of Discipline.

This complaint arises out of your service as Plan Trustee of the Charles B. Feldman Chapter 11 estate from September 21, 1992 through June 28, 2001. It charges that: 1) you failed to deliver to CKS Asset Management, Inc., a creditor in the Chapter 11 case, the required semi-annual distribution under the Confirmed Plan despite CKS's written request in 1995; 2) you failed to provide an accounting to CKS, despite repeated requests beginning in 1995 and continuing to the present; 3) having been placed on notice by CKS that it demanded its share of the funds, you violated Rule 1.14(c) of the Texas Disciplinary Rules of Professional Conduct by failing to keep separate the disputed portion of the funds from that portion you claimed as Plan Trustee Fees; and 4) between June 23, 1999 and March 26, 2001, you made unauthorized payments to yourself from the bankruptcy estate in amounts ranging from $8,562.75 to $55,528.41.

You have the right to respond in writing to these charges. Your response should be received by August 15, 2001. After we receive your response, we will decide whether further proceedings are warranted.

Sincerely,

Keith P. Ellison
United States District Judge

RECEIVED
AUG - 3 2001
BY:_____

R 3715

153. 12/06/01 — Letter ruling of Hon. George P. Kazen, Chief United States District Judge (in record as part of Docket #466).





# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

P.O. BOX 1060
LAREDO, TEXAS 78042
(956) 726-2237
Fax (956) 726-2349

GEORGE P. KAZEN
CHIEF U.S. DISTRICT JUDGE

December 6, 2001

Mr. Colin K. Kaufman
Attorney at Law
P.O. Box 1662
Corpus Christi, Texas 78403

Dear Mr. Kaufman:

This letter is to inform you of the status of this Court's review of the disciplinary complaint filed against you by attorney Matthew A. Rosenstein. In accordance with our Rules of Discipline, I appointed Judge Keith P. Ellison as the reviewing judge and his recommendation has been approved by the Court.

As you are aware, this complaint arises out of your services as Plan Trustee of the Charles B. Feldman Chapter 11 estate from September 21, 1992 through June 28, 2001. The complaint charges that: (1) you failed to deliver to CKS Asset Management, Inc., a creditor in the Chapter 11 case, required semi-annual distributions under the Confirmed Plan despite CKS's written request in 1995; (2) you failed to provide an accounting of Plan assets to CKS as required by Texas Disciplinary Rule of Professional Conduct 1.14(b), despite repeated requests beginning in 1995 and continuing to the present; (3) having been placed on notice by CKS that it demanded its share of the Plan's assets, you violated Rule 1.14(c) of the Texas Disciplinary Rules of Professional Conduct by failing to keep separate the disputed portion of the funds from that portion you claimed as Plan Trustee fees; and (4) you violated Texas Disciplinary Rule of Professional Conduct 1.14(a) by paying Plan funds to yourself out of trust.

The Court finds that the first three claims asserted in the complaint against you do not warrant further disciplinary proceedings.



RECEIVED
DEC 1 0 2001
BY:_____
R3716

Page 2
December 6, 2001

The Court has not yet determined whether further disciplinary proceedings are warranted in connection with the fourth claim against you. We will await the resolution of matters currently pending before the bankruptcy court and the State Bar of Texas before reaching a conclusion on this issue. You shall notify me immediately of the bankruptcy court's rulings on matters currently under advisement, including the bankruptcy court's determination of whether the trustee fees charged by you were reasonable, whether you will be required to disgorge any portion of those fees, and whether sanctions against you are warranted. You also shall notify me immediately of any action taken against you by the State Bar of Texas as a result of the disciplinary complaint currently pending against you in that forum. By copy of this letter, attorney Rosenstein, the complaining party, is likewise directed to inform me when the pending matters identified above are resolved.

Sincerely yours,

George P. Kazen

GPK/gs

xc:    Matthew A. Rosenstein
       Law Offices of Matthew A. Rosenstein
       American Bank Plaza, Suite 420
       711 N. Carancahua
       Corpus Christi, Texas 78475

R3717

92.  6/8/01 -- docket #421  Order Granting in Part [413-1] Motion To Compel Production of  Documents by Colin Kelly Kaufman And Continuing Hearing Re: [413-1] Motion To Compel Production of Documents by Colin Kelly Kaufman. Hearing reset for 9:00 6/22/01 at 1133 N Shoreline Corpus Christi . Parties Notified.  (swm) [EOD 06/08/01] [90-1254]

Clerk of the United States Court
Southern District of Texas
FILED

JUN - 8 2001

Michael N. Milby, Clerk of Court

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| IN RE: | |
| Charles B. FELDMAN dba | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. Feldman Investments | |
| Debtor | In Chapter 11 |

### ORDER PARTIALLY GRANTING PLAN TRUSTEE' ORIGINAL OPPOSED EXPEDITED MOTION TO COMPEL PRODUCTION OF DOCUMENTS

CAME ON to be considered the Plan Trustee's Original Opposed Expedited Motion to Compel Production of Documents; and it appearing to the Court that the same ought to be granted in part, and the remainder continued;

It is accordingly therefore hereby ORDERED that Charles B. Feldman, or his agents or representatives, including James Moon and Albert White, shall by the close of business on June 13, 2001 produce to Colin Kelly Kaufman originals or copies of the following documents, to wit:

The individual or joint tax returns for Charles Feldman (and his wife) for tax years 1993, 1994, 1995, 1996, and 1997.

And it is further hereby ORDERED that hearing on the remainder of the relief requested by Plan Trustee in his said Motion to Compel be and hereby is reset for hearing on June 22, 2001, along with other matters set in this case on that date.

So ordered this 8th day of June, 2001.

Hon. Richard S. Schmidt, Esq.
United States Bankruptcy Judge

After entry, copies to:
Charles B. Feldman, Debtor, 926 Lantana St., Harlingen, TX. 78550-8080

-1-

421

R 2067

James P. Moon, Esq., 2611 W. Ovilla Rd., Red Oak, TX. 75154; FAX (972) 617-7910
Matt Rosenstein, Esq., American Bk. Plaza Suite 420, 711 N. Carancahua, Corpus Christi, TX. 78475; FAX (361) 883-5590
Ron Simank, Esq., Schauer & Simank, 615 N. Upper Broadway #2000, Corpus Christi, TX. 78477; FAX (361) 884-2822
C. K. Kaufman, Esq., P.O. Box 1662, Corpus Christi, TX. 78403-1662; FAX (361) 888-8172.
Curtis Bonner, Esq., P.O. Box 288, Harlingen, TX. 78551; FAX (956) 428-0671

R 20628